## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                              Chapter 11

Sky Ventures, LLC                                   Case No. 14-42107-MER

                        Debtor.

---

**NOTICE OF HEARING, MOTION AND MEMORANDUM OF LAW FOR ORDER (I) APPROVING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING REVISION, ASSUMPTION AND ASSIGNMENT OF SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT AND ASSUMPTION AND ASSIGNMENT AND REJECTION OF OTHER LEASES AND EXECUTORY CONTRACTS, (III) APPROVING PROPOSED COMPROMISE; AND IN THE ALTERNATIVE (IV) REJECTING THE SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT; AND (V) FOR OTHER RELATED RELIEF**

---

### NOTICE OF HEARING

1.      Sky Ventures, LLC ("Debtor"), through its undersigned attorneys, respectfully moves the Court (the "Motion"), pursuant to 11 U.S.C. §§ 105, 363, and 365 and Bankruptcy Rule of Procedure 9019(a) for entry of an order ("Sale Order") approving and authorizing (1) the sale of certain property free and clear of liabilities, liens, claims, interests and encumbrances and in connection therewith, (2) the revision of the Second Amended and Restated Master Lease Agreement dated November 26, 2013 ("Master Lease") by and between the Debtor and Spirit Master Funding, LLC to include six specified locations ("Six Locations")[1] only and to delete all other locations, and the assumption and assignment of the Master Lease, as revised, to the Purchaser, and (3) the assumption and assignment and or rejection of other leases and executory contracts, (4) the proposed compromise with Spirit pursuant to Bankruptcy Rule 9019, or in the

---

1 A description of the Six Locations is set forth in Exhibit A.

alternative, (5) if Spirit enters into a new lease with the Purchaser for the Six Locations on terms acceptable to the Purchaser but does not agree to the proposed compromise, the sale of the Assets, and (6) the rejection of the Master Lease, and (7) such other related relief.

2.      The court will hold a hearing on this Motion at **9:00 a.m. on Wednesday June 18, 2014**, before the Honorable Michael Ridgeway, Courtroom 7W, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415.

3.      Any response to this motion must be filed and served not later than June 13, 2014, which is five (5) days (including Saturdays, Sundays and holidays) before the date set for the hearing. Unless a response opposing the motion is timely filed, the Court may grant the motion without a hearing.

## <u>INTRODUCTION</u>

4.      The Debtor was formed in 1999 in order to acquire from Pizza Hut, Inc. ("<u>Pizza Hut</u>") certain store and development rights in the Northern Iowa, Minnesota and Wisconsin markets ("<u>Market Area</u>").   In November 2000, the Debtor acquired from Pizza Hut approximately eighty-five Pizza Hut locations. The Pizza Hut business model at the time of the Debtor's acquisition was primarily a dine-in quick service restaurant concept.

5.      As of December 2013, the Debtor operated seventy (70) units in its Market Area. At these seventy (70) units, fifteen (15) units were leased from Spirit under the Master Lease.

6.      In 2007, Pizza Hut instituted a significant change in its business model restaurant concept.   At that time, Pizza Hut decided to place a greater emphasis on the delivery business and quick pick-up to compete with Dominos and Papa Johns in the market place.   In addition, Pizza Hut expanded its WingStreet (chicken wings) Café concept in its stores.

7.      The change in business focus required franchisees such as the Debtor to make large capital improvements to their Pizza Hut locations to adapt to the new Pizza Hut concept.

Under its Franchise Agreement with Pizza Hut, the Debtor was required to spend between $12 million to $15 million over the next five years to modernize the Pizza Hut locations and to comply with its obligations under its Franchise Agreement.

8.      Between 2007 and 2012, the Debtor spent significant sums to refurbish its existing locations and to install the WingStreet concept in most of its restaurants. The Debtor added WingStreet to sixty-five locations, refurbished five units and developed six new DELCO lite delivery only locations.

9.      The change in the Pizza Hut business model and the addition of WingStreet did not result in a sufficient increase in revenue and profits at the Debtor's locations to warrant further capital investment.

10.     In March of 2013, the Debtor met with Pizza Hut at its headquarters in Plano, Texas to discuss the capital requirements required under its Franchise Agreement.  At the meeting, the Debtor advised Pizza Hut that, based on its financial condition, it would have to suspend all further redevelopment activities required under the Pizza Hut franchise program.  At the conclusion of the meeting, the Debtor and Pizza Hut agreed that the best course of action for the parties would be for the Debtor to sell its Pizza Hut business.

11.     In the first quarter of 2013, the Debtor retained Auspex Capital LLC ("Auspex") to market the Debtor's assets.  Auspex immediately began an extensive marketing campaign for the Debtor's assets.  Auspex solicited bids from interested parties for all the locations or for different groups of locations.

12.     As a result of the marketing campaign and the bids received incident to the sale process, the Debtor accepted an offer from MUY Pizza Minnesota, LLC ("MUY" or "Purchaser") for fifty-four of the locations.  These locations did not include any of the Debtor's

restaurants that were operated under the Master Lease.  However, MUY advised that it would be willing to acquire six stores under the Master Lease with Spirit at the fully allocable rent for the remaining term of the lease of those six stores, and would be willing to acquire three additional stores under the Master Lease with Spirit at 50% of allocable rent.  See Declaration of Christopher J. Kelleher.

13.     The offer accepted by the Debtor from MUY represented the highest and best bid for the fifty-four locations (and potentially for the nine stores subject to the Master Lease).  The Debtor has received no expression of interest for the remaining stores subject to the Master Lease.

14.     In December of 2013, the Debtor successfully completed the sale of the fifty-four units to MUY. A majority of the proceeds of the sale were paid to creditors of the Debtor.  In addition, in order to obtain the consent of Pizza Hut to the transfer of the franchise rights to MUY, escrow accounts were set up with MUY and Pizza Hut to cover: (i) de-identification costs for certain closed stores; and (2) capital requirements under the Franchise Agreement.

15.     The sale also provided that MUY would manage the operation of the nine (9) restaurants under the Master Lease that MUY had an interest in acquiring to allow Debtor and MUY a further opportunity to negotiate with Spirit for the acquisition of these additional stores. Immediately after the closing of the sale of the fifty-four locations, the Debtor contacted Spirit about amending the Master Lease to allow for the sale of the nine units (six subject to original lease terms and three at 50% of allocable rent) and the disposition of the remaining leased units either through sale or return by the Debtor to Spirit.

16.     In late December 2013 or January 2014, the Debtor furnished financial information to Spirit in an attempt to start a dialogue that would result in the restructuring of the

Master Lease to allow MUY to acquire either six or nine units.  Spirit, however, refused (and still refuses) to meet with the Debtor in person to discuss the restructuring of the Master Lease to allow a sale of the locations to MUY.

17.    After completion of the divestiture of the 54 units in December 2013, Sky's remaining portfolio consisted of 22 Pizza Hut restaurants and one KFC/Pizza Hut co-branded site.  In January, 2014, the Debtor closed down restaurant operations at a number of negative cash flowing non-Spirit locations and continued its efforts to sell its remaining operating stores.

18.    In April, 2014, after failing to engage Spirit in negotiations, the Debtor began to close the negative cash flowing Spirit units.  In late April, MUY informed the Debtor that it was no longer interested in the three Spirit units it had offered to acquire at a 50% rent factor.  The Debtor then closed those units as they were also experiencing negative cash flow.  The only units that presently remain open are the Six Locations under the Master Lease, which MUY has offered to purchase at the rent attributable to those locations provided in the Master Lease.

19.    MUY has entered into an agreement to purchase the business operations of the six operating Pizza Huts which are subject to the Master Lease (i.e. the Six Locations). A copy of the Purchase Agreement is attached as **Exhibit A**.  The sale is contingent on the stores being transferred as going concerns and MUY obtaining lease rights to the Six Locations on terms acceptable to it.  MUY is willing to pay the rent allocated to the Six Locations for the remaining term of the lease on the same terms and conditions as contained in the Master Lease (i.e., the existing triple net lease terms with respect to allocated rent, term, rent escalations, option periods, insurance requirements, sub-lease restrictions etc. with respect to those six stores). The "lease portion" of the proposed transaction can be effected either through (1) a revision of the Master Lease to cover only the six operating stores and deleting the other locations and an

5

assumption and assignment by the Debtor of the revised Master Lease to MUY, or (2) a rejection

of the Master Lease by the Debtor and MUY, with  Spirit entering into a new lease with MUY

for the Six Locations on the existing triple net lease terms with respect to allocated rent, term,

rent escalations, option periods, insurance requirements, sub-lease restrictions etc. with respect to

those six stores.

20.     There is no buyer for the other nine non-operational Pizza Huts under the Master

Lease.  The Debtor closed the nine units prior to the filing of the petition inasmuch as the units

operated on a negative cash flow basis.

21.     In summary, MUY, as the proposed Purchaser, will purchase the business

operations and related assets at the operating six Pizza Huts (the Six Locations) free and clear of

any liabilities liens, claims, interests and encumbrances, if it can either (a) assume the Debtor's

obligations under a revised Master Lease affecting only those six Pizza Huts and deleting the

other locations or (b) timely enter into a new lease with Spirit for the Six Locations on terms and

conditions acceptable to MUY and  essentially on the same terms as presently provided in the

Master Lease with respect to those Six Locations. MUY will not purchase the other nine Pizza

Huts or have any liability for any obligations (including any lease obligations) with respect to

those nine Pizza Huts.

22.     By this Motion, the Debtor moves pursuant to sections 363 and 365 of the

Bankruptcy Code for an order authorizing the Debtor to sell the business operations of six Pizza

Huts to MUY for the aggregate sum of $951,473.00, and in connection therewith, (a) to revise

the Master Lease to cover only the Six Locations  and deleting the other locations, and  assume

and assign the revised Master Lease to MUY (b) if Spirit is unwilling to revise the Master Lease

as proposed , but is willing to timely enter into a new lease for the Six Locations with MUY, the

Debtor proposes to reject the entire Master Lease. In any event, unless the Master Lease is revised as proposed to cover only the Six Locations and delete all other locations (which will obviate any need for rejection, as the lease will be voluntarily revised) and is thereafter assumed and assigned to MUY, since there is no buyer for the other nine locations, the Debtor seeks to reject the Master Lease.

23.    In connection with this proposed sale, if either (a) Spirit consents to the revision of the Master Lease to cover the Six Locations and to delete all  other locations (which will obviate the need for any rejection of the Master Lease as it will be voluntarily amended), and to the assumption and assignment of the revised Master Lease to MUY, or (b) Spirit timely  enters into a new lease with MUY for the Six Locations and agrees to settle all of its  claims against the Debtor's estate as part of the transaction, the Debtor proposes to pay Spirit $400,000 out of the net proceeds from the sale in consideration for , and/or in settlement of, as applicable, (1) any and all cure costs due upon assumption and assignment of the Master Lease, as revised, pursuant to 11 U.S.C. §365(b)(1)(A) or otherwise, (2) any prepetition rejection unsecured claims, (3) revising the Master Lease to cover only the Six Locations and deleting all other locations, or entering into a new lease with MUY for the Six Locations, and (4) waiving any and all other claims possessed by Spirit against the Debtor in the Chapter 11 case or otherwise, *provided however* that if Spirit and the Purchaser enter into a new lease for the Six Locations by June 30, 2014, but Spirit does not agree to the proposed compromise described in this paragraph, the Debtor nonetheless proposes to proceed with the sale of the Assets to MUY and reject the Master Lease with Spirit reserving all rights and claims  it has against the Debtor and the Debtor reserving all defenses to any such claims.  Stated otherwise, Sprit may agree to revise the Master Lease as stated as part of the sale process and will be paid $400,000. Alternatively, if Spirit

timely agrees to a new lease of the Six Locations to MUY, Spirit can choose to either settle all of its claims arising under the Master Lease as proposed and be paid $400,000, or reserve its rights and claims against the Debtor.

24.     The Debtor is provisionally willing to keep the six stores operating to see if an agreement for the transfer to MUY of the Six Locations can be reached. The Debtor believes the Court should appoint a mediator in an attempt to work out an agreement between the parties. Due to the rental payment obligations imposed on the Debtor under the Master Lease, if Spirit does not promptly agree to either a revision of the Master Lease as proposed or to enter into a new lease with MUY for the Six Locations, keeping the stores open past June 30, 2014 is not in the best interests of the estate.

25.     If Spirit does not timely agree to revise the Master Lease (to cover only the Six Locations and delete the other locations,(which will obviate the need to reject the Master Lease) and allow the assumption and assignment  of the revised Master Lease to  MUY on the terms set forth above, the Debtor moves to reject the Master Lease in its entirety as burdensome to the estate. See, e.g. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 567, n. (8th Cir. 1997) and *In re Crystallin, LLC*, 293 B.R. 455, 463 (8th Cir. BAP 2003).  If the Master Lease is rejected, the Debtor will still go forward with the sale if MUY can timely enter into a new lease agreement with Spirit covering the Six Locations.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§105, 363, 365, 1107 and 1108 and Rules 2002, 6004, 6006 and 9019(a) of the Federal Rules of Bankruptcy Procedure.

## GENERAL BACKGROUND

27.     On May 14, 2014, the Debtor filed with this Court its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 case of the Debtor**.**

28.     The Debtor owns and currently operates six (6) restaurants under the name "Pizza Hut."  The restaurants are located in the Minneapolis market. The Pizza Hut restaurants operated by the Debtor are all situated on leased premises pursuant to the Master Lease. The Debtor owns all of the furniture, fixtures and equipment in the restaurants.

29.     The Debtor's Marketing Efforts in connection with the sale of its assets are set forth in the accompanying Declaration of Christopher J. Kelleher.

## TERMS OF THE PROPOSED SALE

30.     A summary of the terms of the proposed sale of the six Pizza Huts to MUY is as follows:[2]

(i)     **Assets to be purchased**: Purchaser has agreed, among other things, to purchase six of the Debtor's restaurants, and all equipment and goods and intangibles related thereto or necessary to their continued operation, as well as trademark and franchise rights, and cash (collectively, the "Assets") and assume the Debtor's responsibilities for rent and other obligations on the Six Locations (or enter a new lease with Spirit on the Six Locations) free and clear of any other liabilities, liens, claims, interests and encumbrances;

(ii)    **Purchase Price**:  The Purchase Price for the Assets is (a) an amount equal to $951,473.00; (b) plus the amount of the Cash Banks as described in Section 2.4 of the Purchase Agreement; (c) plus the amount payable for

---

[2] This section is intended as a summary.  For a full recitation of all terms and conditions, parties should consult the Asset Purchase Agreement. In the event of any conflict between the terms set out in the Motion and the Asset Purchase Agreement, the Agreement shall control.  In the event of any conflict between the terms of the Asset Purchase Agreement and any order of this Court approving the sale of the Assets, the order shall control.

the Inventory as described in Section 2.4 of the Purchase Agreement; (d) plus any prorated amounts payable by Buyer under Section 2.5.2(a) of the Purchase Agreement; minus any prorated amounts payable by Seller under Section 2.5.2(c) of the Purchase Agreement; (e) plus the amount of any deposits held by landlords under the Six Assumed Leases; and (f) subject to reduction for the payments to Spirit as set forth in subjection (iv) below (the "Net Sale Proceeds");

(iii)   **Rejection, Cure and Settlement Amounts (if applicable)**: From the Purchase Price, the Debtor will pay Spirit $400,000 in consideration for and in full settlement of, as applicable, (1) any cure amounts due in connection with the transaction, and any prepetition rejection unsecured claims of Spirit, (2) revising the Master Lease to cover the Six Locations and deleting all other locations, or entering into a new lease with MUY on the Six Locations, and (3) in full compromise of  all other claims possessed by Spirit against the Debtor in  the Chapter 11 case or otherwise.

(iv)   With respect to other contracts which are to be assumed pursuant to the definitive Asset Purchase Agreement (the "Purchase Agreement"), the Debtor will also cure any other Cure Costs (defined below) owed to counterparties to the Assumed Contracts (defined below);

(v)   **Purchase Agreement**: Subject to Court approval, the Debtor and Purchaser will enter into a Purchase Agreement, a copy of which is attached hereto as Exhibit "1"; and

(vi)   **Closing**: if the sale transaction has not closed by June 30, 2014 (subject to any extension as provided in the Purchase Agreement), and for any other reason set forth in the Purchase Agreement, either party may terminate the Purchase Agreement.

## RELIEF REQUESTED

31.   This Motion seeks entry of the Sale Order authorizing (1) the sale of certain property free and clear of liabilities, liens, claims, interests and encumbrances and in connection therewith, (2) the revision of the Master Lease to include the Six Locations only and to delete all other locations, and the assumption and assignment of the Master Lease, as revised, to the Purchaser, and (3) the assumption and assignment and or rejection of other leases and executory contracts, (4) the proposed compromise with Spirit pursuant to Bankruptcy Rule 9019, or in the alternative, (5) if Spirit enters into a new lease with the Purchaser for the Six Locations on terms

acceptable to the Purchaser but does not agree to the proposed compromise, the sale of the Assets, and (6) the rejection of the Master Lease.

## BASIS FOR RELIEF

I.      **Approval of the Sale and Assumption and Assignment of Leases and Contracts and Rejection of Leases is Appropriate**

      A.      **Sound Business Reason Exists for the Sale of the Assets**

32.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

33.     A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so.  *See Stephens Indus. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [Section] 363(b)(1) when a sound business purpose dictates such action."); *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F. 3d 380, 387 (2nd Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *Comm. Of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F. 2d 1063, 1071 (2nd Cir. 1983); *In re Chateaugay Corp.*, 973 F. 2d 141, 143 (2nd Cir. 1992); *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

34.     Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  *See, e.g., In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 101-02 (Bankr. E.D. Mo. 1990).

35.     Here, each of the preceding four factors has been satisfied.  First, a sound business justification exists for the sale of the Assets. The Debtor currently has inadequate liquidity to continue operating all fifteen locations. The Debtor has actively marketed all fifteen of its Pizza Hut locations and there is no buyer for all fifteen. MUY has made the highest and best offer to purchase six Pizza Hut stores, but will not buy the other nine Pizza Huts.  Therefore, since the Debtor cannot operate all fifteen Pizza Huts profitably, the Debtor seeks authority to sell the six stores for which there is a buyer. If the sale of the Assets does not occur, the Debtor will have no choice but to close down the six locations that remain open, which clearly is not in the best interest of the Debtor's estate and creditors. Therefore, a sound business reason exists for the sale of the Assets. Second, the Debtor is providing adequate and reasonable notice to interested parties of the opportunity to object to the sale of the Assets and related transactions. The Debtor will mail a notice containing a description of the Assets, the Six Locations to be conveyed to MUY and the  deleted locations, and the relevant terms and conditions of the sale (including the proposed compromise), the hearing date for the Motion to approve the sale of the Assets and the related transactions, and the date for objecting to the sale of Assets and related transactions to the entire mailing matrix, including but not limited to all interested parties,

lienholders, lessors and counterparties to executory contracts, taxing authorities, and the United

States Trustee. Such notice will constitute adequate notice of the proposed sale of the Assets and

the related transactions. *See, e.g., In re WBQ Partnership*, 189 B.R. 97, 103 (Bankr. E.D. Va.

1995) ("notice is sufficient if it includes the terms and conditions of the sale, if it states the time

for filing objections, and if the estate is selling real estate, it generally describes the property")

(quoting *In re Karpe*, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).  Third, the Debtor has actively

marketed all fifteen of its Pizza Huts and believes the price being offered for the Assets is fair

and reasonable.  Fourth, the Debtor is proceeding in good faith and will make a showing at the

Sale Hearing that the Purchaser of the Assets has acted in good faith.  Courts generally conclude

that parties have acted in good faith with respect to a proposed sale if the purchase price is

adequate and reasonable and the terms of the sale are disclosed fully.  *See, e.g., In re Abbotts

Dairies of Pa., Inc.*, 788 F. 2d 143, 149-50 (3rd Cir. 1986).  Thus, the sale of the Assets proposed

herein should be approved.

> ### B. The Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests

36.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in a bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  In addition, a court may authorize the sale of a debtor's assets free and clear

of any liens, claims, or encumbrances under Section 105 of the Bankruptcy Code.  *See Volvo*

*White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R.

944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is

within the court's equitable powers when necessary to carry out the provisions of Title 11.").

Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements

enumerated therein will suffice to warrant the Debtor's sale of the Assets free and clear of all

interests and claims. *See In re James,* 203 B.R. 449, 453 (Bankr. W.D.Mo. 1997); *Citicorp*

*Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

37.    The Debtor submits that each interest and claim that will not be an assumed

liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and

that any such interests and claims will be adequately protected by either being paid in full at the

time of closing, or by having it attach to the Net Proceeds of the sale, subject to any claims and

defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority

to convey the Assets to the Purchaser, free and clear of all liabilities, liens, claims, interests and

encumbrances, with such liabilities, liens, claims, interests and encumbrances to attach to the Net

Sale Proceeds of the sale.

### C.    The Sale Will Be Made In Good Faith Under Section 363(m) of the Bankruptcy Code

38.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the

appeal, unless such authorization and such sale or lease were
stayed pending appeal.

U.S.C. § 363(m).

39.     Although the Bankruptcy Code does not define "good faith purchaser," courts interpreting Section 363(m) of the Bankruptcy Code have held that "the requisite misconduct necessary to establish a lack of good faith involves 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *In re AFY*, 734 F.3d 810, 818 (8th Cir. 2013) (quoting *In re Burgess*, 246 B.R. 352, 356 (8th Cir.BAP 2000) (quoting *In re Rock Indus. Mach. Corp*., 572 F.2d 1195, 1198 (7th Cir.1978))); *see also, Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990). *In re Sasson Jeans, Inc*., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Asocs., Ltd*., 706 F. 2d 301, 305 (10th Cir. 1983)).   Yet, because there is no bright line test, courts examine the facts of each case by concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Machinery Corp.*, 572 F. 2d 1195, 1198 (7th Cir. 1978)); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F. 2d 143, 147 (3rd Cir. 1986) ("The requirement that a purchaser act in good faith…speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (citations omitted).

40.     The process by which the Debtor intends to sell the Assets is designed in a manner intended to preserve the going concern value of the Assets and to avoid the certainty of realizing only the liquidation value of the Assets should the six restaurants that remain open shut down.  Accordingly, under the circumstances, the Debtor submits that the purchase price is the

highest price achievable for the Assets. To facilitate the transactions, the Debtor will be prepared to present evidence of such good faith at the Sale Hearing.

41.     In connection with the proposed sale of the Assets and the related transactions, the Debtor requests that the Sale Order: (i) bar any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), or any liens or interests of any kind or nature against Purchaser and any affiliate or interest holder thereof, or any affiliate, officers or agent of any of the foregoing, that arose prior to Closing; (ii) provide that the Sale Order is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Section 1104 of the Bankruptcy Code or pursuant to Sections 701 or 702 of the Bankruptcy Code if the Debtor's bankruptcy case is converted to a case under chapter 7 of the Bankruptcy Code; and (iii) provide that except as otherwise agreed by the parties, the rights and obligations of the parties created under the Purchase Agreement and the Sale Order shall not be altered, modified or impaired by the terms of any plan or order confirming any plan, and shall survive confirmation of a plan and closing or dismissal of the Debtor's bankruptcy case.

**D.     The Revision, Assumption and Assignment of the Master Lease Or Rejection of the Master Lease is Appropriate**

42.     Section 365(a) of the Bankruptcy Code provides in relevant part that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Bankruptcy courts use the business judgment standard to determine whether to approve assumption and rejection of leases. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 567, n. 16 (8th Cir. 1997); *see also In re Crystallin, LLC*, 293 B.R. 455, 463 (8th Cir. BAP 2003). This decision entails a "determination that the transaction is in the best interest of the estate." *Id.; see also Crystallin*, 293 B.R. at 464.

16

43.     The Debtor has determined through an exercise of its business judgment that it is in the best interest of the Debtor's estate to revise the Master Lease to cover the Six Locations and delete all other locations, and to assume and assign the revised Master Lease to the Purchaser.  The assumption and assignment of the revised Master Lease (or the entry of a new lease by MUY and Spirit for the Six Locations) is a condition to the sale of the Assets; otherwise, the Purchaser will not purchase the Assets.

44.     Further, the assumption and assignment of any other executory contract listed on Schedules 1.3.2 and 3.16.1 of the Purchase Agreement (the "Assumed Contracts") is in the best interest of the Debtor's estate. The Purchaser requires the assumption and assignment of the Assumed Contracts to continue operating the restaurants as Pizza Hut franchise. The Purchaser will cure any pre-petition amounts owed to the counterparties to the Assumed Contracts; thus, the Debtor will avoid exposure to significant rejection claims.

45.     Pursuant to Section 365, the Debtor may assume and assign a contract or lease by providing for cure of any defaults, compensating the counter party for any pecuniary loss resulting from any defaults, and by demonstrating adequate assurance of future performance. The proposed compromise with Spirit will constitute a cure of any default under, compensation for any pecuniary loss, and adequate assurance of future performance with respect to, the revised Master Lease. With respect to any other leases or executory contracts to be assumed and assigned in connection with the proposed sale of Assets, prior to the hearing on the sale of the Assets, the Debtor shall serve a notice (the "Assumption Notice") on the applicable counterparty of the potential assumption and assignment of a executory contracts and unexpired leases that are anticipated to be assumed or assumed and assigned to the Purchaser the amount of any and all costs, expenses or actions that the Debtor is required to pay or perform to assume and assign any

of the Six Locations and Assumed Contracts pursuant to Section 365(f) of the Bankruptcy Code (the "Cure Cost"), if any; provided however, if the Debtor identifies additional executory contracts and unexpired leases that with the consent of the Purchasers, might be assumed and assigned to the Purchaser, the Debtor will promptly send a supplemental Assumption Notice to the applicable counterparties to such contract or lease. If a counterparty or lessor to the Six Locations and Assumed Contracts objects to the assumption and assignment of its lease or executory contract or to the Cure Cost, it can file an objection thereto in accordance with the notice of the hearing on the proposed sale of the Assets and the related transactions.

46.    The Debtor has provided for a process to allow a cure of defaults in contracts and leases to be assumed and assigned, and the Purchaser can adequately perform all of the obligations of any assigned contracts. Accordingly, the Debtor requests that the court also enter findings that: (i) all defaults of the Debtor under each such assumed or assumed and assigned executory contract or unexpired leases (including the Six Locations) shall be deemed cured with respect to each such assumed or assumed and assigned executory contract or unexpired leases, (ii) no remaining Cure Costs are due and owing and there is no compensation due for any actual pecuniary loss, (iii) there is adequate assurance of future performance with respect to each such assumed or assumed and assigned executory contract or unexpired leases, (iv) such assumption or assumption and assignment is in the best interest of the Debtor and its estate, (v) upon entry of the order, the assumed or assumed and assigned executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, (vi) the counter party to each assumed or assumed and assigned executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed or assumed and assigned executory contract or unexpired lease; (vii) the performance of each such assumed

or assumed and assigned executory contract or unexpired lease will be the responsibility of the

Purchaser pursuant to 11 U.S.C. §363(k) and the Debtor shall have no further obligations

thereunder; and (viii) that any and all unexpired leases and executory contracts not listed on the

Assumption Notice shall be deemed rejected by the Debtor.

47.     As noted, unless the Master Lease is revised to cover only the Six Locations and

to delete all other locations (which will obviate any need to reject the Master Lease), and then

assumed and assigned to MUY the Debtor has determined through an exercise of its business

judgment that it is in the best interest of the Debtor's estate to reject the Master Lease. Under

those circumstances, by rejecting the Master Lease, the Debtor will be relieved from paying the

rent, as well as certain other attendant expenses, thereby avoiding incurring unnecessary

administrative charges that provide no tangible benefit to the Debtor's estate.

**II.     Proposed Compromise with Spirit is Appropriate Under Bankruptcy Rule 9019**

48.      From the Purchase Price, the Debtor proposes to pay Spirit $400,000 in full

settlement of, and in consideration for, as applicable, (1) any cure costs and any prepetition

rejection unsecured claims, (2) revising the Master Lease to cover only the Six Locations and

delete all other locations, or entering into a new lease with MUY for the Six Locations, and (3) in

settlement and compromise of all other claims possessed by Sprit against the Debtor in the

Chapter 11 case or otherwise. The Debtor's proposal is intended to be a compromise of disputed

rights and claims under the Bankruptcy Code and the Master Lease. There is no assurance that

Spirit can be forced to "break apart" the fifteen leases under the Master Lease in order to allow

the assumption and assignment of the Six Locations. Nor is there any assurance that Spirit can be

forced to allow a partial rejection under the Master Lease to allow the rejection of the other nine

locations (rather than all fifteen (15)), in order to allow an assumption of the Six Locations. Yet,

the proposed sale of Assets can only be implemented on terms which require the transfer to MUY of the Six Locations and the elimination of all other locations.

49.     Because of the complexities of the legal issues and the certainty of delay and damage to the estate if this transaction is not promptly approved because of litigation over the respective rights of the parties, and in compromise of those disputes, if Spirit agrees to the proposed transactions and to the compromise proposed in this Motion, the Debtor requests Court authority under Bankruptcy Rule 9019 to compromise any and all such disputes with Spirit and to pay to Spirit at the closing of the sale $400,000 in full settlement of, and in consideration for, as applicable, (1) any cure costs and any prepetition rejection unsecured claims, (2) revising the Master Lease to cover only the Six Locations and deleting all other locations, or entering into a new lease with MUY for the Six Locations, and (3) in full compromise of any and all other claims possessed by Sprit against the Debtor in the Chapter 11 case or otherwise.

50.     "…[T]o be approved, a settlement need not be perfect, it must merely 'not fall below the lowest point in the range of reasonableness'" *In re Petters Co., Inc.,* 455 B.R. 166, 175 (B.A.P. 8th Cir. 2011). "…[A] bankruptcy court evaluating a proposed settlement must consider 'all of the factors bearing on the fairness of the settlement including: "(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."' *In re Petters Co., Inc.*, 455 B.R. 166, 175 (B.A.P. 8th Cir. 2011) (citing the factors set forth in *Drexel Burnham Lambert Corp. v. Flight Transp. Corp. (In re Flight Transp. Sec. Litigation),* 730 F.2d 1128 (8th Cir.1984)*; Drexel v. Loomis,* 35 F.2d 800 (8th Cir.1929)).

51.    In the instant case, the Debtor submits that the proposed settlement by and between the Debtor and Spirit is fair and equitable and clearly falls within the required range of reasonableness. In determining to compromise and settle with Spirit, the Debtor has reviewed and considered all of the factors pertinent to the approval of a compromise and settlement, and believes that in all respects the settlement will serve the best interests of the estate and its creditors.

52.    By entering into the settlement, the Debtor will be able to bring considerable funds into the estate and avoid shutting down all fifteen restaurants. Moreover, if the Master Lease is revised  and assumed and assigned to MUY, or a new lease is entered into between the Purchaser and Spirit, and Spirit agrees to the proposed monetary settlement, the Debtor will limit its exposure on Spirit's potential rejection claim and other claims under the Master Lease. Further, the Debtor will avoid the costly and time-consuming process of litigating to conclusion Spirit's potential rejection claims and the Debtor's defenses thereto. Litigating Spirit's potential rejection claims would require a significant investment of the Debtor's time, effort and resources, with attendant attorneys' fees and expenses. Having considered these facts, the Debtor believes that, in the exercise of its sound business judgment, the proposed settlement with Spirit set forth herein is reasonable and in the best interests of its estate and its creditors, and accordingly should be approved.

### III.    Rejection of the Master Lease is Appropriate

53.    If the Master Lease is not revised as proposed to cover only the Six Locations and delete all other locations (which will obviate any need to reject the Master Lease as it will have been voluntarily revised), and then assumed and assigned to MUY or Spirit does not accept the proposed compromise, the Debtor requests that this Court authorize it to reject the Master Lease with Spirit with respect to all fifteen Pizza Huts.

54.     Under those circumstances, rejection of the entirety of the Master Lease is in the best interest of the Debtor and other parties in interest because the Master Lease will be financially burdensome and unnecessary to the estate.

55.     Furthermore, in connection with any rejection of the Master Lease, the Debtor requests that this Court enter an order requiring any and all claims of Spirit against the Debtor relating to the rejection of the Master Lease to be filed within thirty (30) days following the date of entry of an Order granting the relief sought herein.

**IV.     Relief Under Bankruptcy Rule 6004(h) is Appropriate**

56.     The Debtor requests that any order approving the sale of Assets, the assumption, assignment and rejection of leases and the compromise proposed herein become effective immediately upon its entry.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Given the fact that the Debtor will provide notice in a manner that is reasonable under the circumstances, the Debtor submits that good cause exists for the Court to waive the 14-day stay period under Bankruptcy Rule 6004(h).

**<u>NOTICE</u>**

57.     Notice of this Motion has been given to:  (i) the United States Trustee; (ii) PACA Claimants; (iii) the twenty (20) largest unsecured creditors; (iv) all parties who request notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; (v) the Internal Revenue Service; (vi) Pizza Hut c/o William Evanoff, Sidley Austin LLP, One South Dearborn, Chicago, Illinois  60603; (vii) Pizza Hut of America, Inc., through John J. Murphy, 14841 Dallas Parkway, Dallas, Texas   75254; (viii) Spirit Master Funding, LLC, through Craig Solomon Ganz, Gallagher & Kennedy, 2575 E. Camelback Road, Suite 1100, Phoenix, Arizona  85016-9225; (ix) Matthew H. Morgan, 4600 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402;

(x) Matthew C. Helland, Nichols Kaster, LLP, One Embarcadero Center, Suite 720, San

Francisco, California 94111; (xi) Spirit Realty Capital c/o Briggs and Morgan, Attention:  Jason

R. Asmus, 80 S. Eight Street, 2200 IDS Center, Minneapolis, Minnesota  55402; and (xii) all

parties entitled to notice under Rule 2002(j) of the Federal Rules of Bankruptcy Procedure.  In

light of the nature of the relief requested, the Debtor submits that no further notice is required.

**WHEREFORE**, Sky Ventures, LLC requests entry of an order authorizing: (1) the sale

of certain property free and clear of liabilities, liens, claims, interests and encumbrances and in

connection therewith, (2) the revision of the Master Lease to include the Six Locations only and

to delete all other locations, and the assumption and assignment of the Master Lease, as revised,

to the Purchaser, and (3) the assumption and assignment and or rejection of other leases and

executory contracts, (4) the proposed compromise with Spirit pursuant to Bankruptcy Rule 9019,

or in the alternative, (5) if Spirit enters into a new lease with the Purchaser for the Six Locations

on terms acceptable to the Purchaser but does not agree to the proposed compromise, the sale of

the Assets, and (6) the rejection of the Master Lease, and (7) such other related relief.

Dated: May 28, 2014                          WINTHROP & WEINSTINE, P.A.

                                             By:  *s/ Jacob B. Sellers*
                                             Daniel C. Beck, #192053
                                             Jacob B. Sellers, #348879
                                             225 South Sixth Street
                                             Suite 3500
                                             Minneapolis, MN  55402-4629
                                             (612) 604-6400
                                             dbeck@winthrop.com
                                             jsellers@winthrop.com


                                             HELLER, DRAPER, PATRICK, HORN
                                              & DABNEY, L.L.C.
                                             Douglas S. Draper, La. Bar No. 5073
                                             Leslie A. Collins, La. Bar No. 14891
                                             Greta M. Brouphy, La. Bar No. 26216

650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone: 504.299.3333/
Fax: 504.299.3399
ddraper@hellerdraper.com
lcollins@hellerdraper.com
gbrouphy@hellerdraper.com

**Counsel for Debtor**

9118911v1

## VERIFICATION

I, Barry Zelickson, declare under penalty of perjury that I am the I am Senior Vice President of Border Foods Companies who serves as Senior Vice President of Sky Ventures, LLC, that I have read the foregoing document, and that the factual information contained therein is true and correct according to the best of my knowledge, information, and belief.

Dated: May 28, 2014

**EXHIBIT A**

**Purchase Agreement**

{00340355-16}

**ASSET PURCHASE AGREEMENT**

**by and among**

**SKY VENTURES, LLC,**

**MUY PIZZA MINNESOTA, LLC,**

**LEE J. ENGLER and JEFFERY T. ENGLER,**

**dated as of**

**May 12, 2014**

# TABLE OF CONTENTS

**Page No.**

**ARTICLE 1. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES** ................................................................................................................ 1

| | | |
|---|---|---|
| 1.1 | Sale of Assets ................................................................ | 1 |
| 1.2 | Excluded Assets ............................................................. | 2 |
| 1.3 | Assumed Liabilities ....................................................... | 2 |
| 1.4 | Retained Liabilities ....................................................... | 3 |

**ARTICLE 2. PURCHASE PRICE AND CLOSING** ................................................... 3

| | | |
|---|---|---|
| 2.1 | Closing .......................................................................... | 3 |
| 2.2 | Purchase Price ............................................................... | 3 |
| 2.3 | Payment Terms .............................................................. | 4 |
| 2.4 | Cash Banks and Inventory ............................................. | 4 |
| 2.5 | Prorated Items ............................................................... | 4 |
| 2.6 | Allocation of Purchase Price ......................................... | 5 |
| 2.7 | Transfer Fees and Taxes ................................................ | 5 |
| 2.8 | Title Insurance; Surveys; Closing Fees ......................... | 5 |

**ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF SELLER AND OWNERS** ................................................................................................................... 6

| | | |
|---|---|---|
| 3.1 | Organization .................................................................. | 6 |
| 3.2 | Authority ....................................................................... | 6 |
| 3.3 | No Conflict .................................................................... | 6 |
| 3.4 | Required Consents ......................................................... | 7 |
| 3.5 | Tangible Personal Property Assets ................................ | 7 |
| 3.6 | Real Property Assets ..................................................... | 7 |
| 3.7 | Compliance With Laws .................................................. | 7 |
| 3.8 | Permits .......................................................................... | 8 |
| 3.9 | Financial Statements ..................................................... | 8 |
| 3.10 | Litigation and Proceedings ........................................... | 8 |
| 3.11 | No Undisclosed Liabilities ............................................ | 8 |
| 3.12 | Restaurant Employees ................................................... | 9 |
| 3.13 | Taxes ............................................................................. | 10 |
| 3.14 | Employee Benefit Plans ................................................ | 10 |
| 3.15 | Environmental ............................................................... | 11 |
| 3.16 | Material Contracts ......................................................... | 12 |
| 3.17 | Franchise Matters .......................................................... | 14 |
| 3.18 | Insurance ....................................................................... | 14 |
| 3.19 | Absence of Changes ...................................................... | 14 |
| 3.20 | Brokers .......................................................................... | 15 |
| 3.21 | Affiliated Transactions .................................................. | 15 |

**3.22**    Updates to Disclosure Schedule........................................................15

**ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF BUYER ............................ 15**

**4.1**    Organization..............................................................................15
**4.2**    Authority...................................................................................15
**4.3**    No Conflict................................................................................15
**4.4**    Brokers.....................................................................................16
**4.5**    Sufficient Funds........................................................................16

**ARTICLE 5. CONDUCT PRIOR TO CLOSING ...................................................... 16**

**5.1**    Seller's Obligations...................................................................16
**5.2**    Joint Obligations.......................................................................17
**5.3**    Title Review..............................................................................17
**5.4**    Restaurant Employees...............................................................18
**5.5**    Casualty Loss............................................................................19
**5.6**    Condemnation...........................................................................19
**5.7**    Bankruptcy Court Matters.........................................................20

**ARTICLE 6. CONDITIONS PRECEDENT TO CLOSING........................................ 20**

**6.1**    Conditions to Buyer's Obligations.............................................20
**6.2**    Conditions to Seller's and Owners' Obligations .........................21
**6.3**    Joint Conditions to the Parties' Obligations ..............................21

**ARTICLE 7. CLOSING DELIVERIES ...................................................................... 22**

**7.1**    Buyer's Deliveries ....................................................................22
**7.2**    Seller's and Owners' Deliveries ................................................23

**ARTICLE 8. [RESERVED] ........................................................................................ 24**

**ARTICLE 9. INDEMNIFICATION ........................................................................... 24**

**9.1**    Effect of Closing .......................................................................24
**9.2**    Indemnification by Seller and Owners .......................................24
**9.3**    Indemnification by Buyer ..........................................................25
**9.4**    Indemnification Procedure.........................................................25
**9.5**    Limitations on Indemnification..................................................26

**ARTICLE 10. TERMINATION .................................................................................. 27**

**10.1**    Termination Events....................................................................27
**10.2**    Effect Of Termination ...............................................................28

**ARTICLE 11. MISCELLANEOUS ............................................................................ 28**

| | | |
|---|---|---|
| **11.1** | Notices | 28 |
| **11.2** | Governing Law | 30 |
| **11.3** | Jurisdiction | 30 |
| **11.4** | WAIVER OF TRIAL BY JURY | 30 |
| **11.5** | No Rights of Subrogation | 30 |
| **11.6** | Entire Agreement | 30 |
| **11.7** | Amendments | 30 |
| **11.8** | Severability | 30 |
| **11.9** | No Assignment | 31 |
| **11.10** | Certain Defined Terms | 31 |
| **11.11** | Confidentiality | 31 |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is dated as of May 12, 2014, and is by and among MUY Pizza Minnesota, LLC, a Texas limited liability company ("*Buyer*"), Sky Ventures, LLC, a Delaware limited liability company ("*Seller*"), and Lee J. Engler and Jeffery T. Engler (the "*Owners*").

## Background:

A.   Seller operates six (6) Pizza Hut franchised restaurants (the "*Restaurants*") at the addresses listed on attached Exhibit A, all of which are leased by Seller from Spirit Master Funding, LLC ("*Spirit*") pursuant to that certain First Amended and Restated Master Lease Agreement dated November 30, 2012 (the "*Master Lease*"). The operation of the Restaurants and all related rights and incidental activities thereto is referred to herein as the "*Business.*"

B.   Buyer currently manages the Restaurants pursuant to a Management Agreement between Buyer and Seller dated December 10, 2013.

C.   On December 10, 2013, Buyer and Seller entered into a Put and Call Option Agreement (the "*Option Agreement*"), pursuant to which Seller granted to Buyer the right to acquire all of the assets associated with the Restaurants. Buyer desires to exercise that right, on the terms and subject to conditions set forth herein (notwithstanding any other terms or conditions set forth in the Option Agreement).

D.   Seller is in a Chapter 11 bankruptcy proceeding that was filed in the United States Bankruptcy Court for the District of Minnesota (the "*Bankruptcy Court*") under the caption "_____" on May 14, 2014 (the "*Bankruptcy Case*"). The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE 1.
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES

1.1   **Sale of Assets**. Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase from Seller all the assets of Seller related to the Restaurants and the Business (excepting the Excluded Assets described below), including, but not limited to, all personal property, furniture, trade fixtures, equipment, spare parts and tools, signage, Inventory and Cash Banks (as defined in Section 2.4), licenses and permits (to the extent assignable), goodwill, Intellectual Property, computer hardware (including point of sale equipment and credit card equipment), computer software (to the extent owned by Seller), telephone numbers, advertising materials, all data and records related to the operations of the Business, including service and warranty records, equipment logs, operating guides and manuals, and, subject to any applicable legal requirement, copies of personnel records described in Section 1.2.6, Seller's rights under the Master Lease Agreement with Spirit with respect to the Restaurants, Seller's rights under the Franchise Agreements, Seller's rights under the Assumed Contracts (defined in Section 1.3.3), all claims of Seller against

third parties relating to the Assets (excluding, for the avoidance of doubt, all such rights of Seller to the extent relating to the Retained Liabilities), and all rights of Seller relating to deposits with landlords for the leased Restaurants, all of which are collectively referred to as the "*Assets*."

1.2  **Excluded Assets**.  The following items shall be excluded from the definition of Assets and shall not be conveyed to Buyer (collectively, the "*Excluded Assets*"):

    **1.2.1**  other than the Cash Banks, all cash in bank accounts, bank deposits, and accounts receivable;

    **1.2.2**  all utility deposits directly related to the Restaurants;

    **1.2.3**  all assets located at Seller's corporate office;

    **1.2.4**  all of Seller's federal, state, local, and other tax returns, reports, declarations, and applications related to Taxes ("*Tax Returns*") and other records which are not directly related to or reasonably necessary to the conduct of the Restaurants;

    **1.2.5**  any tax credits, tax refunds, tax benefits, signing bonuses with vendors, or other benefits (including rights to rebates from vendors, subject to the proration of rebates in accordance with Section 2.5.1 below) relating to periods prior to the Closing Date;

    **1.2.6**  employment records and personnel files of employees (provided that, with respect to certain employees designated by Buyer, certain historical employee information shall be made available to Buyer for Buyer's review prior to Closing in accordance with applicable law);

    **1.2.7**  all contracts and agreements other than the Franchise Agreements, the Real Property Leases, and the Assumed Contracts (defined below), together with all tangible personal property subject to or associated with such excluded contracts and agreements;

    **1.2.8**  all rights associated with Seller's corporate name; and

    **1.2.9**  all assets associated with the nine (9) remaining units covered under the Master Lease that are not included as part of this transaction (collectively, the "*Excluded Units*").

1.3  **Assumed Liabilities**.  Buyer agrees to assume and perform the following obligations first arising or accruing from and after the Closing Date (collectively, the "*Assumed Liabilities*"):

    **1.3.1**  Seller's leasehold interest with respect to the Restaurants;

- 2 -

**1.3.2** all Seller's rights and obligations under franchise agreements or other contracts with Franchisor (or its affiliates) listed on <u>Schedule 1.3.2</u>, copies of which have been provided to Buyer (the "***Franchise Agreements***"); and

**1.3.3** the Material Contracts that are described on <u>Schedule 3.16.1</u> as "Assumed Material Contracts," and all other contracts, written or oral, relating to the purchase of goods or services in the ordinary course in connection with the operation of the Restaurants that can be terminated on notice of thirty (30) days or less with no material termination fees (all such vehicle leases, Assumed Material Contracts, and other contracts are collectively referred to hereinafter as the "***Assumed Contracts***"), in each case to the extent of obligations first arising and accruing on and after the Closing Date.

**1.4** <u>**Retained Liabilities**</u>.  Buyer is not assuming, and shall not be deemed to have assumed any liabilities of Seller other than the Assumed Liabilities.  Except for the Assumed Liabilities, Buyer shall not have any obligation for or with respect to any liability or obligation of Seller of any nature whatsoever, whether accrued or fixed, absolute or contingent, known or unknown, or determined or determinable, and whether incurred prior to, on, or after the Closing Date (such liabilities not assumed by Buyer are hereinafter referred to as the "***Retained Liabilities***"), all of which Retained Liabilities will be paid or satisfied by Seller.

## ARTICLE 2.
## PURCHASE PRICE AND CLOSING

**2.1** <u>**Closing**</u>.  The transactions contemplated by this Agreement shall be consummated (the "***Closing***") within three (3) business days after the satisfaction or waiver of the conditions set forth in Article 6; <u>provided</u>, <u>however</u>, that if the Closing has not occurred by September 30, 2014 (subject to extension as described in other Sections of this Agreement) (such date is hereinafter referred to as the "***Outside Closing Date***"), then either party may terminate this Agreement under <u>Section 10.1</u>.  The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "***Closing Date***."  The Closing shall be effective as of 12:01 a.m. Central Standard Time on the Closing Date (the "***Effective Time***").

**2.2** <u>**Purchase Price**</u>.  The purchase price for the Assets (the "***Purchase Price***") shall be calculated as follows:

**2.2.1** an amount equal to $921,473.00;

**2.2.2** plus the amount of the Cash Banks as described in <u>Section 2.4</u>;

**2.2.3** plus the amount payable for the Inventory as described in <u>Section 2.4</u>;

**2.2.4** plus any prorated amounts payable by Buyer under <u>Section 2.5.2(a)</u>;

**2.2.5** minus any prorated amounts payable by Seller under <u>Section 2.5.2(c)</u>; and

**2.2.6**   plus the amount of any deposits held by landlords under the Real Property Leases.

**2.3**   **Payment Terms**.  The Purchase Price shall be payable by Buyer to Seller or as directed by Seller at Closing by wire transfer to an account designated by Seller.

**2.4**   **Cash Banks and Inventory**.  Following the close of business on the day prior to the Closing Date, the parties shall conduct a joint inventory to determine the amount of food products, paper products, and new uniforms located at the Restaurants (excluding any obsolete, unusable or other out of date or non-current items disallowed by the Franchisor) (collectively, the "*Inventory*") and all cash in the registers or safes located at the Restaurants (the "*Cash Banks*").  At Closing, Buyer shall pay Seller's cost for the Inventory, together with an amount equal to the total Cash Banks at each Restaurant.  In addition, Seller shall receive a credit at Closing for the amount of agreed upon food and other products ordered by Seller on or prior to the Effective Time and which are to be delivered to the Restaurants after the Effective Time.

**2.5**   **Prorated Items**.

**2.5.1**   At Closing, the parties shall calculate the proration (as of the Effective Time) of rents, CAM charges, certain prepaid advertising and other prepaid items, state, and local real and personal property Taxes for the Restaurants, syrup refunds or rebates, other vendor rebates, and other expenses that relate to both pre-Closing and post-Closing periods with respect to the Assets and Assumed Liabilities, and the credit due Seller for food and other products ordered by Seller for the Restaurants which are to be delivered after the Effective Time, as described in Section 2.4.

**2.5.2**   The items that are prorated under Section 2.5.1 shall be payable in the manner set forth below:

**(a)**   If a prorated amount is payable by Buyer and determinable or estimable at the Closing, it shall be added to the amount payable by Buyer at the Closing.

**(b)**   If a prorated amount is payable by Buyer and not determinable or estimable at the Closing, it shall be billed by Seller when determinable and paid by Buyer to Seller in immediately available funds, within five (5) business days after the date the amount is determined.

**(c)**   If a prorated amount is payable by Seller and determinable or estimable at the Closing, it shall be deducted from the amount otherwise payable by Buyer at the Closing.

**(d)**   If a prorated amount is payable by Seller and not determinable or estimable at the Closing, it shall be billed by Buyer when determinable and paid by Seller to Buyer in immediately available funds, within five (5) business days after the date the amount is determined.

**2.5.3**   Not later than ninety (90) days after the Closing Date (or such earlier period of time as such final proration amounts shall become available), Buyer shall prepare and deliver to Seller a final prorations schedule ("*Final Prorations Schedule*") which shall set forth in reasonable detail any adjustments to the parties' closing estimates of those amounts, together with all supporting computations of such amounts in reasonable detail and written instructions for the payment of any amounts for the benefit of Buyer or Seller, as the case may be, as a result of the adjustments set forth in the Final Prorations Schedule.   The Final Prorations Schedule shall become final and binding upon the parties unless Seller objects to any matter set forth therein within ten (10) business day after delivery of the Final Prorations Schedule.   Subject to any timely disputes made pursuant to the previous sentence, any payment required to be made as a result of the Final Prorations Schedule shall be made by wire transfer of immediately available funds to a bank account designated by Buyer or Seller, as the case may be, within three (3) business days after the date the Final Prorations Schedule becomes final and binding on the parties.

**2.6**   **Allocation of Purchase Price**.   The Purchase Price shall be allocated among the Assets in the manner required by Section 1060 of the Code and as shown on the allocation schedule attached hereto as Schedule 2.6.   After the Closing, the parties will make consistent use of the allocations set forth in such allocation schedule for all purposes, including for purposes of any Tax Returns and any forms or reports required to be filed pursuant to Section 1060 of the Code (including Internal Revenue Service Form 8594), or any comparable provision of state, local, or foreign law.   As soon as practicable after the Closing Date, Buyer will prepare and deliver to Seller Internal Revenue Service Form 8594 reflecting the agreed allocation, to be filed with the Internal Revenue Service.   Any subsequent adjustment to the Purchase Price will be allocated in accordance with Section 1060 of the Code.   Buyer and Seller agree that the form of the transactions, the consideration provided for in this Agreement and the allocation of the Purchase Price provided above were arrived at on the basis of arm's length negotiation between Buyer and Seller, and shall be respected by each of them and their respective affiliates for federal, state, local, and other tax reporting purposes, including filings on Internal Revenue Service Form 8594, and that no party will assert or maintain a position inconsistent with the foregoing.

**2.7**   **Transfer Fees and Taxes**.   Seller shall pay all sales, use, or transfer Taxes, if any, arising out of the transfer of Assets.   In addition, Seller will pay any and all transfer, legal or processing fees imposed by Franchisor in connection with the transfer of the Franchise Agreements to Buyer.

**2.8**   **Title Insurance; Surveys; Closing Fees**.   Buyer will be responsible for the cost of premiums for any title insurance policies (owner's and lender's policies) with respect to the properties, but Seller, at its expense, will provide Buyer with an Owner's and Encumbrances Report ("*O & E Report*") for the properties or, at Seller's option, title insurance commitments with respect to such properties.   Seller also shall provide Buyer with copies of any surveys associated with any of the Restaurants in Seller's possession.

Furthermore, the closing escrow fees of the Title Company will be split equally between Buyer and Seller.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF SELLER AND OWNERS

Seller and Owners hereby, jointly and severally, represent and warrant to Buyer that the statements contained in this Article 3 are true and correct as of the date hereof and will be true and correct as of the Closing Date as though made again on and as of the Closing Date, except as otherwise set forth in the disclosure schedules that will be provided by Seller to Buyer within fifteen (15) days following the execution of this Agreement, as amended prior to the Closing in accordance with Section 3.22 (the "*Disclosure Schedules*").  For purposes of this Article 3, "*Knowledge*," "*Seller's Knowledge*" "*Knowledge of Seller*", "*Known*," or words of similar import shall mean the actual knowledge of Jeffery T. Engler, Lee J. Engler, Fred Burmer, Barry Zelickson, Barb Schneider and Craig Wallin, or any information that should have been known by any of them after making reasonable inquiry of those individuals who report directly to them.

3.1    **Organization**.  Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware, and is duly qualified to transact business and is in good standing under the laws of the States of Minnesota, Iowa, and Wisconsin.  Seller is not required to be qualified in any other jurisdictions.

3.2    **Authority**.  Subject to the Bankruptcy Court's entry of the Sale Approval Order, Seller has all necessary corporate power to own its respective properties and operate its respective business as now owned and operated.  Except for the approval of the Bankruptcy Court, Seller has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby.  Owners have all necessary legal capacity to enter into this Agreement and each of the Transaction Documents to which they are a party and to perform their obligations hereunder and thereunder.  The execution and delivery by Seller of this Agreement and each Transaction Document, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by Seller.  This Agreement has been duly executed and delivered by Seller and Owners, and (assuming due authorization, execution, and delivery by Buyer) this Agreement constitutes a legal, valid, and binding obligation of Owners and of Seller, enforceable against Seller and Owners in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

3.3    **No Conflict**.  Subject to the Bankruptcy Court's entry of the Sale Approval Order, the execution, delivery, and performance of this Agreement by Seller and Owners will not: (a) violate or result in a breach of any term of the organizational documents of Seller; (b) violate any law, order, rule, or regulation, in each case applicable to Seller, Owners, or the Restaurants, of any court or of any Governmental Authority having jurisdiction over Seller or Owners, (c) result in the creation or imposition of any Lien upon any of the

Assets, or (d) except as set forth on <u>Schedule 3.3</u>, breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any contract or agreement to which Seller is a party.

**3.4** **Required Consents**.   Schedule 3.4 sets forth all consents from any third parties, including, without limitation, any Governmental Authority or any vendor of Seller, that are required in connection with the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby by Seller and Owners (collectively, the "***Required Consents***").

**3.5** **Tangible Personal Property Assets**.

    **3.5.1**   Seller has good title to all Assets constituting tangible personal property, free and clear of any Liens, except for Permitted Liens.

    **3.5.2**   Each Restaurant contains the tangible personal property Assets (such as furniture, trade fixtures, equipment, signage, supplies, and small wares) required to operate the Restaurant in accordance with the Franchisor's requirements.

    **3.5.3**   The equipment located at the Restaurants will be in working order at Closing, functional and fit for its intended purpose.

**3.6** **Real Property Assets**.

    **3.6.1**   Seller has a valid leasehold interest under the Master Lease with respect to the Restaurants, free and clear of all mortgages, pledges, security interests, or other monetary liens, options, rights of first refusal, or rights of first offer.

    **3.6.2**   Seller has not received any written notice from any Governmental Authority that Seller's ownership, use, or operation of the Restaurants is presently in violation of any applicable building code, zoning, land use or other law, order, ordinance, rule, or regulation affecting the operation of the Restaurants (including, but not limited to, the Americans with Disabilities Act of 1990, as amended).   There are no pending or, to Seller's Knowledge, threatened condemnation proceedings affecting the Restaurants.   Seller has not received any notice of, nor does Seller have any Knowledge of, any planned road construction or similar public works projects that are reasonably expected to materially and adversely affect any of the Restaurants.

    **3.6.3**   All mechanical, electrical, heating, air conditioning, communications, drainage, sewer, water, and plumbing systems located at or used in the Restaurants will be in working order on the Closing Date, functional and fit for their intended purpose.

**3.7** **Compliance With Laws**.   Except as set forth on <u>Schedule 3.7</u>, to Seller's Knowledge, Seller is, and during the past two (2) years has been, in compliance in all material respects with all laws and regulations applicable to Seller and the Business and no legal

proceeding has been filed or commenced against Seller alleging any failure to so comply. Seller has not received, at any time during the past two (2) years, any written notice from any Governmental Authority regarding (i) any actual or alleged violation of, or failure to comply with, any legal requirement, or (ii) any actual or alleged obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

3.8     **Permits**.  Seller has all material approvals, authorizations, consents, licenses, franchises, certifications, and permits required by any Governmental Authority for the ownership of the Assets or operation of the Restaurants (collectively, the "***Permits***"). Seller owns or possesses all such Permits, and Seller is in compliance in all material respects with all requirements set forth in such Permits.  No other material licenses or permits are required in the conduct of the Business. Each Permit is valid and in full force and effect.  Seller is, and during the past two (2) years has been, (i) in compliance in all material respects with all of the terms and requirements of each Permit; and (ii) Seller has not received, at any time during the past two (2) years, any written notice from any Governmental Authority or any other Person regarding (A) any actual or alleged material violation or breach of any Permit, or (B) any actual revocation, withdrawal, suspension, cancellation, termination of, or modification to any Permit.

3.9     **Financial Statements**.   Schedule 3.9 contains the unaudited, internally prepared unit level profit and loss statements for each Restaurant for the fiscal periods ending December 24, 2012, December 23, 2013, and for the trailing periods ending March 17, 2014 (collectively, the "***Financial Statements***"). The Financial Statements were prepared by Seller from its books and records on a basis consistent with Sellers historical internal accounting practices and in accordance with generally accepted accounting principles ("***GAAP***") except for any exceptions for GAAP described in the footnotes to the Financial Statements.  Each of the Financial Statements fairly presents the results of operations of the applicable Restaurant of Seller for the fiscal period to which it relates.

3.10    **Litigation and Proceedings**.  Except as set forth on Schedule 3.10, there is no claim, suit, arbitration, action, order or proceeding now pending, or, to Seller's Knowledge, threatened, at law or in equity, or before any court, arbitrator, or Governmental Authority, relating to the Restaurants or the Business or to which Seller is (or would be in the case of threatened actions) a party.

3.11    **No Undisclosed Liabilities**.  Except as set forth on Schedule 3.11, Seller does not have any liabilities or obligations (whether known or unknown and whether absolute, accrued, contingent or otherwise), except for (a) liabilities of the type not required to be reflected as liabilities on a balance sheet prepared in accordance with GAAP, (b) liabilities that have arisen or may arise in the ordinary course of business, (c) liabilities arising out of or related to the transactions contemplated hereby, (d) liabilities associated with the ownership or operation of the Excluded Units, and (e) liabilities the subject matter of which is covered in any other representation or warranty contained in this Article 3 or the applicable Schedules thereto, whether or not the existence of such liability would constitute a breach or inaccuracy thereof.

**3.12** **Restaurant Employees**.

**3.12.1** Seller has provided Buyer with access to a true and complete listing of all individuals who, as of April 1, 2014, were employees of Seller working at the Restaurants, together with the following information for each individual: name, job title or position, annual base salary or hourly rate, date of hire, and employment status (full-time or part-time, exempt or non-exempt). Three days prior to the Closing Date, Seller will update this list to add any employees added since April 1, 2014, if necessary. All such employees, together with certain salaried employees also set forth on such listing who provide services in connection with the Restaurants, are collectively referred to as the "***Restaurant Employees***." Other than as set forth on Schedule 3.12.1, since January 1, 2014, Seller has not made any bonus payments to the Restaurant Employees.

**3.12.2** Schedule 3.12.2 sets forth a true and complete list of all concluded or settled litigation, claims, arbitrations, or proceedings of Seller relating to Seller's employees or former employees and the employment practices at the Restaurants, in each case occurring from January 1, 2013 through the date hereof.

**3.12.3** Except as set forth on Schedule 3.12.3:

**(a)** Seller is not a party to any written employment contracts or collective bargaining agreements with any employees of Seller. There is no organizational effort currently being made or, to Seller's Knowledge, threatened by, or on behalf of, any labor union to organize employees of Seller and no demand for recognition of employees of Seller has been made by, or on behalf of, any labor union. Seller has no Knowledge of any union organizing activity occurring with regard to any of the Restaurants during the past five (5) years.

**(b)** Seller has not received written notice from a Governmental Authority that Seller is in violation of any applicable law relating to the hiring, employment, or discharge of any of the Restaurant Employees, and, to Seller's Knowledge, no such violation exists.

**(c)** Seller has not received written notice from any Person of any event or occurrence, pending or threatened, that could reasonably be expected to serve as the basis for a claim against Seller relating to any employment or workplace-related conduct.

**(d)** Seller is and has been in compliance in all material respects with all applicable employment and workplace laws, including without limitation those related to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar Taxes, occupational safety and health, and layoffs, in each case relating to Seller's employees and/or employment practices at the Restaurants; provided, however, that

Buyer acknowledges that Seller shall not be responsible for any claims, liabilities, costs or damages arising after the Effective Time as a result of Buyer's non-compliance or breach of any applicable employment or workplace laws after the Effective Time, regardless of whether Buyer operates the Restaurants or manages its employees in a manner similar or identical to the manner in which Seller operates the Restaurants or managed its employees prior to the Effective Time.

**3.12.4** There are no former employees of Seller (or any of their dependents) who currently receive COBRA health plan continuation coverage from Seller's group health insurance carrier.

**3.13** **Taxes**.  Seller has timely filed (or will timely file after giving effect to any applicable extensions) all Tax Returns required to be filed by Seller for all periods up to the Closing Date.  All Tax Returns are, or if not yet filed will be, true, accurate, and complete in all material respects and reflect all Taxes payable by Seller.  Seller's Tax Returns have not been audited by any Governmental Authority within the six (6) years prior to the date hereof.  Seller has paid (or will timely pay) all Taxes which are due and payable (or which relate to any period prior to the Closing Date) or for which assessments have been received prior to the Closing Date.  There are no audits, suits, actions, claims, investigations, inquiries, or proceedings pending or to Seller's Knowledge, threatened, against Seller with respect to Taxes, nor has any deficiency or claim for any Taxes been imposed or assessed.  There are no outstanding notices of deficiencies, adjustments, or changes in assessments with respect to any Taxes.  Seller has not waived any statute of limitations with respect to any taxable year.  There is no agreement, waiver, or consent providing for an extension of time with respect to the assessment of any Taxes against Seller.  All amounts required to be withheld or collected by Seller for Taxes with respect to any other Person have been so withheld or collected and paid to the appropriate Governmental Authority and all Forms W 2 and 1099 required with respect thereto have been properly completed and timely filed.

**3.14** **Employee Benefit Plans**.

**3.14.1** Schedule 3.14.1 contains a true and complete list of each pension, profit sharing, other deferred compensation, bonus, incentive compensation, stock purchase, stock option, supplemental retirement, severance, or termination pay, medical, hospitalization, life insurance, dental, disability, salary continuation, vacation, supplemental unemployment benefits plan, program, arrangement or contract, and each other employee benefit plan, program, arrangement or contract, currently maintained, contributed to, or required to be contributed to, by Seller for the benefit of any employee of Seller, whether or not any of the foregoing is funded, whether formal or informal, whether or not subject to the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***") and whether legally binding or not (collectively, the "***Benefit Plans***").

- 10 -

**3.14.2** With respect to each of the Benefit Plans:

(a) the Benefit Plan is, and at all times since its inception, has been, maintained, administered, operated, and funded in all material respects in accordance with its terms and in material compliance with all applicable requirements of all applicable laws, including, but not limited to, ERISA and the Code;

(b) all reports, tax returns, information returns, and other information regarding the Benefit Plan that are required by law to be filed have been accurately, timely and properly filed;

(c) Neither the Seller nor any member of a controlled group of corporations, a group of trades or businesses under common control or an affiliated service group, within the meaning of Section 414(b), (c), (m) or (o) of the Code, of Seller ("***Related Party***") currently maintains, sponsors, participates in, has liability under, or contributes to, or has ever maintained, established, sponsored, participated in, had liability under, or contributed to, any pension plan (within the meaning of Section 3(2) of ERISA) which is subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code; and

(d) Neither the Seller nor any Related Party is a party to, or has made any contribution to or otherwise incurred any obligation under, any "multiemployer plan" as such term is defined in Section 3(37) of ERISA or any "multiple employer plan" as such term is defined in Section 413(c) of the Code;

**3.15** **<u>Environmental</u>**.

**3.15.1** To Seller's Knowledge, Seller is and has been in compliance in all material respects with all applicable Environmental Laws in connection with the operation of the Business and has not received any communication from any Governmental Authority alleging that Seller is in violation of, or has any liability under, any Environmental Laws.

**3.15.2** There are no Environmental Claims relating to the properties associated with the Restaurants pending or, to the Knowledge of Seller, threatened against Seller.

**3.15.3** Seller has not Released, nor to Seller's Knowledge has any other Person Released, any Hazardous Materials at, on, under or from any of the properties associated with the Restaurants in a manner that violates any Environmental Law.

**3.15.4** To Seller's Knowledge, there are no, and there never have been any, underground storage tanks located on any of the properties associated with the Restaurants.

**3.15.5** Seller has provided Buyer with copies of any environmental investigations, studies, audits, tests, reviews, or other analyses pertaining to the Restaurants that are in Seller's possession or control.

**3.16**  **Material Contracts**.

**3.16.1** Schedule 3.16.1 sets forth the following contracts or agreements, other than the Franchise Agreements and the Real Property Leases (collectively, the "***Material Contracts***") to which Seller is a party or by which any of the Assets are bound, true and complete copies of which have been provided to Buyer:

**(a)**  consulting agreements;

**(b)**  agreement for the payment of severance benefits, retention bonuses, transaction bonuses or sale bonuses to any employee;

**(c)**  plan or contract or arrangement with respect to Benefit Plans;

**(d)**  contract for the purchase of equipment or other materials (other than Inventory) having an annual purchase price under any such contract in excess of $25,000;

**(e)**  contract for the purchase of Inventory other than individual purchase orders for Inventory entered into in the ordinary course of business consistent with past practices;

**(f)**  contract for the sale of any equipment, Inventory or other assets, except for sales of Inventory in the ordinary course of business;

**(g)**  agreements with any suppliers (involving purchases of goods or services) of the business;

**(h)**  personal property leases or license agreements, where the lease provides for annual payments in excess of $10,000.00 or has an unexpired term as of the Closing Date in excess of one year;

**(i)**  agreements relating to P.O.S. equipment, systems or maintenance, and agreements relating to credit card equipment or credit card processing;

**(j)**  license agreements or agreements relating to computer hardware or software;

**(k)**  agreements restricting in any manner Seller's right to compete with any other Person, restricting Seller's right to sell to or purchase from any other Person, or restricting the ability of Seller to employ any Person;

**(l)**  agreements restricting in any manner any Person's rights to compete with Seller, restricting any Person's right to sell to any customer of a Seller or

- 12 -

purchase from any competitor of a Seller or restricting the ability of any Person to employ any employee of a Seller;

**(m)**    agreements of agency, representation, distribution, or franchise (other than the Franchise Agreements) which contemplate the payment of cash or other consideration in any one year period or on its face in an amount in excess of $10,000;

**(n)**    service agreements affecting any of any the Assets where the annual service charge is in excess of $10,000;

**(o)**    contracts for the advertisement, display or promotion of any products or services, which contemplate the payment of cash or other consideration in any one year period or on its face in an amount in excess of $10,000;

**(p)**    contracts for the purchase, sale, or removal (as the case may be) of electricity, gas, water, telephone, coal, sewage, power or other utility service;

**(q)**    loan or credit agreements, pledge agreements, notes, security agreements, mortgages, debentures, indentures, factoring agreements or letters of credit other than those agreements with Lenders, the monetary obligations under which will be satisfied at Closing;

**(r)**    guaranties, performance, bid or completion bonds, or surety or indemnification agreements;

**(s)**    partnership agreements, operating agreements or joint venture agreements or other contracts (however named) involving a sharing of profits, losses, costs, or liabilities by Seller and another Person; and

**(t)**    any other agreements which provide for the annual receipt or expenditure of more than $10,000, except agreements for the purchase or sale of goods or rendering of services in the ordinary course of business.

Schedule 3.16.1 also identifies those Material Contracts which Buyer has agreed to assume at Closing (the "***Assumed Material Contracts***"). Those Material Contracts that are not identified as Assumed Material Contracts will be retained by Seller, and Seller shall remain responsible for all obligations thereunder.

**3.16.2** Each Assumed Material Contract is in full force and effect and constitutes a legal, valid, and binding agreement, enforceable against Seller in accordance with its terms and, to Seller's Knowledge, against each other party thereto, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles. Seller has not given to or received from any other party, any notice or other communication (whether oral or written) regarding any actual, alleged, possible or potential violation or breach of, or default under, any

- 13 -

Assumed Material Contract.  To Seller's Knowledge, the other parties to each Assumed Material Contract are not in violation or breach of or default under such Assumed Material Contract.  Schedule 3.4 describes the extent to which any Assumed Material Contract is not assignable to Buyer without the consent of the counterparty thereto.

**3.17**    **Franchise Matters**.  Schedule 1.3.2 sets forth a true, correct and complete list of all Franchise Agreements pertaining to the Restaurants that are effective as of the date of this Agreement and sets forth the expiration date of each Franchise Agreement.  All the Franchise Agreements listed on Schedule 1.3.2 are in full force and effect and are valid and binding obligations of Seller and enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.  Except as set forth on Schedule 3.17, there is no material default under any Franchise Agreement by the Seller or, to the Seller's Knowledge, by any other party thereto.

**3.18**    **Insurance**.  Seller has in force the insurance policies set forth on Schedule 3.18.  All such policies are in full and force and effect.  Seller is not in material default with respect to its obligations under any such policy nor has Seller received any notice of cancellation with respect thereto.  Seller has not been refused any insurance with respect to the Business by any insurance carrier to which it has applied for insurance or with which it has carried insurance.

**3.19**    **Absence of Changes**.  Since January 1, 2014, Seller has operated the Business in the ordinary course consistent with past practice and, except as shown on Schedule 3.19, there has not been any Material Adverse Effect.  Except as set forth on Schedule 3.19, since January 1, 2014:

**3.19.1**    Seller has not transferred, sold, leased or licensed any assets or properties, except in the ordinary course of business consistent in nature and amount with those transferred or sold in comparable prior periods;

**3.19.2**    there has not occurred any physical damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the Assets in an aggregate amount exceeding $25,000;

**3.19.3**    Seller has not made any outstanding commitments for capital expenditures in an aggregate amount exceeding $25,000, excluding capital expenditures that will be completed prior to Closing;

**3.19.4**    Seller has not made any material change in employment terms for any of its salaried management employees, other than in the ordinary course and consistent with past practice; and

**3.19.5**    Seller has not made any material change in its accounting or Tax methods or practices, other than as may be required by applicable law, or made any election or entered into any arrangement with respect to Taxes.

**3.20** **Brokers**.  Except for Auspex Capital, LLC, no broker, finder, or investment banker is entitled to any brokerage, finder or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller or Owners.  Seller shall be responsible for all fees owing Auspex Capital, LLC for which it has contracted.

**3.21** **Affiliated Transactions**.  Except as set forth on Schedule 3.21, no Related Person of the Seller or Owners is a party to any agreement, contract, commitment or transaction with the Seller outside of the ordinary course of business or has any interest in any material property used by the Seller.

**3.22** **Updates to Disclosure Schedule**.  From time to time prior to the Closing, Seller shall supplement or amend with reasonable frequency the information contained in the Disclosure Schedules solely with respect to any matter hereafter arising or occurring which, if existing or occurring on or before the date of this Agreement, would have been required to be set forth in any Disclosure Schedule (each, an "***Intervening Event***").  Any such supplement or amendment delivered pursuant to this Section shall in no event be the basis for a claim that any representation or warranty is inaccurate or has been breached for purposes of Section 9.2, but such supplement or amendment may provide a basis for Buyer to terminate this Agreement pursuant to Section 10.1.8 to the extent provided therein.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller and Owners that:

**4.1** **Organization**.  Buyer is duly organized, validly existing, is in good standing under the laws of its state of formation, and is duly qualified to transact business and in good standing in all jurisdictions where its activities so require, except where the failure to so qualify would not have a material adverse effect on the Buyer.

**4.2** **Authority**.  Buyer has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby.  The execution and delivery by Buyer of this Agreement and each Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller and Owners) this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

**4.3** **No Conflict**.  The execution, delivery, and performance of this Agreement by Buyer will not: (a) violate or result in a breach of any term of Buyer's organizational documents; (b) violate any law, order, rule, or regulation applicable to Buyer, or of any court or Governmental Authority having jurisdiction over Buyer; or (c) breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to

accelerate the maturity or performance of, or payment under, or to cancel terminate or modify any contract or agreement to which Buyer is a party.

4.4    **Brokers**.  No broker, finder, or investment banker is entitled to any brokerage, finder, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.5    **Sufficient Funds**.  As of the Closing Date, Buyer shall have available cash resources and financing in an amount sufficient to consummate the transactions contemplated in this Agreement, including resources to pay all expenses, fees and any assumed liabilities.

## ARTICLE 5.
## CONDUCT PRIOR TO CLOSING

5.1    **Seller's Obligations**.  From the date hereof until the Closing, Seller agrees as follows:

5.1.1    **Required Consents**.  Seller shall use commercially reasonable efforts, and Buyer shall cooperate with Seller, to obtain all Required Consents, including the consent of Spirit (it being understood and agreed that commercially reasonable efforts shall not be construed to mean that Seller shall be required to incur any fees or expenses more than would be commercially reasonable in the context of the transactions contemplated by this Agreement).

5.1.2    **Replacement Lease**.  Seller shall use commercially reasonable efforts, and Buyer shall cooperate with Seller, to obtain Spirit's agreement to enter into a new lease with Buyer for the Restaurants acquired hereunder (the "***Replacement Lease***"). The Replacement Lease shall be similar to the Master Lease in all material respects.

5.1.3    **Additional Documents Required by Buyer's Lender**.   Seller shall use commercially reasonable efforts, and Buyer shall cooperate with Seller, to obtain from Spirit: (a) consents to any leasehold mortgage required by Buyer's lender, in such form as is customary for similar financings; and (b) such other  documents as Buyer or Buyer's lender may reasonably request.   Any costs and expenses required by any landlords in connection with the partial assignment of the Master Lease will be paid by Seller; provided, however, that Buyer shall be responsible for any costs related to any documents (such as consents to leasehold mortgages or subordination, non-disturbance, and attornment agreements) otherwise required by Buyer or Buyer's lender(s) in connection with any financing to be obtained by Buyer.

5.1.4    **Operation of Business**.  Except with respect to rent payments under the Master Lease, Seller shall carry on the Business in the usual and ordinary course of business, consistent with past practices.  Seller shall use commercially reasonable efforts to keep available the services of its key employees and to preserve the goodwill of those having business relationships with Seller.

**5.1.5** **No Shop**.  Except to the extent otherwise required by an order of the Bankruptcy Court, Seller and Owners shall not, and Seller and Owners shall cause all of their Representatives (including any investment banker, attorney, or accountant retained or engaged by that party) to not:

**(a)** other than the transactions contemplated by this Agreement, initiate, solicit, or encourage any inquiry, proposal, or offer relating to

(i) a sale, transfer, or other disposition of all or substantially all of Seller's assets in a single transaction or a series of related transactions; or

(ii) a sale, transfer, or assignment of any of the membership interests or other equity interests of Seller (in each case, a "***Competing Transaction***");

**(b)** engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any Person relating to a Competing Transaction;

**(c)** facilitate any effort or attempt to make or implement a Competing Transaction or any other proposal that requires Seller to abandon, terminate, or fail to consummate the transactions contemplated by this Agreement; or

**(d)** consummate, agree, or commit to consummate a Competing Transaction.

**5.2** **Joint Obligations**.  From the date hereof until the Closing, Seller and Buyer each agree as follows:

**5.2.1** **Franchisor Approval**.  Seller and Buyer shall both use commercially reasonable efforts to obtain the consent of Franchisor and waivers of rights of first refusal with respect to the transactions contemplated by this Agreement and to Buyer's ownership and operation of the Restaurants.

**5.2.2** **Efforts to Close Transaction**.  Seller and Buyer shall both use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to consummate the transactions contemplated hereby as soon as practicable.

**5.3** **Title Review**.

**5.3.1** Seller has retained the Title Company to provide O & E Reports or updated title commitments for the Restaurants (collectively, the "***Title Commitments***").  Seller will cause the Title Company to provide such Commitments to Buyer promptly once they are available.

**5.3.2**  Following Buyer's receipt of all of the Title Commitments for the Restaurants from the Title Company, Buyer shall have a period of ten (10) days (regardless of whether the Due Diligence Period has expired or will expire during such period) to provide any objections to the Master Lease Agreement and the related information furnished to Buyer regarding the status of fee ownership of such Restaurants, as shown in the Title Commitments (each, a "***Leased Property Title Objection***").  Buyer shall deliver a written description of its Leased Property Title Objections, if any, to Seller.  Buyer's failure to timely approve or disapprove, in writing, of any matters set forth in the Title Commitments shall be deemed Buyer's acceptance thereof.

**5.3.3**  If Buyer delivers written notice of any Leased Property Title Objections to Seller during the 10-day period provided above, then Seller shall use commercially reasonable efforts to remove or cure such Leased Property Title Objections, at Seller's sole cost and expense, for a period of ten (10) days following Seller's receipt of such Objections ("***Seller Cure Period***").  During the Seller Cure Period, Seller shall keep Buyer fully informed as to the efforts Seller is making to remove or cure the Leased Property Title Objections.

**5.3.4**  If Seller, despite its commercially reasonable efforts, is unable to cure any Leased Property Title Objection during the Seller Cure Period, then Buyer shall have the right (after receipt of written notice from Seller to such effect), to elect to:

**(a)**  agree with Seller to close the transaction contemplated hereby, thereby accepting the applicable uncured Leased Property Title Objections as Permitted Encumbrances; or

**(b)**  terminate this Agreement in its entirety no later than three (3) days after expiration of the Seller Cure Period, in which case neither party shall have any further rights or obligations hereunder, except for those rights and obligations expressly stated herein to survive the termination hereof;

provided, however, that nothing contained herein shall relieve Seller or Buyer of any obligation resulting from Seller's or Buyer's failure to otherwise comply with the other terms and conditions of this Agreement or to perform its obligations hereunder (it being understood and agreed, however, that Seller shall not be liable for failures to cure matters which are deemed Permitted Encumbrances).

**5.4**  **Restaurant Employees**.

**5.4.1**  Buyer will not have any discussions with any employees of Seller without the prior approval of the Owners.

**5.4.2**  At Closing, Seller will terminate the employment of all of the Restaurant Employees (as defined in Section 3.12.1) and will perform all obligations in connection therewith or contemplated by this Agreement, including without limitation (a) giving required notices, and (b) paying all compensation due

- 18 -

through the day prior to the Closing Date, including accrued but unused vacation time and paid time off due to the Restaurant Employees.

5.4.3   Subject to its due diligence investigation and Buyer's customary employment qualifications, requirements and standards, Buyer shall offer employment to all of the employees of Seller performing services at the Restaurants.

5.4.4   Seller shall be responsible for all accrued wages, salary and bonuses and other employee benefits payable to or with respect to former employees of Seller up through the Effective Time.   Without limiting the foregoing, Seller shall be responsible for complying with the requirements of COBRA, and applicable provisions of state law (if any) relating to former employees and will provide group health insurance continuation coverage under COBRA to all former employees of Seller who incur COBRA qualifying events on or prior to the Closing Date.

5.5   **Casualty Loss**.  Seller shall retain all risks and liability for damage to any of the property associated with the Restaurants by fire, storm, accident, or any other casualty or cause (a "***Casualty Loss***") until the Effective Time.   If, prior to the Effective Time, any of the Restaurants suffer a Casualty Loss which Seller and Buyer do not reasonably expect to be repaired or replaced prior to the Closing Date, then Buyer shall have the option of either proceeding with the purchase of the affected Restaurant and obtaining from Seller all insurance proceeds with respect to such Casualty Loss (based on 100% of replacement costs, plus the amount of any deductible required to be paid by Buyer) or electing to delay the Closing with respect to the affected Restaurant while the repair or restoration is completed by Seller.  If Buyer elects to delay the Closing then the parties shall enter into a mutually acceptable amendment to this Agreement that: (i) adjusts the Purchase Price with respect to the Restaurants that were not subject to the Casualty Loss by subtracting from their Purchase Price the agreed value of the affected Restaurant as set forth on Schedule 54, and (ii) allocates a new purchase price for the affected Restaurant in accordance with Schedule 5.4, and (iii) commits Buyer to close on the purchase of the affected Restaurant within ten (10) days after Seller has completed the repair and restoration of the affected Restaurant (provided, however, that Buyer shall only be required to proceed with Closing with respect to the affected Restaurant if all of the other conditions precedent to Closing with respect to such Restaurant are satisfied (or waived) as provided in Section 6.1 and Section 6.3).  Following execution of such amendment with respect to the affected Restaurant, the parties shall proceed to Closing on the remaining Restaurants in accordance with the terms and subject to the conditions of this Agreement.

5.6   **Condemnation**.   If, prior to Closing, any action is initiated by any Governmental Authority to take all or any portion of the Restaurants by eminent domain (a "***Condemnation***"), then all of Seller's assignable right, title, and interest in and to the award (if any) from the condemning authority shall be assigned to Buyer at the Closing and there shall be no reduction in the Purchase Price; provided, however, that if the Condemnation is expected to materially and adversely affect the use of any Restaurant as a "quick service restaurant," then Buyer shall have the right to terminate this Agreement

- 19 -

solely with respect to the affected Restaurant, and the parties shall enter into a mutually acceptable amendment to this Agreement that adjusts the Purchase Price with respect to the Restaurants that were not subject to the Condemnation in accordance with Schedule 5.4 and treats the award of the condemning authority and all Assets associated with the affected Restaurants as Excluded Assets.

5.7    **Bankruptcy Court Matters**. Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings, pleadings and service lists that Seller is required to, or that are prudent to file with the Bankruptcy Court, that relate to the consummation or approval of this Agreement and will provide Buyer with reasonable opportunity to review and comment on such before service and filing.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Approval Order by the Bankruptcy Court as soon as reasonably practicable, but in no event later than the Closing Date.  Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of a Sale Approval Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE 6.
## CONDITIONS PRECEDENT TO CLOSING

6.1    **Conditions to Buyer's Obligations**.  Buyer's obligation to consummate the transactions contemplated hereby is subject to the fulfillment, or waiver by Buyer, of all of the following conditions on or prior to the Closing Date, in addition to those specified in Section 6.3.  Notwithstanding anything to the contrary set forth in this Agreement, Buyer may not assert that the failure of any of the conditions set forth below serves as the basis for Buyer's refusal to close the transaction contemplated hereby to the extent that such failure of a condition was caused by Buyer's breach of any of its covenants contained in this Agreement.

6.1.1    **Seller's and Owners' Representations and Warranties**.  The representations and warranties made by Seller and Owners in this Agreement are true and correct in all material respects on and as of the Closing Date as if originally made on and as of such date, except for those representations and warranties qualified by materiality which shall be true and correct in all respects on and as of the Closing Date as if originally made on and as of such date.

6.1.2    **Seller's and Owners' Covenants**.  All obligations of Seller and Owners to be performed prior to the Closing Date have been performed in all material respects.

6.1.3    **No Material Adverse Effect**.  During the period from the date of this Agreement to the Closing Date, there has not occurred, and there does not exist on the Closing Date, any condition or fact which, individually or in the aggregate, has or reasonably may be expected to result in a Material Adverse Effect.

    **6.1.4**   **Seller's and Owners' Closing Deliveries**.  Seller and Owners have executed and delivered all of the documents, and performed all of the acts, which are set forth in Section 7.2.

**6.2**   **Conditions to Seller's and Owners' Obligations**.  Seller's and Owners' obligation to consummate the transactions contemplated hereby is subject to the fulfillment, or waiver by Seller and Owners, of all of the following conditions on or prior to the Closing Date, in addition to those specified in Section 6.3.  Notwithstanding anything to the contrary set forth in this Agreement, neither Seller nor Owners may assert that the failure of any of the conditions set forth below serves as the basis for Seller's or Owners' refusal to close the transaction contemplated hereby to the extent that such failure of a condition was caused by Seller's or Owners' breach of any of their covenants contained in this Agreement.

    **6.2.1**   **Buyer's Representations and Warranties**.  The representations and warranties made by Buyer in this Agreement are true and correct in all material respects on and as of the Closing Date as if originally made on and as of such date.

    **6.2.2**   **Buyer's Covenants**.  All obligations of Buyer to be performed hereunder prior to the Closing Date have been performed in all material respects.

    **6.2.3**   **Buyer's Closing Deliveries**.  Buyer has executed and delivered all of the documents, and performed all of the acts, which are set forth in Section 7.2.

**6.3**   **Joint Conditions to the Parties' Obligations**.  In addition to the conditions set forth in Section 6.1 and Section 6.2, the obligation of both Buyer and Seller to consummate the transactions contemplated hereby is further subject to the fulfillment, or waiver by such party, of all of the following conditions on or prior to the Closing Date.  Notwithstanding anything to the contrary set forth in this Agreement, neither party may assert the failure of any of the conditions set forth below to the extent the failure of any such condition was caused by the breach of such party of any of its covenants contained in this Agreement.

    **6.3.1**   **Franchisor Approval**.  The parties have obtained written waivers of all rights of first refusal of the Franchisor and approval from Franchisor to the assignment of the Franchise Agreements to Buyer (or, as applicable, the issuance to Buyer of new Franchise Agreements covering the operation of the Restaurants).

    **6.3.2**   **No Proceedings**.  No lawsuit, proceeding, or investigation has been commenced by any Governmental Authority on any grounds to restrain, enjoin, or hinder the consummation of the transactions contemplated hereby.

    **6.3.3**   **Required Consents**.  All of the Required Consents have been obtained, including the consent of Spirit.

    **6.3.4**   **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered a sale approval order in the Bankruptcy Case, in form and substance reasonably satisfactory to Buyer and Seller, authorizing the transactions and approving this Agreement under Sections 363 and 365 of the Bankruptcy Code (the "***Sale***

*Approval Order*"), and such Sale Approval Order shall be in full force and effect as of the Closing Date and shall not have been stayed, vacated, or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Seller and shall (a) provide that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code, (b) waive any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h) or 6006(d), (c) provide that the sale of the Assets shall be free and clear of all Liens, other than Permitted Liens, (d) provide that the transactions contemplated hereby are approved and that Seller's execution, delivery, and performance of the documents related thereto are approved in all respects; and (e) provide that Buyer is not a successor to Seller.

## ARTICLE 7.
## CLOSING DELIVERIES

**7.1**   **Buyer's Deliveries**.  Buyer shall execute and/or deliver to Seller all of the following items prior to or on the Closing Date:

**7.1.1**   the Purchase Price as set forth in Section 2.2;

**7.1.2**   an assumption instrument, duly executed by Buyer, pursuant to which Buyer assumes the Franchise Agreements upon such terms as are reasonably satisfactory to Buyer, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.1.3**   the Replacement Lease, duly executed by Buyer, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.1.4**   an assignment and assumption agreement, duly executed by Buyer, assuming Seller's rights and obligations under the Assumed Contracts, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.1.5**   a certified copy of such Buyer's Articles of Organization issued by the Texas Secretary of State;

**7.1.6**   a certificate of good standing of Buyer, issued not earlier than twenty-one (21) days prior to the Closing Date by the Texas Secretary of State;

**7.1.7**   a certified copy of the resolutions of the governing body of Buyer, authorizing the execution and delivery of this Agreement and the Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby;

**7.1.8**   a closing certificate executed by, an officer or manager of Buyer, on behalf of Buyer, pursuant to which Buyer certifies to Seller that:

**(a)**   the conditions set forth in Section 6.2 and Section 6.3 have been satisfied; and

- 22 -

(b)  all documents to be executed and delivered by Buyer at the Closing have been executed by duly authorized officers of Buyer; and

**7.1.9**  all other documents reasonably required from Buyer to consummate the transactions contemplated hereby.

**7.2**  **Seller's and Owners' Deliveries**.  Seller (and Owners, as applicable) shall execute and deliver, or in the case of documents or deliverables from third parties, use commercially reasonable efforts to cause to be delivered, to Buyer all of the following items prior to or on the Closing Date:

**7.2.1**  the written approval of Franchisor to the assignment of the Franchise Agreements;

**7.2.2**  a bill of sale, duly executed by Seller, conveying all of the Assets, free and clear of all Liens other than Permitted Liens, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.2.3**  an assignment instrument, duly executed by Seller, conveying all of the Franchise Agreements to Buyer, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.2.4**  an assignment and assumption agreement, executed by Seller, assigning its rights and obligations under the Assumed Contracts, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.2.5**  the Replacement Lease, duly executed by Spirit, which shall have been approved and authorized by the Bankruptcy Court in the Sale Approval Order;

**7.2.6**  copies of all Required Consents, except to the extent waived by Buyer;

**7.2.7**  all consents, orders and approvals of the Bankruptcy Court, including, without limitation, a copy of the Sale Approval Order;

**7.2.8**  certified copy of the Articles of Organization of Seller, issued by the Delaware Secretary of State;

**7.2.9**  a certificate of good standing for Seller issued not earlier than twenty-one (21) days prior to the Closing Date by the Delaware Secretary of State and any other jurisdiction where a Restaurant being transferred is located.

**7.2.10**  a certified copy of the resolutions of the governing body of Seller, authorizing the execution and delivery of this Agreement and the Transaction Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby;

**7.2.11**  a closing certificate executed by Owners and an officer or manager of Seller, on behalf of Seller, certifying to Buyer that:

- 23 -

    **(a)**    the conditions set forth in <u>Section 6.1</u> and <u>Section 6.3</u> have been satisfied; and

    **(b)**    all documents to be executed and delivered by Seller at the Closing have been executed by a duly authorized representative of Seller; and

**7.2.12** all other documents reasonably required from Seller and/or Owners to consummate the transactions contemplated hereby.

## ARTICLE 8.
## [RESERVED]

## ARTICLE 9.
## INDEMNIFICATION

**9.1**    <u>**Effect of Closing**</u>.  The representations and warranties contained in this Agreement shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months after the Closing Date; provided, however that the representations and warranties in <u>Section 3.1</u> (Organization), <u>Section 3.2</u> (Authority), <u>Section 3.5.1</u> (Title to Tangible Personal Property Assets), <u>Section 3.6.2</u> (Title to Leasehold Interest), and <u>Section 3.20</u> (Brokers), shall survive indefinitely (collectively, the "***Fundamental Representations***"); and provided further, that the representations and warranties in <u>Section 3.13</u> (Taxes) shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus sixty (60) days.  All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

**9.2**    <u>**Indemnification by Seller and Owners**</u>.  Subject to <u>Section 9.5</u>, from and after the Closing Date, Seller and Owners shall jointly and severally indemnify, defend and hold harmless Buyer and its officers, directors, employees, stockholders, heirs, successors, and assigns (each, a "***Buyer Indemnified Party***"), from and against any and all losses, damages, debts, liabilities, obligations, judgments, orders, awards, claims, fines, penalties, costs, and expenses (including reasonable legal or accounting fees or expenses) (collectively, "***Losses***") imposed on, incurred by, or asserted against any of them as a result of:

**9.2.1** any breach of a representation or warranty of Seller or Owners contained in Article 3;

**9.2.2** any breach or non-fulfillment of any covenant, agreement, or other obligation of Seller or Owners contained in this Agreement; and

**9.2.3** the Retained Liabilities.

**9.3**    **Indemnification by Buyer**.  Subject to Section 9.5, from and after the Closing Date, Buyer shall indemnify, defend and hold harmless Owners, Seller, and Seller's officers, directors, employees, heirs, successors, and assigns (each, a "***Seller Indemnified Party***"), from and against any and all Losses imposed on, incurred by, or asserted against any of them as a result of:

    **9.3.1**    any breach of a representation or warranty of Buyer contained in Article 4;

    **9.3.2**    any breach or non-fulfillment of any covenant, agreement, or other obligation of Buyer contained in this Agreement; or

    **9.3.3**    the Assumed Liabilities.

**9.4**    **Indemnification Procedure**.

    **9.4.1**    To make a claim for indemnification or reimbursement hereunder, the Person entitled to indemnification or reimbursement hereunder (the "***Indemnified Party***") shall give written notice of such claim (a "***Claim Notice***") to the Person responsible for providing indemnification or reimbursement hereunder (the "***Indemnifying Party***").  The Claim Notice shall describe in reasonable detail the events, facts, and circumstances giving rise to the claim, the date of such occurrence (to the extent known by the Indemnified Party), the nature of the basis for indemnification or reimbursement therefor, and a good faith estimate of the amount of the claim (or, if it is not practicable to determine such estimate, the amount proposed in good faith to be reserved with respect to such claim).

    **9.4.2**    No failure or delay by the Indemnified Party in the performance of the obligations described in Section 9.4.1 shall reduce or otherwise affect the indemnification, reimbursement, or payment obligations hereunder, except to the extent that such failure or delay shall have adversely affected the Indemnifying Party's ability to defend against, settle, or satisfy any liability, damage, loss, claim, or demand for which the Indemnified Party is entitled to indemnification or reimbursement hereunder.

    **9.4.3**    For any indemnification claim that does not involve a third party claim, the Indemnifying Party shall, within twenty (20) days after delivery of the Claim Notice, deliver a written response to the Indemnified Party admitting or disputing the claims set forth in the Claim Notice and (if disputed) a summary in reasonable detail of the factual, contractual, and legal grounds for such dispute.

    **9.4.4**    Notwithstanding Section 9.4.1, if the Claim Notice relates to a third party claim against the Indemnified Party, then such Indemnified Party shall promptly, and in all events within ten (10) days of obtaining actual knowledge thereof, notify the Indemnifying Party of the existence of any claim, demand, or other matter requiring a defense to which the Indemnifying Party's obligations under this Article would apply; provided that no failure or delay by the Indemnified Party to provide such notice within such timeframe shall reduce or otherwise affect the indemnification, reimbursement, or payment obligations hereunder, except to the

extent that such failure or delay shall have adversely affected the Indemnifying Party's ability to defend against, settle, or satisfy any liability, damage, loss, claim, or demand for which the Indemnified Party is entitled to indemnification or reimbursement hereunder.  The Indemnified Party shall give the Indemnifying Party a reasonable opportunity to defend the claim, demand, or matter at the Indemnifying Party's own expense and with counsel selected by the Indemnifying Party and reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnified Party shall at all times also have the right to fully participate in the defense at its own expense.  Any such claim, demand, or other matter shall not be settled or compromised without the consent of the Indemnified Party unless the settlement or resolution includes a full release of the Indemnified Party.  If the Indemnifying Party shall, within a reasonable time after receipt of the Claim Notice, fail to defend the Indemnified Party, then the Indemnified Party shall have the right, but not the obligation, to undertake the defense of, and to compromise or settle, exercising reasonable business judgment, the claim, demand, or other matter on behalf, for the account and at the risk of the Indemnifying Party.  If the claim is one that cannot by its nature be defended solely by the Indemnifying Party (including, without limitation, any federal or state Tax proceeding), the Indemnified Party shall make available, or cause to be made available, all information that the Indemnifying Party may reasonably request.

**9.5**   **Limitations on Indemnification**.  The indemnification provided for in <u>Section 9.2</u> and <u>Section 9.3</u> shall be subject to the following limitations:

**9.5.1**   Subject to <u>Section 9.5.5</u>, the Buyer Indemnified Parties shall not have the right to be indemnified pursuant to <u>Section 9.2.1</u> unless and until the Buyer Indemnified Parties have incurred on a cumulative basis aggregate indemnifiable Losses pursuant to <u>Section 9.2.1</u> in an amount exceeding $50,000 less the amount of all indemnifiable Losses incurred by Buyer under Section 9.2.1 of the October APA (the "***Basket Amount***"), in which case Seller and/or Owners shall be liable to the Buyer Indemnified Parties for all indemnifiable Losses incurred by the Buyer Indemnified Parties, including the Basket Amount.

**9.5.2**   Subject to <u>Section 9.5.5</u>, the total aggregate liability of Seller and Owners for indemnification under <u>Section 9.2.1</u> (excluding indemnification for Seller's breach of the Fundamental Representations and of <u>Section 3.13</u>, which shall not be limited by this <u>Section 9.5.2</u>) shall not exceed **$2,000,000** less the amount of all indemnifiable Losses incurred by Buyer under Section 9.2.1 of the October APA.

**9.5.3**   No Indemnifying Party shall be obligated to indemnify any Indemnified Party for any Losses to the extent the Losses are recovered by the Indemnified Party under any insurance policy either now or hereafter maintained by such Indemnified Party.  Each Indemnified Party shall use commercially reasonable efforts to obtain recoveries under any potentially applicable insurance policy.  If an Indemnified Party obtains such recoveries after the Indemnifying Party makes any indemnification payment with respect to the same Losses, then such  Indemnified

- 26 -

Party shall promptly reimburse the Indemnifying Party for the amount of such recoveries it received (not to exceed the payment previously made by the Indemnifying Party with respect to such Losses).

**9.5.4**    No Indemnifying Party shall be liable to any Indemnified Party for any consequential, special, or punitive damages.

**9.5.5**    In no event shall the limitations contained in <u>Section 9.5.2</u> and <u>Section 9.5.4</u> apply to any indemnification claim by a Buyer Indemnified Party for:

    **(a)**    any fraudulent or intentional misrepresentation of Seller or Owners;

    **(b)**    any claim arising out of a breach by Seller and Owners of any of the Fundamental Representations;

    **(c)**    claims for indemnification under <u>Section 9.2.2</u> or <u>Section 9.2.3</u>.

**9.5.6**    Following the Closing, the remedies provided for in this Article 9 shall be the exclusive remedies of the Indemnified Parties for any claim arising out of this Agreement or the transactions contemplated hereby.

## ARTICLE 10.
## TERMINATION

**10.1**    <u>**Termination Events**</u>.  By notice given prior to the Effective Time (or such earlier date as specified below), subject to <u>Section 10.2</u>, this Agreement may be terminated as follows:

**10.1.1**    by mutual consent of Buyer, Seller, and Owners, subject to the approval of the Bankruptcy Court;

**10.1.2**    by Buyer, if (a) the Bankruptcy Case is converted to a Chapter 7 proceeding, (b) Seller files a plan of reorganization that does not provide for the consummation of the transactions contemplated hereby with Buyer under the terms of this Agreement, or (c) the Bankruptcy Case is dismissed or a Chapter 11 trustee is appointed for the Seller;

**10.1.3**    by Buyer, if a material breach of any provision of this Agreement has been committed by Seller and such breach has not been waived by Buyer (<u>provided</u>; <u>however</u>, that if such breach is curable by Seller prior to the Outside Closing Date through the exercise of Seller's commercially reasonable efforts, then for so long as Seller continues to exercise such commercially reasonable efforts to cure the same, Buyer may not terminate this Agreement);

**10.1.4**    by Seller, if a material breach of any provision of this Agreement has been committed by Buyer and such breach has not been waived by Seller (<u>provided</u>; <u>however</u>, that if such breach is curable by Buyer prior to the Outside Closing Date through the exercise of Buyer's commercially reasonable efforts, then for so long

as Buyer continues to exercise such commercially reasonable efforts to cure the same, Seller may not terminate this Agreement);

**10.1.5** by Buyer, if the conditions to Closing set forth in <u>Section 6.1</u> or <u>Section 6.3</u> have not been satisfied on or before the Outside Closing Date, unless Buyer is in material breach of this Agreement (and regardless of whether Buyer is using commercially reasonable efforts to cure such breach);

**10.1.6** by Seller, if the conditions to Closing set forth in <u>Section 6.2</u> or <u>Section 6.3</u> have not been satisfied on or before the Outside Closing Date, unless Seller is in material breach of this Agreement (and regardless of whether Seller is using commercially reasonable efforts to cure such breach); or

**10.1.7** by Buyer, if any amendment or supplement to information in the Disclosure Schedules is made by Seller pursuant to <u>Section 3.22</u>, and both of the following conditions are met:

**(a)** such supplement or amendment discloses an Intervening Event that is reasonably likely to have a Material Adverse Effect on the Seller or the Business; and

**(b)** Seller does not cure or resolve the breach of representation or warranty caused by the Intervening Event to the reasonable satisfaction of Buyer prior to the Outside Closing Date.

**10.2** **Effect Of Termination.** Each party's right of termination under <u>Section 10.1</u> is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to <u>Section 10.1</u>, all obligations of the parties under this Agreement will terminate, except that the provisions in this <u>Section 10.2</u> and Articles 9 and 11 will survive, along with any other provision which specifically states that it shall survive termination; <u>provided</u>, <u>however</u>, that, if this Agreement is terminated because of a breach of this Agreement by the nonterminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 11.
## MISCELLANEOUS

**11.1** <u>Notices</u>.

**11.1.1** For a notice or other communication under this Agreement to be valid, it must be in writing and delivered (a) by hand, (b) by overnight courier or registered or certified mail, return receipt requested and postage prepaid, or (c) by email.

**11.1.2** A valid notice or other communication under this Agreement will be effective when received by the party to which it is addressed.  It will be deemed to have been received as follows:

**(a)** if it is delivered by hand, or delivered by registered or certified mail, return receipt requested and postage prepaid, upon receipt as indicated by the date on the signed receipt;

**(b)** if it is delivered by overnight courier, the next business day after being deposited with such courier for next day delivery;

**(c)** if it is delivered by email, when the party to which the email is addressed, by notice in accordance with this Section (but without any need for further acknowledgement), acknowledges having received that email, with an automatic "read receipt" not constituting acknowledgment of an email for purposes of this Section; and

**(d)** if the party to which it is addressed rejects or otherwise refuses to accept it, or if it cannot be delivered because of a change in address for which no notice was given, then upon that rejection, refusal, or inability to deliver.

**11.1.3** For a notice or other communication to a party under this Agreement to be valid, it must be addressed using the information specified below for that party or any other information specified by that party in a notice in accordance with this Section 11.1.

If to Buyer, to:

MUY Pizza Minnesota, LLC
Attn: James H. Bodenstedt
17890 Blanco Road #444
San Antonio, TX 78232
Email: jim.bodenstedt@muybrands.com

*with copies to:*

MUY Pizza Minnesota, LLC
Attn: Dawson Bremer, Chief Legal Officer
17890 Blanco Road #444
San Antonio, TX 78232
Email: dawson.bremer@muybrands.com

- 29 -

If to Seller, to:

> Sky Ventures, LLC
> Attn: Barry M. Zelickson
> 5425 Boone Avenue North
> New Hope, MN 55428
> Email: bzelickson@borderfoods.com

*with copies to:*

> Winthrop & Weinstine, P.A.
> Attn: Timothy M. Barnett
> Suite 3500
> 225 South Sixth Street
> Minneapolis, MN  55402
> Email: tbarnett@winthrop.com

**11.2**   **Governing Law**.  The laws of the State of Minnesota, without giving effect to its principles of conflicts of law, govern all adversarial proceedings arising out of this Agreement. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**11.3**   **Jurisdiction**.  If any party brings any proceeding arising out of this Agreement or any Transaction Document, then that party must bring that proceeding only in the Bankruptcy Court.  Each party hereby submits to the exclusive jurisdiction of the foregoing courts for purposes of any such proceeding.   Each party hereby waives any claim that any proceeding brought in accordance with this Section has been brought in an inconvenient forum or that the venue of that proceeding is improper.

**11.4**   **WAIVER OF TRIAL BY JURY**.  EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY PROCEEDINGS ARISING OUT OF THIS AGREEMENT.

**11.5**   **No Rights of Subrogation**.  Nothing in this Agreement, whether express or implied, is intended to give any Person any right of subrogation against any party to this Agreement.

**11.6**   **Entire Agreement**.   This Agreement constitutes the entire understanding among the parties with respect to the subject matter of this Agreement and supersedes all other agreements, whether written or oral, among the parties.

**11.7**   **Amendments**.  No amendment to this Agreement will be effective unless it is in writing and signed by all parties.

**11.8**   **Severability**.  If any provision of this Agreement is held to be unenforceable, then that provision is to be construed by modifying it to the minimum extent necessary to make it

enforceable, unless such modification is not permitted by law, in which case that provision is to be disregarded. If an unenforceable provision is modified or disregarded in accordance with this Section, the rest of the Agreement is to remain in effect as written, and the unenforceable provision is to remain as written in any circumstances other than those in which the provision is held to be unenforceable.

11.9   **No Assignment**.  No party may assign this Agreement without the prior written consent of the other parties; provided, however, the Buyer may assign this Agreement to an affiliate at Closing as long as the Buyer confirms it shall remain liable hereunder until completion of all transactions required to close the purchase and sale contemplated hereby.

11.10   **Certain Defined Terms**.  Certain capitalized terms used in this Agreement shall have the meanings ascribed to such terms on attached Annex I.

11.11   **Confidentiality**.  Except as and to the extent required by law, without the prior written consent of the other party, Buyer will not, and Buyer will direct its representatives not to, disclose or use to the detriment of any other party, any Confidential Information (as defined below) with respect to Seller at any time or in any manner other than in connection with the evaluation or consummation of the transaction contemplated by this Agreement.  For purposes of this Section, "*Confidential Information*" means any proprietary information of Seller or its affiliates, subsidiaries, officers, or the Owners, including, but not limited to, the existence of this Agreement and all data, reports, financial statements or information, projections, employee information, product information, customer and vendor information, documents and records containing or otherwise reflecting information concerning the Restaurants, in any form or medium and whether communicated in writing, orally or otherwise, which is provided to Buyer or its representatives by or on behalf of Seller, together with any analyses, compilations, studies, or other documents prepared by Buyer or its representatives which contain or otherwise reflect or are derivative of such information.  "Confidential Information" does not include information that Buyer or its representatives can establish: (i) was already in its possession prior to the time of disclosure; (ii) was obtained from a third party who is not subject to any legal, contractual, or fiduciary prohibition or obligation limiting or prohibiting disclosure; or (iii) was published or otherwise available to the general public through no act or failure on the part of Buyer or its representatives.  Buyer acknowledges that damages may be inadequate compensation for breach of this Section and, subject to the discretion of any court, Seller shall be entitled to equitable relief to restrain, by an injunction or similar remedy, any breach or threatened breach of this Section by Buyer or any of its representatives.

*[Remainder of page intentionally left blank - signatures appear on the following page(s).]*

8951729v5

The parties are signing this Asset Purchase Agreement as of the date indicated in the introductory paragraph.

**BUYER:**

MUY PIZZA MINNESOTA, LLC,
a Texas limited liability company

By: _____

     James H. Bodenstedt

Its:    President


**SELLER:**

SKY VENTURES, LLC,
a Delaware limited liability company

By:    BFI Ventures, LLC, a Minnesota limited
     liability company

By: _____

     Lee J. Engler

Its:    President


**OWNERS:**

_____

Lee J. Engler


_____

Jeffery T. Engler

The parties are signing this Asset Purchase Agreement as of the date indicated in the introductory paragraph.

**BUYER:**

MUY PIZZA MINNESOTA, LLC,
a Texas limited liability company

By:  _____
     James H. Bodenstedt
Its:    President

**SELLER:**

SKY VENTURES, LLC,
a Delaware limited liability company

By:    BFI Ventures, LLC, a Minnesota limited
       liability company

By:  _____
     Lee J. Engler
Its:    President

**OWNERS:**

_____
Lee J. Engler

_____
Jeffery T. Engler

*Signature page to Asset Purchase Agreement*

## Annex I

## Certain Defined Terms

"*COBRA*" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Environmental Claims*" means any administrative or judicial actions, suits, orders, claims, proceedings, or written or oral notices of noncompliance by or from any Person alleging liability arising out of the Release of or exposure to any Hazardous Material or the failure to comply with any Environmental Law.

"*Environmental Law*" means any applicable federal, state, or local law, regulation, ordinance, policy, or directive, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et. seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 1101 et. seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et. seq.; the Hazardous Materials Transportation Act of 1974, 49 U.S.C. § 1801 et. seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et. seq.; the Clean Air Act, 42 U.S.C. § 4701 et. seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et. seq.; the Safe Drinking Water Act, 42 U.S.C. § 3001 et. seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et. seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et. seq.; and any laws regulating the use of biological agents or substances including medical or infectious wastes and the corresponding State laws, regulations and local ordinances, etc. which may be applicable, as any such acts may be amended, provided that in all cases Environmental Laws shall not include general health code requirements and related health and safety laws, rules, and regulations.

"*Franchisor*" means Pizza Hut, Inc.

"*Governmental Authority*" means any nation or government, foreign, or domestic, any state or other political subdivision thereof, and any agency or other entity exercising executive, legislative, regulatory, or administrative functions of government, including all taxing authorities.

"*Hazardous Materials*" means any substance defined as "hazardous substances," "hazardous air pollutant," "pollutants," "contaminants," "hazardous materials," "hazardous wastes," "toxic chemicals," "petroleum or petroleum products," "toxics," "hazardous chemicals," "extremely hazardous substances," "pesticides" or related materials, including but not limited to radon and asbestos, as now, in the past, or hereafter defined in any Environmental Law.

"*Lien*" means any mortgage, pledge, assessment, security interest, encumbrance, charge, claim, easement, option, right of first refusal, right of first offer, or other lien or restriction of any kind or nature (whether arising by contract or by operation of law), including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"*Material Adverse Effect*" means any event, matter, condition or circumstance that (1) has or can be reasonably expected to have, a material detrimental effect on the Assets, Assumed

Liabilities, results of operations, financial condition, or prospects of the Business in each case considered as a whole, (2) has a material detrimental effect on the ability of Seller to perform under this Agreement, or (3) materially and detrimentally affects the legality, validity, binding effect, or enforceability of this Agreement; provided, however, that "Material Adverse Effect" shall exclude any adverse event, matter, condition, or circumstance arising out of (A) a decline in the retail price of the products sold by Seller, (B) an increase in the price of food products used by Seller, (C) general economic conditions, (D) conditions generally affecting the "quick service restaurant" industry, (E) war, act of terrorism, civil unrest, or similar event or any worsening thereof, or (F) any change in applicable law or the interpretation thereof.

"*October APA*" means that certain Asset Purchase Agreement dated October 31, 2013 by and among Buyer, Seller, Owners, and PH Minnesota, LLC, pursuant to which Buyer acquired 54 restaurants from Seller and PH Minnesota, LLC.

"*Person*" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture, or other entity, or a Governmental Authority.

"*Related Person*" means any director, executive officer, shareholder or affiliate of the Seller (or any spouse of such Person).

"*Release*" or "*Released*" means any release, spill, emission, leaking, pumping, emitting, discharging, injecting, escaping, leaching, dumping, disposing, or passive migration into or through the environment.

"*Representative*" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel, or other representative of that Person.

"*Sale Approval Order*" shall have the meaning set forth in Section 6.3.4.

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative, or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"*Title Company*" means Stewart Title Company.

"*Transaction Document*" means all agreements, certificates and instruments delivered by either party in connection with the transactions contemplated by this Agreement.

**Exhibits and Schedules**

| Exhibit | A | Restaurants |
|---|---|---|

| Schedule | 1.3.2 | Franchise Agreements |
|---|---|---|
| | 2.6 | Allocation of Purchase Price |
| | 3.3 | Conflicts with Contracts or Agreements |
| | 3.4 | Required Consents |
| | 3.5.1 | Exception to Clear Title of Tangible Personal Property |
| | 3.7 | Exception to Compliance with Laws |
| | 3.9.1 | Description of Pro Forma Adjustments to Financial Statements |
| | 3.10 | Litigation |
| | 3.12.1 | Bonuses to Employees Since January 1, 2013 |
| | 3.12.2 | Settled Litigation Involving Employees |
| | 3.12.3 | Employment Contracts and Other Matters |
| | 3.14.1 | Employee Benefit Plan |
| | 3.16.1 | Assumed Material Contracts |
| | 3.17 | Franchise Matters |
| | 3.18 | Insurance |
| | 3.19 | Absence of Changes |
| | 3.21 | Affiliate Transactions |
| | 5.8 | Schedule of Restaurant Values |

**Exhibit A**

**Restaurant List**

| 13773 | **RBD** | **10900 173rd St** | **Lakeville** |
|-------|---------|--------------------|---------------|
| **13780** | **RBD** | **1918 London Rd** | **Duluth** |
| **13788** | **RBD** | **1157 S Main** | **Sauk Centre** |
| **13823** | **RBD** | **1653 Weir Dr** | **Woodbury** |
| **13839** | **DELCO** | **3854 N Central** | **Columbia Heights** |
| **13862** | **DELCO** | **5501 Grand Ave** | **Duluth** |

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                           Chapter 11

Sky Ventures, LLC                                Case No. 14-_____

                    Debtor.

## DECLARATION OF CHRISTOPHER J. KELLEHER

I, Christopher J. Kelleher, certify and declare as follows:

1.     I am a Managing Director of Auspex Capital, LLC ("Auspex").

2.     Auspex is a financial advisory and boutique investment banking firm that specializes in the restaurant industry.  Its target client is a multi-unit restaurant entity that is seeking solutions to challenges posed by the restaurant industry.

3.     Auspex was formed in 2005 and has a staff of seven (7) professionals.

4.     Its Managing Directors combined have over fifty (50) years of experience in multi-unit restaurant finance and sales.

5.     Since 2004, Auspex has placed in excess of $1.5 Billion of senior debt for restaurant companies.   In addition, Auspex has completed more than sixty-five (65) mergers, acquisitions or divestiture assignments.

6.     Auspex was retained by Sky Ventures, LLC in 2013 to work with the company and address issues that related to the financing and operations of Sky Ventures, LLC's nearly eighty (80) operating Pizza Hut, Inc. ("Pizza Hut") stores in the upper Midwest.

7.     We were retained to review how Sky Ventures, LLC could solve the financial problems posed by the capital remodel requirements that were imposed on franchisees under their Pizza Hut franchise agreement.

8.      In working with Sky Ventures, LLC and Pizza Hut, a decision was reached by Sky Ventures, LLC to exit the Pizza Hut franchise business.

9.      Auspex was retained to manage the Sky Ventures, LLC sale process. All parties were advised that all potential buyers would, in their pricing of the assets for sale, take into account the required capital remodel expenditures.

10.     Auspex immediately, after its retention, undertook an extensive analysis on both an entity and store level. Auspex prepared financial material that could be distributed to potential buyers. The analysis identified the stores that operated profitably and those that were cash- flow negative.

11.     The store level analysis performed by Auspex revealed that only six (6) of the fifteen (15) locations, subject to the Master Lease Agreement with Spirit Master Funding, LLC ("Spirit"), operated with positive cash flow.

12.     In the spring/early summer of 2013, Auspex sent out a package to eleven (11) prospective buyers as part of an organized sales process. The package advised prospective bidders that they could purchase all or some of the Pizza Hut locations owned and operated by Sky Ventures, LLC.

13.     Auspex received indications of interest from nine (9) prospective buyers. The potential buyers' confidentiality agreements were given access to detailed financial information concerning the stores owned and operated by Sky Ventures, LLC. In addition, they were permitted to review the physical locations owned and operated by Sky Ventures, LLC.

14.     Ultimately, Auspex received bids from five (5) bidders. No bidder made a bid on only the fifteen (15) units subject to the Spirit Master Lease.

2

15.    The highest and best offer received with respect to the Spirit Master Lease stores was an offer by MUY Pizza Minnesota, LLC ("MUY") to pay $951,000.00 for the going concern assets of six (6) of the Master Lease stores and pay to Spirit the allocable rental for the six (6) locations. Initially, MUY indicated an interest in purchasing an additional three (3) units at one-half the allocable rent or the remaining term of the lease with no consideration for the going concern assets in the three (3) locations. MUY has since advised that it is not interested in the three (3) stores. In addition, MUY has advised that it is only interested in the six (6) locations if they are acquired as a going concern.

16.    MUY, in addition to making an offer for six (6) of the Master Lease stores, entered into a contract to acquire fifty-four (54) locations owned and operated by Sky Ventures, LLC. The sale of the fifty-four (54) units closed in December of 2013.

17.    MUY, in connection with the sale, was able to receive the consent of Pizza Hut to take over the fifty-four (54) stores and it is believed that Pizza Hut will agree to the sale of the six (6) Master Lease stores to MUY.

18.    It is my belief that a full and fair sales process was run by Auspex in connection with the Sky Ventures, LLC sales process. I believe that the universe of potential buyers who could obtain the consent of Pizza Hut was contacted about the opportunity to acquire some or all of the Sky Ventures, LLC locations. I believe that the sales price offered by MUY for six (6) of the Master Lease locations coupled with its agreement to pay the allocable rent of the stores subject to the sales offer for the remaining term of the Master Lease is the highest and best offer Sky Ventures, LLC will receive.

19.    I do not believe that marketing the six (6) Master Lease stores will yield a greater recovery for the estate or Spirit.

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __ day of May, 2014.

CHRISTOPHER J. KELLEHER

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                          Chapter 11

Sky Ventures, LLC                                              Case No. 14-42107-MER

                     Debtor.

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2014, I caused the following documents:

1.    NOTICE OF HEARING, MOTION AND MEMORANDUM OF LAW FOR AUTHORITY TO SELL PROPERTY FREE AND CLEAR OF INTERESTS, LIENS, MORTGAGES, PRIVILEGES AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363; and

2.    NOTICE OF HEARING, MOTION AND MEMORANDUM OF LAW FOR ORDER (I) APPROVING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING REVISION, ASSUMPTION AND ASSIGNMENT OF SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT AND ASSUMPTION AND ASSIGNMENT AND REJECTION OF OTHER LEASES AND EXECUTORY CONTRACTS, (III) APPROVING PROPOSED COMPROMISE; AND  IN THE ALTERNATIVE (IV) REJECTING THE SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT; AND (V) FOR OTHER RELATED RELIEF

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of electronic filing to all persons registered for electronic notice, including the United States Trustee.

I further certify that I sent the foregoing documents via overnight FedEx or overnight Express Mail to the parties shown on the attached Chapter 11 Service List.

Dated: May 28, 2014

WINTHROP & WEINSTINE, P.A.

By:  *s/ Jacob B. Sellers*
Daniel C. Beck, #192053
Jacob B. Sellers, #348879
225 South Sixth Street
Suite 3500
Minneapolis, MN  55402-4629
(612) 604-6400
dbeck@winthrop.com
jsellers@winthrop.com

and

HELLER, DRAPER, PATRICK, HORN
 & DABNEY, L.L.C.
Douglas S. Draper, La. Bar No. 5073
Leslie A. Collins, La. Bar No. 14891
Greta M. Brouphy, La. Bar No. 26216
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone: 504.299.3333/
Fax: 504.299.3399
ddraper@hellerdraper.com
lcollins@hellerdraper.com
gbrouphy@hellerdraper.com

**Counsel for Debtor**

9119055v1

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 |
| Sky Ventures, LLC | Case No. 14-42107-MER |
| Debtor. | |

## CHAPTER 11 SERVICE LIST

| | | |
|---|---|---|
| A+ SERVICES<br>4481 N FRONTAGE RD<br>ROCHESTER MN 55901 | AARON POHJOLA DBA AP<br>SERVICES OF DULUTH<br>1806 W ARROWHEAD<br>ROAD<br>DULUTH MN 55811 | ALPHA CONTAINER<br>4180 160TH STREET E<br>ROSEMOUNT MN 55068 |
| BRIGGS AND MORGAN<br>ATTN JASON R ASMUS<br>80 S EIGHTH ST<br>2200 IDS CTR<br>MINNEAPOLIS MN 55402<br>*ECF* | CARLSON<br>REFRIGERATION<br>602 OGDEN AVENUE<br>SUPERIOR WI 54880 | CRAIG S GANZ ESQ<br>GALLAGHER & KENNEDY<br>PA<br>2575 E CAMELBACK RD<br>STE 1100<br>PHOENIX AZ 85016 |
| CUSTOM CREATIONS<br>REMODELING<br>1321 ANDOVER BLVD STE<br>112<br>ANDOVER MN 55304 | DELAGET LLC<br>6200 MINERAL POINT RD<br>SUITE 102<br>MADISON WI 53705 | GEOFF MICHAEL GROUP<br>1713 AVOCET LANE<br>MOUND MN 55364 |
| HYDRO RESTORATION<br>50 GLEN EDGE RD<br>DELLWOOD MN 55110 | IPHFHA<br>7829 E ROCKHILL STREET<br>STE 201<br>WICHITA KS 67206-3918 | JANE E HEATH ESQ<br>DUGGAN SMITH & HEATH<br>LLP<br>560 HIGUERA ST STE B<br>SAN LUIS OBISPO CA<br>93401 |

| KFC NATIONAL COUNCIL & ADVERTISING COOP PO BOX 642474 PITTSBURGH PA 15264-2474 | KFC ROYALTY PO BOX 203805 DALLAS TX 75320-3805 | KFC UPPER MIDWEST ADV ASSOC ATTN: APRIL JOLLEY C/O AFA KRAUSE 45 WEST 10000 SOUTH STE 201 SANDY UT 84070 |
|---|---|---|
| KFC YRSG HIRING ZONE PO BOX 203805 DALLAS TX 75320-3805 | KFC YRSG MERIT KFC PO BOX 203805 DALLAS TX 75320-3805 | LAKE REGION ELECTRIC 4601 113TH AVENUE NE SPICER MN 56288 |
| LEGEND MECHANICAL 12467 BOONE AVENUE STE 1 SAVAGE MN 55378 | MACGILLIVRAY RANCH LLC 225 LOS ROBLES TEMPLETON CA 93465 | MATTHEW C HELLAND ESQ NICHOLS KASTER LLP ONE EMBARCADERO CTR STE 720 SAN FRANCISCO CA 94111 |
| MATTHEW H. MORGAN ESQ 4600 IDS CENTER 80 SOUTH 8TH STREET MINNEAPOLIS MN 55402 | MEIER ELECTRIC INC OF MARSHALL 1004 W MAIN ST PO BOX 455 MARSHALL MN 56258 | MTG 8555 123RD STREET WEST SAVAGE MN 55378 |
| PAR TECH INC PO BOX 301175 DALLAS TX 75303-1175 | PEPSI 75948 PO BOX 75948 CHICAGO IL 60675 | PIZZA HUT C/O WILLIAM EVANOFF SIDLEY AUSTIN LLC 1 S DEARBORN ST CHICAGO IL 60603 |
| PIZZA HUT INC ST LOUIS/YRSG PO BOX 955641 ST LOUIS MO 63195-5641 | PRAXAIR DISTRIBUTION INC 26 BEACH AVE LA GRANGE PARK, IL 60526 *RETURNED AS NOT FOUND, NO NEW ADDRESS YET* | QUIKORDER INC 351 WEST HUBBARD STREET STE 501 CHICAGO IL 60654 |

| ROYAL ROOFING<br>PO BOX 248<br>MONTICELLO MN 55362 | SPIRIT MASTER FUNDING LLC<br>ATTN COMPLIANCE DEPT<br>16767 N PERIMETER DR STE 210<br>SCOTTSDALE AZ 85260-1042<br>*ECF* | SPIRIT REALTY CAPITAL<br>16767 N PERIMETER DRIVE<br>SUITE 210<br>SCOTTSDALE AZ 85260 |
| --- | --- | --- |
| SUMMIT FACILITY & KITCHEN SERV LLC<br>8818 7TH AVENUE N<br>GOLDEN VALLEY MN 55427 | TACO BELL CORP PO BOX 116946<br>ATTN PYMT PROCESSING PO BOX 116946<br>ATLANTA GA 30368-6946<br>*RETURNED AS NOT FOUND, NO NEW ADDRESS YET* | TRUEX ELECTRIC<br>PO BOX 346<br>ROCKWELL IA 50469 |
| UFPC SMALLWARES CONNECTION<br>PO BOX 73184<br>CLEVELAND OH 44193 | XCEL ENERGY - MPLS MN<br>PO BOX 9477<br>MINNEAPOLIS MN 55484-9477 | PIZZA HUT OF AMERICA, INC.<br>c/o JOHN J. MURPHY<br>14841 DALLAS PARKWAY<br>DALLAS TX 75254 |
| IRS<br>380 JACKSON STREET STE 650<br>ST PAUL MN 55101 | IRS<br>PO BOX 7346<br>PHILADELPHIA PA 19101-7346 | MINNESOTA REVENUE<br>PO BOX 64651<br>ST PAUL MN 55164-0651 |
| MN DEPARTMENT OF EMPLOYMENT AND ECONOMIC DEVELOPMENT<br>332 MINNESOTA STREET<br>ST PAUL MN 55101-1351 | UNITED STATES ATTORNEY<br>DISTRICT OF MINNESOTA<br>300 S 4TH STREET STE 600<br>MINNEAPOLIS MN 55415 | MINNESOTA DEPARTMENT OF REVENUE<br>600 NORTH ROBERT STREET<br>ST. PAUL MN 55101-2228 |
| ST. LOUIS COUNTY AUDITOR<br>100 N 5TH AVE W<br>ROOM 214<br>DULUTH MN 55802 | WISCONSIN DEPARTMENT OF REVENUE<br>SALES AND USE TAX<br>2135 RIMROCK ROAD<br>MADISON, WI 53713 | ERIC GOODMAN<br>BAKER HOSTETLER<br>PNC CENTER<br>1900 EAST 9TH ST.,<br>SUITE 3200<br>CLEVELAND, OH 44114-3482 |

| IOWA DEPARTMENT OF REVENUE SALES AND USE TAX HOOVER STATE OFFICE BUILDING 1305 E WALNUT DES MOINES, IA 50319 | TOURISM TAX CITY OF DULUTH 411 W 1ST STREET TREASURER'S OFFICE DULUTH, MN 55802 | BRENT WEISENBERG BALLARD SHAHR LLP 425 PARK AVE NEW YORK, NY 10021 |
| --- | --- | --- |

9081150v1