## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                    Chapter 11

Sky Ventures, LLC,                                        Case No. 14-42107 (MER)

       Debtor.

---

**OBJECTION OF SPIRIT MASTER FUNDING, LLC TO THE DEBTOR'S MOTION
FOR AN ORDER (I) APPROVING SALE OF CERTAIN ASSETS, (II) APPROVING
REVISION, ASSUMPTION, AND ASSIGNMENT OF SECOND AMENDED AND
RESTATED MASTER LEASE AGREEMENT, AND (III) APPROVING PROPOSED
COMPROMISE, OR, IN THE ALTERNATIVE, (IV) REJECTING THE SECOND
AMENDED AND RESTATED MASTER LEASE AGREEMENT**

---

Spirit Master Funding, LLC ("**Spirit**"), by and through its undersigned counsel,

Ballard Spahr LLP and Briggs and Morgan, P.A., hereby objects (this "**Objection**") to the

motion (the "**Sale Motion**") of Sky Ventures, LLC (the "**Debtor**"), pursuant to Sections 105,

363, and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry

of an order authorizing and approving:

    (1)    the sale of certain of the Debtor's assets free and clear of all liens and claims (the

        "**Sale**");

    (2)    the (a) modification of the Second Amended and Restated Master Lease

        Agreement dated November 26, 2013 (the "**Master Lease**"), by and between the

        Debtor and Spirit, attached hereto as **Exhibit A**, to include six specified locations

        (the "**Six Locations**") only and to remove and reject all other locations, and

(b) assumption and assignment of the modified Master Lease to MUY Pizza Minnesota, LLC (the "**Purchaser**");

(3)      a proposed compromise with Spirit pursuant to Bankruptcy Rule 9019; <u>or, in the alternative</u>,

(4)      if Spirit enters into a new lease with the Purchaser for the Six Locations on terms acceptable to the Purchaser but does not agree to the proposed compromise, the sale of certain assets and the rejection of the Master Lease.

In support of its Objection, Spirit states as follows:

## I.

## <u>PRELIMINARY STATEMENT</u>

1.       Executory contracts must be assumed or rejected *cum onere* – with all their benefits and burdens.  Through the Sale Motion, the Debtor seeks to evade the *cum onere* rule by severing certain properties from the Master Lease, rejecting its obligations as to those leases, and assuming and assigning its rights to the remaining leases covered by the Master Lease to the Purchaser.

2.       The determination of whether a contract is "severable" for purposes of allowing rejection of a portion of an agreement is controlled by state law and looks to the intent of the parties.  The relevant test is whether the various provisions were intended to be interdependent – i.e., whether the parties would have agreed to one set of obligations in the absence of another. This interdependence test conforms precisely to the *cum onere* rules for executory contracts, which do not allow a debtor to obtain the benefits of a contract without the corresponding burdens.

3.      Here, the structure of the Master Lease Agreement, its specific provisions, and the parties' negotiations establish that the obligations as to each of the locations were interdependent.  The Master Lease clearly and unambiguously reflects the intention of the parties that the lease be a unitary, non-severable lease.  Indeed, the Master Lease specifically provides that both parties acknowledge and agree that it constitutes a single lease for all of the Debtor's properties, the Debtor's obligations and rights thereunder may not be allocated or divided among such properties and the Debtor waives all claims and defenses based upon the characterization of the Master Lease as anything other than a master lease of all of the properties.

4.      By seeking to modify the Master Lease by assuming the Six Locations and rejecting the balance of the leases, the Debtor is trying to repudiate the critical element for it having obtained the benefits of this transaction, and to flout the structure for which the parties expressly bargained and on which they reached agreement.  Because the Debtor's severability argument is contrary to both the facts and the applicable law, the Sale Motion should be denied and the Master Lease Agreement should be immediately rejected by the Debtor.

## II.

## BACKGROUND

### A.      The Debtor's Acquisition and Subsequent Partial Disposition of the Pizza Hut Restaurants

5.      The Debtor was formed in 1999 in order to acquire from Pizza Hut, Inc. ("**Pizza Hut**"), certain store and development rights in the Northern Iowa, Minnesota, and Wisconsin markets.

6.      In November 2000, the Debtor acquired approximately 85 Pizza Hut locations from Pizza Hut.

7.      In December 2013, the Debtor sold 54 Pizza Hut locations to the Purchaser (the "**Asset Sale**").   The Debtor has since closed all of its Pizza Hut locations other than those operating from the Six Locations.   It is uncertain at this juncture whether the Debtor was functionally insolvent upon completion of the Asset Sale.

**B.      The Debtor Files for Bankruptcy Protection**

8.      On May 14, 2014 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

9.      The Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.   To date, no trustee or official committee of unsecured creditors has been appointed in this case.

**C.      The Sale Motion**

10.      On May 28, 2014, the Debtor filed the Sale Motion pursuant to which it seeks authority to enter into, and for approval of, an Asset Purchase Agreement with the Purchaser (the "**APA**").   Under the APA, the Debtor proposes to assume and assign the Six Locations which are subject to the Master Lease and sell certain other assets to the Purchaser in consideration for a purchase price of $951,473. (the "**Purchase Price**").

11.      The Sale is contingent on the Purchaser obtaining lease rights to the Six Locations on acceptable terms.   The Debtor proposes to accomplish the Sale in one of two ways:

(i)      modify the Master Lease to cover only the Six Locations and then assume and assign the modified Master Lease to the Purchaser and reject the balance of the leases, or

(ii)      reject the Master Lease while Spirit and the Purchaser enter into a new lease for the Six Locations on the same terms and conditions currently provided for in the Master Lease.

12.     If Spirit (i) consents to the modification, assumption, and assignment of the Master Lease, or (ii) timely enters into a new lease with the Purchaser for the Six Locations and agrees to resolve all of its claims against the Debtor's estate in connection therewith, the Debtor proposes to pay Spirit $400,000..  Alternatively, if Spirit and the Purchaser enter into a new lease for the Six Locations by June 30, 2014, but Spirit does not agree to accept $400,000 in final satisfaction of its claims, the Debtor will proceed with the Sale by rejecting the Master Lease and Spirit will retain all of its rights to assert claims against the Debtor.

**III.**

**THE SALE MOTION SHOULD BE DENIED BECAUSE
THE MASTER LEASE IS NOT SEVERABLE**

13.     Notwithstanding the Debtor's and Spirit's clear and unambiguous statement of intention that the Master Lease be a single, non-severable lease, the Debtor improperly seeks to assume and assign only a portion of the locations covered by the Master Lease.  Because the Sale Motion does not contemplate or provide for an assumption of the entire, indivisible Master Lease, the Sale Motion must be denied.

    **A.     The *Cum Onere* Principle of Assumption or Rejection Precludes Rejection of a Portion of a Contract Where the Parties Intended that the Contract Obligations are Interdependent**

        **(i)     The Application of Severability Law to Contract Rejection**

14.     Whether a particular agreement is unitary or several is determined by the intent and actions of the contracting parties and is a question of state law.  In re Wagstaff Minnesota, Inc., 2012 WL 10623, *3 (D.Minn. January 3, 2012); cf. In re United Airlines, Inc., 453 F.3d 463, 468 (7th Cir. 2006) (applying Colorado law and finding that "[a] contract cannot be severed unless the language of the contract manifests each party's intent to treat the contract as divisible….  Even if the parties entered a multi-part contract, that contract cannot be severed

after the fact if the parties entered it "as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out") (internal citations omitted); In re Integrated Health Servs., Inc., 2000 WL 33712484, *3 (Bankr. D. Del., July 7, 2000) ("a debtor may not assume less than all unexpired leases or executory contracts in an integrated group unless they are severable.  Whether the leases are severable is determined by the intent and actions of the contracting parties."); In re Plum Run Serv. Corp., 159 B.R. 496,499 (Bankr. S.D. Ohio 1993) (applying Ohio law in resolving the issue of severability and finding the contract indivisible because "the parties intended to consider the [contract] as a single, interdependent contract, not as eleven divisible contracts."); In re T & H Diner, Inc., 108 B.R. 448, 453 (D.N.J. 1989) ("The question of divisibility is a matter of state law ….  In New Jersey the determination of whether a transaction constitutes one or several contracts is primarily based upon the intentions of the parties") (internal citations omitted).

15.    The centrality of state law here is critical.  In other areas of bankruptcy law, a pro-reorganization bias may result in debtors obtaining some leeway.  However, with respect to executory contracts generally – as is evidenced by the *cum onere* rule – and with respect to severability in particular, bankruptcy policy holds no sway.  Whether a contract is severable is to be decided under state law.  In any event, there is no federal policy which permits severance of a lease solely because it makes a debtor's reorganization more feasible.  In re Buffets Holdings, Inc., et al., 387 B.R. 115, 124 (Bankr. D. Del. 2008) (citing In re East Hampton Sand & Gravel Co., Inc., 25 B.R. 193 (Bankr. E.D.N.Y. 1982)).

16.    In the bankruptcy context, the severability determination plays out in the context of the law of executory contracts, which is rooted in the *cum onere* principle that a debtor may not assume a contract only in part, but must assume an agreement in its entirety, with all its

6

benefits and burdens.  See, e.g., In re ANC Rental Corp., 277 B.R. 226, 238-39 (Bankr. D. Del. 2002).  "The [debtor] may not blow hot and cold.  If he accepts the contract, he accepts it *cum onere*.  If he receives the benefits, he must adopt the burdens.  He cannot accept one and reject the other."  In re Fleming Companies, 499 F.3d 300, 308 (3d Cir. 2007) (quoting In re Italian Cook Oil Corp., 190 F.2d 994, 997 (3d Cir. 1951)).  Accordingly, in Fleming, the Third Circuit addressed whether assumption of a grocery supply contract was permissible absent assumption of a separate contract relating to the lease of a warehouse facility.  Holding that the lease – despite the fact that it was embodied in a separate document – was a "material and economically significant term of the arrangement," the court denied the assumption, holding that "the *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'"  Id. (citation omitted).

17.     Here, the relevant question is whether under applicable state law, the Master Lease is a single agreement, which must be assumed or rejected as a whole, or whether it consists of multiple agreements (albeit perhaps contained in a single document), which should be viewed as discrete for purposes of allowing some to be rejected while others are assumed.  See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minnesota, 671 N.W.2d 213, 221 (Minn. Ct.App. 2003) (Under Minnesota law, whether a contract is severable depends upon the intention of the parties as ascertained from the writing of the contract).  Stated another way, a finding of severability, for rejection purposes, requires a determination that separate obligations are indeed discrete, and not an "integral part" of the parties' agreement.

### (ii)     **Under Minnesota Law, the Intent of the Parties Governs**

18.     The state law applicable to the Master Lease is the law of Minnesota.  The Supreme Court of Minnesota has held that the determination of whether a contract is severable

requires the Court to ascertain the intent of the parties.  Shultz v. Stiernagle, 270 N.W.2d 269,

271 (Minn. 1978) ("whether a contract is entire or severable turns on the intent of the parties, as

objectively manifested by them."); E. Edelman & Co. v. Queen Stove Works, Inc., 205 Minn. 7,

19, 284 N.W. 838, 844 (1939) (stating that "[a]scertaining the intent of the parties" would

answer whether the contract was "entire or divisible").

19.    The intent of the parties is determined by the Court upon consideration of the

language of the agreement.  Alpha Real Estate Co. of Rochester v. Delta Dental Plan of

Minnesota, 671 N.W.2d 213, 221 (Minn. Ct.App. 2003) ("When the intent of the parties can be

determined from the writing of the contract, construction of the instrument is a question of law

for the court to resolve….") (quotations and citations omitted).  In addition, the terms of the

agreement shed light on severability, for example "[a] separate statement of price or other

consideration is one basis for determining the intention of the parties in the absence of an

expressed intention or intention otherwise indicated."  Henry Simons Lumber Co. v. Simons, 232

Minn. 187, 193-95, 44 N.W.2d 726, 730-31 (1950).

> **(iii)    The Debtor's Obligations as to the Various Premises in the Master
> Lease are Interdependent, and not Separately Subject to Assumption
> or Rejection**

20.    As noted above, whether a contract is entire or divisible is determined "by the

intent and actions of the contracting parties."  In re Wagstaff Minnesota, Inc., 2012 WL 10623,

*3.  As a general matter, moreover, there is a presumption against a finding of divisibility:

"There is a presumption against finding a contract divisible, unless divisibility is expressly stated

in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise

clearly manifested."  15 WILLISTON ON CONTRACTS §45:4 at 275.

21.     Here, the intent of the parties that each lease is a non-divisible agreement is evident from the Master Lease structure itself, the provisions and language of the Master Lease, and the negotiations of the parties.

**(a)     The Structure of the Master Lease**

22.     This is not a case where a landlord happened to have numerous locations available for rent, decided to rent them to a single tenant, and used a single contract for that purpose as a matter of convenience.  Rather, the Master Lease was drafted specifically to provide the legal protections such a lease affords Spirit, such as the ability to terminate the Master Lease for all properties if rent was not paid.  Indeed, in Section 32 of the Master Lease, the following expressions of intent, representations, warranties, stipulations and waivers were deemed material inducements to Spirit entering into the Master Lease:

> (i)     It is the intent of the parties hereto, and the parties acknowledge and agree that they have executed and delivered this Lease with the understanding that (1) this Lease constitutes a single lease of all, but not less than all, of the Properties, and, subject to the certain terms and conditions in this Lease, if at any time this Lease covers other real property in addition to the Properties, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee. . . .

> (iii)     Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of all of the Properties.  Lessee stipulates and agrees (1) not to challenge the validity, enforceability or characterization of the lease of the Properties as a true lease and/or as a single instrument pertaining to the lease of all, but not less than all, of the Properties, and (2) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 32.B.

Based on the foregoing alone, there is indisputable evidence that the parties intended that the Master Lease be treated as a unitary lease and that the parties did not intend that the respective

9

rights and obligations for particular properties be severable.  In light of this fact, it would violate

the parties' intent to rewrite their agreement as a separate lease for each of the properties, as the

Debtor now seeks to do through the Sale Motion.

**(b)**    **The Provisions of the Master Lease**

23.    Numerous provisions of the Master Lease confirm that it is a unitary lease and

that the parties did not intend that the respective rights and obligations for particular properties

be separable:

- Section 2 of the Master Lease requires that the Debtor diligently operate its business on at least 85% the properties.

- Section 3 of the Master Lease requires the Debtor to exercise its option to renew on no less than 50% of the properties.

- The Base Monthly Rent under Section 4 of the Master Lease was calculated and paid in the aggregate and not on a location by location basis.

- It is an Event of Default under Section 21 of the Master Lease if the Debtor vacates or abandons more than 15% of the properties.

- Under Section 24 of the Master Lease, the Debtor does not have the right to assign any particular premises under the Master Lease but rather, may only assign the Master Lease as a whole, subject to certain conditions.

24.    The foregoing provisions are utterly irreconcilable with the notion of a divisible

lease.  In a divisible lease, each site would be deemed to be the subject of a separate rent

agreement, and the tenant would only have to pay for the sites which it gets to use.  Here, the

Debtor has to pay for all the sites even if it vacates or abandons certain locations.  Although such

a "hell or high water" obligation may not be a necessary condition for an indivisible lease, it

conclusively refutes any suggestion that the lease is divisible on a site-by-site basis.

25.    Based on the foregoing, the provisions of the Master Lease confirm its unitary

nature and that Debtor's obligations as to individual sites are not divisible.  Accordingly, the

10

Debtor may not assume and assign the Six Locations to the Purchaser, and Spirit hereby refuses

to consent to such assumption and assignment. The Debtor must therefore reject the Master

Lease, and Spirit will file a rejection damage claim in accordance with any order authorizing

such rejection.

        **WHEREFORE,** Spirit respectfully requests that this Court enter an order

sustaining this Objection, denying the Debtor's Sale Motion, authorizing and directing the

Debtor to reject the Master Lease, and granting such other relief as this Court deems just and

proper.

Dated: June 13, 2014                Respectfully Submitted,

                                      BALLARD SPAHR LLP

                                      By: */e/ Craig Solomon Ganz*
                                      Craig Solomon Ganz (*Pro Hac Vice*)
                                      ganzc@ballardspahr.com
                                      1 East Washington Street, Suite 2300
                                      Phoenix, AZ 85004-2555
                                      Telephone: (602) 798-5400
                                      Facsimile: (602) 798-5595

                                      Brent Weisenberg (*Pro Hac Vice*)
                                      425 Park Avenue
                                      New York, NY 10022
                                      Telephone: (646) 346-8041
                                      Facsimile: (212) 223-1942

                                      -and-

                                      Benjamin E. Gurstelle
                                      bgurstelle@briggs.com
                                      BRIGGS AND MORGAN, P.A.
                                      2200 IDS Center
                                      80 South 8th Street
                                      Minneapolis, MN 55402
                                      Telephone: (612) 977-8722
                                      Facsimile: (612) 977-8650

                                      *Counsel for Spirit Master Funding, LLC*

# Exhibit A

# SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT

by and between

## SPIRIT MASTER FUNDING, LLC,
as Lessor

and

## SKY VENTURES, LLC,
as Lessee

Made as of November 26, 2013

# TABLE OF CONTENTS

Page

1.    Certain Defined Terms .................................................................................... 1
2.    Lease of Properties; Use ................................................................................. 1
3.    Lease Term; Extension .................................................................................... 1
4.    Rental and Other Monetary Obligations ......................................................... 2
5.    Representations and Warranties of Lessor ...................................................... 3
6.    Representations and Warranties of Lessee ...................................................... 4
7.    Rentals To Be Net to Lessor ........................................................................... 6
8.    Taxes and Assessments ................................................................................... 6
9.    Utilities ............................................................................................................ 6
10.   Insurance ......................................................................................................... 6
11.   Tax and Insurance Impound ........................................................................... 9
12.   Compliance With Laws, Restrictions, Covenants and Encumbrances ........... 9
13.   Condition of Property; Maintenance ............................................................. 13
14.   Waste; Alterations and Improvements .......................................................... 13
15.   Indemnification ............................................................................................. 14
16.   Quiet Enjoyment ........................................................................................... 14
17.   Inspection ...................................................................................................... 14
18.   Casualty ......................................................................................................... 14
19.   Condemnation ............................................................................................... 17
20.   Fair Market Value ......................................................................................... 19
21.   Default, Conditional Limitations, Remedies and Measure of Damages ....... 19
22.   Mortgage, Subordination and Attornment ................................................... 22
23.   Estoppel Certificate ....................................................................................... 24
24.   Assignment .................................................................................................... 24
25.   Notices ........................................................................................................... 26
26.   Holdover ........................................................................................................ 27
27.   Landlord's Lien/Security Interest ................................................................. 27
28.   Removal of Personalty .................................................................................. 27
29.   Financial Statements; Compliance Certificate ............................................. 27
30.   Force Majeure ............................................................................................... 28
31.   No Merger ...................................................................................................... 28
32.   Characterization ............................................................................................ 28
33.   Easements ...................................................................................................... 30
34.   Bankruptcy .................................................................................................... 30
35.   Attorneys' Fees ............................................................................................. 31
36.   Memorandum of Lease .................................................................................. 31
37.   No Brokerage ................................................................................................. 31
38.   Waiver of Jury Trial and Punitive, Consequential, Special and Indirect Damages ........ 31
39.   Securitizations and Other Transactions ........................................................ 31
40.   State-Specific Provisions .............................................................................. 32
41.   Performance at Lessee's Expense ................................................................. 32
42.   Miscellaneous ............................................................................................... 33

Exhibit A      Defined Terms
Exhibit B      Legal Description of Properties
Exhibit C      Wiring Instructions
Exhibit D      Environmental Disclosures
Exhibit E      State-Specific Provisions
Exhibit F      De-Identification Requirements

3893266v1/22874-0079

## SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT

**THIS SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT** (this "Lease") is made as of November 26, 2013 (the "Effective Date"), by and between **SPIRIT MASTER FUNDING, LLC,** a Delaware limited liability company, formerly known as Spirit SPE Portfolio 2004-6, LLC, a Delaware limited liability company ("Lessor"), whose address is 16767 N. Perimeter Dr., Suite 210, Scottsdale, Arizona 85260-1042, and **SKY VENTURES, LLC,** a Delaware limited liability company ("Lessee"), whose address is 965 Decatur Avenue North, Golden Valley, Minnesota 55402.

This Lease amends and restates in its entirety that certain First Amended and Restated Master Lease Agreement dated November 30, 2012 (the "Original Lease"). The terms of the Original Lease remain in force and effect as to the period ending on 11:59 p.m. prior to the Effective Date. The terms contained in this Lease shall apply and be effective with respect to the period from and after the Effective Date, without novation, replacement or substitution of the Original Lease. For avoidance of doubt, the Lease Term shall be deemed to have commenced on May 24, 2005 (the "Original Effective Date"), and the leasehold estate of Lessee shall mean the estate commencing under the Original Lease, without interruption of or intervention by subsequent parties with an interest in the Properties.

In consideration of the mutual covenants and agreements herein contained, Lessor and Lessee hereby covenant and agree as follows:

1.      **Certain Defined Terms.**  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

2.      **Lease of Properties; Use.**  In consideration of the Rentals and other Monetary Obligations to be paid by Lessee and of the other terms, covenants and conditions on Lessee's part to be kept and performed, Lessor hereby leases to Lessee, and Lessee hereby takes and hires, the Properties, subject to the Permitted Encumbrances, all Legal Requirements (including any existing violation thereof), and the condition of the Properties as of the Original Effective Date; *provided, however*, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any Permitted Encumbrance which may have expired or been terminated. During the Lease Term, the Properties shall be used solely for the operation of a Permitted Facility, and related purposes such as ingress, egress and parking. Lessee shall at all times during the Lease Term occupy the Properties and shall diligently operate its business on at least eighty-five percent (85%) Properties. Lessee shall not, by itself or through any assignment, sublease or other type of transfer, convert any of the Properties to an alternative use during the Lease Term without Lessor's prior written consent.

3.      **Lease Term; Extension.**  The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on May 31, 2020 ("Expiration Date"), unless terminated sooner as provided in this Lease and as may be extended as provided herein. The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to herein as the "Lease Term." Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any

extension option is exercised, and provided that Lessee's Franchise Agreements are extended for a period of not less than the applicable extension periods, Lessee shall have the right and option (each, an "Extension Option") to extend the Initial Term as to not less than fifty percent (50%) of the Properties then subject to this Lease for four (4) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect. In the event Lessee exercises the Extension Option for less than all of the Properties, the Base Monthly Rental shall be adjusted downwards as follows: total value of the retained Properties (as determined at the time of Lessor's acquisition of the Properties) divided by the total value for all the Properties (as determined at the time of Lessor acquisition of the Properties) multiplied by the Base Monthly Rental in effect at the time Lessee exercised the Extension Option. Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so first, no later than one hundred twenty (120) days prior to the Expiration Date and one hundred twenty (120) days prior to the expiration of the immediately preceding Extension Term, as the case may be. If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above as to the Properties, then this Lease shall terminate on the last day of the Initial Term or, if applicable, the last day of the Extension Term then in effect. Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 3.

4.     **Rental and Other Monetary Obligations**.

A.     *Base Monthly Rental.* During the Initial Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental; *provided, however*, if the Effective Date is a date other than the first day of the month, Lessee shall pay to Lessor (or any other party designated by Lessor) on the Effective Date the Base Monthly Rental prorated by multiplying the Base Monthly Rental by a fraction, the numerator of which is the number of days remaining in the month (including the Effective Date) for which Rental is being paid, and the denominator of which is the total number of days in such month. During the Extension Terms, if any, Lessee shall pay the Rental (including the Base Monthly Rental) in the manner set forth in this Section 4. Unless otherwise specifically stated to the contrary herein, Lessee shall perform all its obligations under this Lease at its sole cost and expense and shall pay all Rental and any other Monetary Obligation due hereunder when due and payable, without notice or demand.

B.     *Adjustments.* On the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rent Adjustment. The "Rent Adjustment" shall be an amount equal to the lesser of (1) ten percent (10%) of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (2) 1.25 times the product of (i) the percentage change between the Price Index (as defined below) for April 2010 or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month two months prior to the applicable Adjustment Date, and (ii) the then current Base Annual Rental. "Price Index" shall mean the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in

1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency. Notwithstanding any provision contained herein, in no event shall Base Annual Rental be reduced as a result of the application of the Rent Adjustment described in this Section 4.B. In the event that the Price Index ceases to be published, its successor index as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of this Section. In the event there is no successor index, Lessor shall reasonably select an alternative price index that will constitute a reasonable substitute for the Price Index.

C.      *Additional Rental.*  Lessee shall pay and discharge, as additional rental ("Additional Rental"), all sums of money required to be paid by Lessee under this Lease which are not specifically referred to as Rental. Lessee shall pay and discharge any Additional Rental when the same shall become due, provided that amounts which are billed to Lessor or any third party, but not to Lessee, shall be paid within thirty (30) days after Lessor's written demand for payment thereof (together with a copy of such bill, invoice or other similar documentation received by Lessor or such third party) or, if later, when the same are due. In no event shall Lessee be required to pay to Lessor any item of Additional Rental that Lessee is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

D.      *Payment of Rental and Other Monetary Obligations.*  All Rental and other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due without any setoff, abatement, deferment, deduction or counterclaim whatsoever. Lessee shall make all such Rental and other Monetary Obligation payments via reverse debit initiated by Lessee to Lessor's account, in accordance with the wiring instructions outlined on Exhibit C attached hereto and incorporated herein. Any payment which is not made within five (5) days after the due day thereof, shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however,* in no event shall Lessee be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect.

5.      **Representations and Warranties of Lessor**.  The representations and warranties of Lessor contained in this Section are being made to induce Lessee to enter into this Lease and Lessee has relied and will continue to rely upon such representations and warranties. Lessor represents and warrants to Lessee as follows:

A.      *Organization, Authority and Status of Lessor.*  Lessor has been duly organized and is validly existing and in good standing under the laws of the State of Delaware. All necessary corporate action has been taken to authorize the execution, delivery and performance by Lessor of this Lease and of the other documents, instruments and agreements provided for herein. The person who has executed this Lease on behalf of Lessor is duly authorized to do so.

B.      *Enforceability; Quiet Enjoyment.* This Lease constitutes the legal, valid and binding obligation of Lessor, enforceable against Lessor in accordance with its terms. Lessor covenants and warrants that Lessee shall have and enjoy full, quiet and peaceful possession of the Properties, their appurtenances and all rights and privileges incidental thereto during the Term, as against all persons claiming by, through, or under Lessor, subject to the provisions of this Lease.

C.      *Litigation.* There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving Lessor before any arbitrator or Governmental Authority which might reasonably result in any material adverse change in the contemplated business, condition, worth or operations of Lessor.

D.      *Absence of Breaches or Defaults.* Lessor is not in default under any document, instrument or agreement to which Lessor is a party or by which Lessor or any of Lessor's property is subject or bound. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessor is a party or by which Lessor or any of Lessor's property is subject or bound.

6.      **Representations and Warranties of Lessee**. The representations and warranties of Lessee contained in this Section are being made to induce Lessor to enter into this Lease and Lessor has relied, and will continue to rely, upon such representations and warranties. Lessee represents and warrants to Lessor as follows:

A.      *Organization, Authority and Status of Lessee.* Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign limited liability company to do business in any jurisdiction where such qualification is required. All necessary company action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein. Lessee is not a "foreign limited liability company", "foreign corporation", "foreign partnership", "foreign trust" or "foreign estate", as those terms are defined in the Code and the regulations promulgated thereunder. Lessee's United States tax identification number is correctly set forth on the signature page of this Lease. The person who has executed this Lease on behalf of Lessee is duly authorized to do so. The address of Lessee stated in Section 25 is the principal place of business and principal executive office of Lessee, and Lessee will provide Lessor with written notice of any change of location of its principal place of business or principal executive office within ten (10) days thereof.

B.      *Enforceability.* This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

C.      *Litigation.* There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving Lessee or the Properties before any arbitrator or Governmental Authority which might reasonably

result in any material adverse change in the contemplated business, condition, worth or operations of Lessee or the Properties.

D.     *Absence of Breaches or Defaults*.   Lessee is not in default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Properties or any of Lessee's property is subject or bound.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee is a party or by which Lessee, the Properties or any of Lessee's property is subject or bound.

E.     *Licenses and Permits*.   Lessee has obtained all required licenses and permits, both governmental and private, to use and operate the Properties as Permitted Facilities.

F.     *Financial Condition; Information Provided to Lessor*.   The financial statements, all financial data and all other documents and information heretofore delivered to Lessor by or with respect to Lessee, Guarantor and/or the Properties in connection with this Lease and/or relating to Lessee, Guarantor and/or the Properties are true, correct and complete in all material respects, there have been no amendments thereto since the date such items were prepared or delivered to Lessor, and no change has occurred to any such financial statements, financial data, documents and other information not disclosed in writing to Lessor, which would result in a Material Adverse Effect.

G.     *Compliance with OFAC*.   Lessee, and to the best of Lessee's knowledge, each of Lessee's Entities is not currently identified on the OFAC List, and is not a Person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.  The Lessee has implemented procedures and will consistently apply those procedures throughout the Lease Term, to ensure the foregoing representations and warranties remain true and correct during the Lease Term.

H.     *Solvency*.   There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee, or to the best of Lessee's knowledge, its shareholders or Affiliates.  Lessee does not have unreasonably small capital to conduct its business.

I.     *Ownership*.   Neither Lessee nor any Affiliate of Lessee that actually or constructively owns ten percent (10%) or more of the outstanding capital stock of Lessor owns, directly or indirectly, (i) ten percent (10%) or more of the total combined voting power of all classes of voting capital stock of Lessee, or (ii) ten percent (10%) or more of the total value of all classes of capital stock of Lessee.

7.     **Rentals To Be Net to Lessor**.   The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease

Term, and all Costs and obligations of every kind and nature whatsoever relating to the Properties shall be performed and paid by Lessee.

8.    **Taxes and Assessments**.  Lessee shall pay, prior to delinquency, all taxes and assessments of every type or nature assessed against or imposed upon the Properties or Lessee during the Lease Term, including without limitation, all taxes or assessments upon the Properties or any part thereof and upon any personal property, trade fixtures and improvements located on the Properties, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; all taxes, charges, license fees and or similar fees imposed by reason of the use of the Properties by Lessee; and all excise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease.  All tax statements, bills and invoices shall be sent directly to Lessee by the applicable government authority, and Lessor agrees to promptly provide copies of any such statements, bills and invoices received by Lessor to Lessee.

Within thirty (30) days after each tax and assessment payment is required by this Section to be paid, Lessee shall, upon prior written request of Lessor, provide Lessor with evidence reasonably satisfactory to Lessor that such payment was made in a timely fashion. Lessee may, at its own expense, contest or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (A) neither the Properties nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings, (B) no Event of Default has occurred, and (C) Lessee shall promptly provide Lessor with notices of any such proceeding, as well as copies of all notices received or delivered by Lessee and filings made by Lessee in connection with such proceeding.

9.    **Utilities**.  Lessee shall contract, in its own name, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Properties during the Lease Term.  Under no circumstances shall Lessor be responsible for any interruption of any utility service.

10.    **Insurance**.  Throughout the Lease Term, Lessee shall maintain, with respect to each of the Properties, at its sole expense, the following types and amounts of insurance, in addition to such other insurance as Lessor may reasonably require from time to time:

A.    Insurance against loss or damage to real property under an "all risk" insurance policy, which shall include coverage against all risks of direct physical loss, including loss by fire, lightning, terrorism, ordinance or law, and other risks normally included in the standard ISO special form (which shall include flood insurance if the Property is located within a flood hazard area and which shall include earthquake insurance if the Property is located in an area where earthquake insurance is customarily maintained for similar commercial properties).  Such insurance shall be in amounts sufficient to prevent Lessor from becoming a co-insurer under the applicable policies, and in any event, after application of deductible, in amounts not less than 100% of the

full insurable replacement cost, as determined from time to time at Lessor's request but not more frequently than once in any 12-month period.

B.      Comprehensive general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, liquor liability coverage, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of the Property or adjoining ways, streets, parking lots or sidewalks. Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Section 15 hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $2,000,000 per occurrence for bodily injury and property damage, and $5,000,000 general aggregate per location, or such higher limits as Lessor may reasonably require from time to time, and shall be of form and substance satisfactory to Lessor.

C.      Workers' compensation insurance in the statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about any of the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

D.      Business income insurance or rental value insurance in an amount up to $200,000 per Property. Such insurance is to follow form of the real property "all risk" coverage and is not to contain a co-insurance clause.

E.      Such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements similar in character, location and use and occupancy to the Property.

All insurance policies shall:

(i)      Provide (1) for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents, (2) that the insurer shall not deny a claim and that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Properties, and (3) that any losses otherwise payable thereunder shall be payable notwithstanding any act or omission of Lessor or Lessee which might, absent such provision, result in a forfeiture of all or a part of such insurance payment;

(ii)      Be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor;

(iii)      Contain deductibles not to exceed $25,000.00;

(iv)    Contain a standard non-contributory mortgagee clause or endorsement in favor of any lender designated by Lessor;

(v)    Provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor and to any lender covered by any standard mortgagee clause or endorsement;

(vi)    Be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)    Except for workers' compensation insurance referred to in Section 10.C above, name Lessor and any Lessor Affiliate or lender requested in writing by Lessor, as an "additional insured" with respect to general liability insurance, and as a "named insured" with respect to real property and "loss payee" with respect to all real property and rent value insurance, as appropriate and as their interests may appear;

(viii)    Be evidenced by delivery to Lessor and any lender designated by Lessor of an Acord Form 28 for property coverage (or any other form requested in writing by Lessor) and an Acord Form 25 for liability, workers' compensation and umbrella coverage (or any other form requested by Lessor); provided that in the event that either such form is no longer available, such evidence of insurance shall be in a form reasonably satisfactory to Lessor and any lender designated by Lessor; and

(ix)    Be issued by insurance companies licensed to do business in the states where the Properties are located and which are rated A:VIII or better by Best's Insurance Guide or are otherwise approved by Lessor.

It is expressly understood and agreed that (I) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any lender designated by Lessor; (II) the foregoing minimum limits of insurance coverage shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; and (III) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or lender of Lessor identified in writing to Lessee certificates of insurance or, upon Lessor's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times.

Lessee shall pay as they become due all premiums for the insurance required by this Section 10. In the event that Lessee fails to comply with any of the foregoing requirements of this Section 10 within ten (10) days of the giving of written notice by Lessor to Lessee, Lessor shall be entitled to procure such insurance. Any sums expended by Lessor in procuring such insurance shall be Additional Rent and shall be repaid by Lessee, together with interest thereon

at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor.

Anything in this Section 10 to the contrary notwithstanding, any insurance which Lessee is required to obtain pursuant to this Section 10 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 10.

11.    **Tax and Insurance Impound**.  Upon the occurrence and during the continuance of an Event of Default, in addition to any other remedies, Lessor may require Lessee to pay to Lessor sums which will provide an impound account (which shall not be deemed a trust fund) for paying up to the next one year of taxes, assessments and/or insurance premiums.  Upon such requirement, Lessor will estimate the amounts needed for such purposes and will notify Lessee to pay the same to Lessor in equal monthly installments, as nearly as practicable, in addition to all other Monetary Obligations due under this Lease.  Should additional funds be required at any time, Lessee shall pay the same to Lessor on demand.  Lessee shall advise Lessor of all taxes and insurance bills which are due and shall cooperate fully with Lessor in assuring that the same are paid.  Lessor may deposit all impounded funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor.  Upon the occurrence and during the continuance of an Event of Default by Lessee, Lessor may apply all impounded funds against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.

12.    **Compliance With Laws, Restrictions, Covenants and Encumbrances**.

A.    *Compliance*.  Lessee's use and occupation of each of the Properties, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record with respect to the Properties, including but not limited to, compliance with all applicable zoning regulations both prior to and following the Effective Date of the Lease, in either event, the failure with which to comply could have a Material Adverse Effect.  Lessee agrees to cooperate with Lessee in all reasonable respects in connection with Lessee's efforts to maintain and/or achieve compliance with all applicable zoning regulations.  Without in any way limiting the foregoing provisions, Lessee shall comply with all Legal Requirements relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect.  Upon the Lessor's written request from time to time, but in no event more than one time in any twelve-month period, so long as no Event of Default has occurred and is continuing during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Section 6.G and this Section 12.A remain true and correct and have not been breached.  Lessee shall promptly notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.  In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and, at Lessor's request, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from,

Governmental Authorities relating to such an event. Lessee shall also reimburse Lessor for all reasonable Costs incurred by Lessor in evaluating the effect of such an event on the Properties and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Lessor to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof.

B.     *Acts Resulting in Increased Insurance Rates*.     Lessee will use commercially reasonable efforts to prevent any act or condition to exist on or about the Properties which will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase.

C.     *ADA*.   Without limiting the generality of the other provisions of this Section, Lessee agrees that it shall be responsible for complying in all respects with the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder (collectively, the "ADA"), as it affects the Properties.   Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

D.     *Environmental*.

(i)     *Representations and Warranties*.   Lessee represents and warrants to Lessor, which representations and warranties shall survive the execution and delivery of this Lease, as follows:

(1)     Except as set forth on Exhibit D attached hereto, the Properties and Lessee are not in violation of or subject to, any pending or, to Lessee's actual knowledge, threatened investigation or inquiry by any Governmental Authority or to any remedial obligations under any Environmental Laws that could have a Material Adverse Effect, nor has Lessee received any written notice or other written communication from any Person (including but not limited to a Governmental Authority) with respect to any Property relating to (I) Hazardous Materials or Remediation thereof; (II) possible liability of any Person pursuant to any Environmental Law; (III) other environmental conditions; or (IV) any actual or potential administrative or judicial proceedings in connection with any of the foregoing that are likely, as of the date hereof, to have a Material Adverse Effect. The foregoing representations and warranties would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Properties.

(2)     Except to the extent set forth on Exhibit D attached hereto, (I) all uses and operations on or of the Properties, whether by Lessee or

any other Person, have been in compliance in all material respects with all Environmental Laws and environmental permits issued pursuant thereto; (II) during the Lessee Entities' ownership of the Properties there have been no Releases in, on, under or from any of the Properties, or, to Lessee's actual knowledge, from other property migrating toward any of the Properties, except in Permitted Amounts; (III) there are no Hazardous Materials in, on, or under any of the Properties, except in Permitted Amounts; (IV) the Properties have been kept free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law (the "Environmental Liens") during the Lessee Entities' ownership of the Properties; and (V) Lessee has not allowed any other tenant or other user of the Properties to do any act that materially increased the dangers to human health or the environment, posed an unreasonable risk of harm to any Person (whether on or off any of the Properties), impaired the value of any of the Properties in any material respect, is contrary to any requirement set forth in the insurance policies maintained by Lessor, constituted a public or private nuisance, constituted waste, or violated any covenant, condition, agreement or easement applicable to any of the Properties.

(ii)     *Covenants.*

(1)     Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (2) below, as follows:

(I)     The Properties and Lessee shall not be in violation of any Remediation required by any Governmental Authority. Lessee shall cooperate with any investigation or inquiry by any Governmental Authority.

(II)     All uses and operations on or of the Properties, whether by Lessee or any other Person, shall be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto.

(III)     There shall be no Releases in, on, under or from the Properties, except in Permitted Amounts.

(IV)     There shall be no Hazardous Materials in, on or under the Properties, except in Permitted Amounts.

(V)     Lessee shall keep the Properties or cause the Properties to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person other than Lessor.

(VI)     Lessee shall not do or allow any other tenant or other user of the Properties to do any act that (a) materially

increases the dangers to human health or the environment, (b) poses an unreasonable risk of harm to any Person (whether on or off any of the Properties), (c) has a Material Adverse Effect, (d) is contrary to any material requirement set forth in the insurance policies maintained by Lessee, (e) constitutes a public or private nuisance or constitutes waste, or (f) violates any covenant, condition, agreement or easement applicable to the Properties.

(2)    Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Lessee to satisfy any one or more of the covenants set forth in subsections (I) through (VI) above provided that Lessee shall be in compliance with the requirements of any Governmental Authority with respect to the Remediation of any Release at the Properties.

(iii)    *Notification Requirements.*  Lessee shall promptly notify Lessor in writing upon Lessee obtaining actual knowledge of (1) any Releases or Threatened Releases in, on, under or from any of the Properties other than in Permitted Amounts, or migrating towards any of the Properties; (2) any material non-compliance with any Environmental Laws related in any way to any of the Properties; (3) any actual Environmental Lien; (4) any required or proposed Remediation of environmental conditions relating to any of the Properties required by applicable Governmental Authorities; and (5) any written notice or other communication which Lessee receives from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials or Remediation thereof at or on any of the Properties, other than in Permitted Amounts, possible liability of any Person relating to any of the Properties pursuant to any Environmental Law, other environmental conditions in connection with any of the Properties, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Lessee shall, upon Lessor's reasonable written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(iv)    *Remediation.*  Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release) in, on, under or from the Properties and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment. Should Lessee fail to undertake such Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all reasonable Costs incurred in connection therewith shall be paid by Lessee.

(v)    *Indemnification.*  Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties

from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to compliance with any Environmental Laws, any Hazardous Materials or other environmental matters concerning the Properties. It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

E.    *Encumbrances*.  Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Properties, other than any such obligations created or permitted by Lessor without Lessee's prior written consent.

13.    **Condition of Property; Maintenance**.  Lessee hereby accepts the Properties "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof. Lessee shall, at its sole cost and expense, but subject to Section 18 of this Lease, be responsible for (a) keeping all of the building, structures and improvements erected on each of the Properties in good and substantial order and repair, (b) repair or reconstruct damage or destruction to any building, structures or improvements erected on the Properties from acts of God or any other catastrophes, and (c) make all necessary structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Properties.

14.    **Waste; Alterations and Improvements**.  Lessee shall not commit actual or constructive waste upon the Properties.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Properties in any manner without the consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Lessee may undertake nonstructural alterations to the Properties, individually, costing less than $100,000.00 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed contractor and according to plans and specifications approved by Lessor (which approval shall be deemed given if Lessor does not object in writing to any such plans and specifications within twenty (20) days after the same are submitted to Lessor) and subject to such other conditions as Lessor shall require.  Any work at any time commenced by Lessee on the Properties shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease.  Upon completion of any alterations, Lessee shall promptly provide Lessor with (A) evidence of full payment to all laborers and materialmen contributing to the alterations, (B) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications, (C) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy), and (D) any other documents or information reasonably requested by Lessor.  Lessee shall execute and file or record, as and to the extent required under applicable law, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable law in the states where the Properties are located.  Any addition to or alteration of the Properties shall be deemed a part of the Properties and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require to evidence the ownership by Lessor of such addition or alteration.

15.    **Indemnification**.  Lessee agrees to use and occupy the Properties at its own risk and hereby releases Lessor and Lessor's agents and employees from all claims for any damage or injury to the full extent permitted by law, except as to the extent attributable to the negligence or willful misconduct of Lessor, its employees and representatives.  Lessee agrees that Lessor shall not be responsible or liable to Lessee or Lessee's employees, agents, customers or invitees for bodily injury, personal injury or property damage occasioned by the acts or omissions of any other lessee or such lessee's employees, agents, contractors, customers or invitees.  Lessee agrees that any employee or agent to whom the Properties or any part thereof shall be entrusted by or on behalf of Lessee shall be acting as Lessee's agent with respect to the Properties or any part thereof, and neither Lessor nor Lessor's agents, employees or contractors shall be liable for any loss of or damage to the Property or any part thereof.  Lessee shall indemnify, protect, defend and hold harmless each of the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's use and occupancy of the Property, whether relating to its original design or construction, latent defects, alteration, maintenance, use by Lessee or any Person thereon, supervision or otherwise, or from any breach of, default under, or failure to perform, any term or provision of this Lease by Lessee, its officers, employees, agents or other Persons, except as to the extent attributable to the negligence or willful misconduct of Lessor, its employees and representatives.  It is expressly understood and agreed that Lessee's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

16.    **Quiet Enjoyment**.  So long as Lessee shall pay the Rental and other Monetary Obligations herein provided and shall keep and perform all of the terms, covenants and conditions on its part herein contained, Lessee shall have, subject and subordinate to Lessor's rights herein, the right to the peaceful and quiet occupancy of the Properties.

17.    **Inspection**.  Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior written notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Properties or any part thereof and inspect the same.  Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Properties and any other loss occasioned by such entry, but, subject to Section 38, excluding damages arising as a result of the negligence or intentional misconduct of Lessor.

18.    **Casualty**.

A.    *Notification*.  Should the whole or any part of any of the Properties be partially or totally destroyed by fire or any other casualty, Lessee shall give prompt notice thereof to Lessor and any mortgagee (if required by the terms of any applicable mortgage or deed of trust and Lessee has received written notice thereof).  Such notice shall provide a general description of the nature and extent of such casualty, and shall include copies of any documents or notices received in connection therewith.  Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and documents relating to such casualty.

B.    *Partial Casualty.*  In the event of a casualty which is not a Total Casualty (a "Partial Casualty"), and the Lease terminates, all Net Awards shall be paid to Lessor. In the event the Lease does not terminate, Lessee shall receive all Net Awards to be used solely for the restoration of the applicable Property.  In the event of Partial Casualty, Lessor shall have the option to terminate this Lease with respect to the applicable Property affected by notifying Lessee in writing within thirty (30) days after Lessee gives Lessor notice of such Partial Casualty, or to continue this Lease in effect with respect to such Property, which election shall be evidenced by either a notice from Lessor to Lessee, or Lessor's failure to notify Lessee in writing that Lessor has elected to terminate this Lease with respect to such Property within such thirty (30) day period. Lessee shall have a period of ninety (90) days after receipt of the Lessor's notice to terminate referenced above during which to elect, despite such Lessor notice of termination, to continue this Lease with respect to such Property on the terms herein provided.  If Lessee does not elect to continue this Lease with respect to such Property or shall fail during such ninety (90) day period to notify Lessor of Lessee's intent to continue this Lease with respect to such Property, then the Lease shall terminate with respect to such Property as of the last day of the month during which such ninety (90) day period expired, and the Base Monthly Rental with respect to the remaining Properties shall be proportionately reduced based upon the values attributed to all of the Properties at the time of Lessor's acquisition of the Properties.  Lessee shall vacate and surrender such Property by such termination date, in accordance with the provisions of this Lease, and all obligations of either party hereunder with respect to such Property shall cease as of the date of termination; *provided, however,* Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease with respect to such Property and Lessee's obligations to pay Base Monthly Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the date of termination shall survive such termination.  In such event, Lessor may retain all Net Awards related to the Partial Casualty, and Lessee shall immediately pay Lessor an amount equal to the insurance deductible applicable to any Partial Casualty.

If Lessor elects not to terminate this Lease with respect to such Property, or if Lessor elects to terminate this Lease with respect to such Property (as provided above) but Lessee elects to continue this Lease with respect to such Property, then this Lease shall continue in full force and effect on the following terms: all Base Monthly Rental and other Monetary Obligations due under this Lease shall continue unabated, and Lessee shall promptly commence and diligently prosecute restoration of such Property to the same condition, as nearly as practicable, as prior to such Partial Casualty as approved by Lessor.  Lessee shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

C.    *Total Casualty.*  In the event of a casualty of all or substantially all of any of the Properties or a Partial Casualty, in either event that results in Lessee making a good faith determination that the restoration and continued use of any such Property as a Permitted Facility would be uneconomic (collectively, a "Total Casualty"), then, in such event:

(i)      *Awards*. Lessor shall be entitled to receive the entire Net Award in connection therewith without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease. Lessee shall be entitled to claim and receive any insurance proceeds with respect to Lessee's personalty, the interruption of its business and moving expenses, but only if such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Total Casualty.

(ii)      *Option To Terminate*. Lessee shall have the right to terminate this Lease with respect to the applicable Property by notice (the "Termination Notice") given to Lessor not later than sixty (60) days after the Total Casualty. The Termination Notice must: (1) specify a date on which this Lease shall terminate, which date shall be the last day of a calendar month occurring not earlier than sixty (60) and not later than one hundred twenty (120) days after the delivery of such notice (the "Early Termination Date"); and (2) contain a certificate executed by an officer of Lessee which (I) describes the Total Casualty, and (II) represents and warrants that either all of such Property has been damaged or destroyed, or that substantially all of such Property has been damaged or destroyed, and Lessee has determined in good faith that the restoration and continued use of the remainder of such Property as a Permitted Facility would be uneconomic. At the time of the Early Termination Date all obligations of either party under the Lease with respect to such Property shall cease and the Base Monthly Rental with respect to the remaining Property shall be proportionately reduced based upon the values attributed to all of the Properties at the time of Lessor's acquisition of the Property.

D.      *Insurance*. Any loss under any property damage insurance required to be maintained by Lessee pursuant to Section 10 shall be adjusted by Lessor and Lessee. Notwithstanding the foregoing or any other provisions of this Section 18 to the contrary, if at the time of either a Partial or Total Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

E.      *Lessee Obligation in Event of Casualty*. During all periods of time following a casualty under this Section, Lessee shall take reasonable steps to ensure that the Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

F.     *No Limitations.*  Notwithstanding the foregoing, nothing in this Section 18 shall be construed as limiting or otherwise adversely affecting the representations, warranties, covenants and characterizations set forth in Lease.

G.     *Loss or Damage.*  Notwithstanding any other provision in this Lease to the contrary, Lessor shall not be liable for any damage to the property of Lessee or of others located on or in the Property, nor for the loss or damage to any property of Lessee or others by theft or otherwise.  All property of Lessee kept or stored on the Property shall be so kept or stored at the risk of Lessee, and Lessee shall indemnify and hold Lessor harmless from an against any claims arising out of damage to the same unless such damage shall be caused by the willful act or gross negligence of Lessor.

19.    **Condemnation**.

A.     *Notification.*  Lessee shall give prompt written notice to Lessor and any mortgagee (if required by the terms of any applicable mortgage or deed of trust and Lessee has received written notice thereof) of any condemnation of any of the Properties and the commencement of any proceedings or negotiations which might result in a condemnation of any of the Properties.  Lessor shall give prompt written notice to Lessee of any condemnation of any of the Properties and the commencement of any proceedings or negotiations which might result in a condemnation of any of the Properties.  Such notice shall provide a general description of the nature and extent of such condemnation or threatened condemnation, and shall include copies of any documents or notices received in connection therewith.  Thereafter, Lessee or Lessor, as applicable, shall promptly send Lessor or Lessee, as applicable, copies of all notices, correspondence and documents relating to such condemnation or threatened condemnation.

B.     *Partial Taking.*  In the event of a condemnation which is not a Total Condemnation ("Partial Condemnation"), any Condemnation Award shall be paid to Lessor in the event the Lease is terminated, otherwise, the Condemnation Award shall be paid to Lessee to be used solely for the restoration of the applicable Property. "Condemnation Award" shall mean the entire award payable with respect to the applicable Property by reason of a condemnation whether pursuant to a judgment or by agreement or otherwise.  In the event of a Partial Condemnation of any of the Properties, Lessor shall have the option to terminate this Lease with respect to the applicable Property affected by notifying Lessee in writing within thirty (30) days after Lessee gives Lessor notice of such Partial Condemnation or that title has vested in the condemning authority, or to continue this Lease in effect, which election shall be evidenced by either a notice from Lessor to Lessee, or Lessor's failure to notify Lessee in writing that Lessor has elected to terminate this Lease with respect to such Property within such thirty (30) day period.  Lessee shall have a period of sixty (60) days after receipt of the Lessor's notice to terminate referenced above during which to elect, despite such Lessor notice of termination, to continue this Lease with respect to such Property on the terms herein provided.  If Lessee does not elect to continue this Lease with respect to such Property or shall fail during such sixty (60) day period to notify Lessor of Lessee's intent to continue this Lease with respect to such Property, then this Lease shall terminate with respect to such Property as of the last day of the month during which such sixty (60) day period

expired, and the Base Monthly Rental with respect to the remaining Properties shall be proportionately reduced based upon the values attributed to all of the Properties at the time of Lessor's acquisition of the Properties.  Lessee shall vacate and surrender such Property by such termination date, in accordance with the provisions of this Lease, and all obligations of either party hereunder with respect to such Property shall cease as of the date of termination, *provided, however*, Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease with respect to such Property and Lessee's obligations to pay Base Monthly Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the date of termination shall survive such termination.  In such event, Lessor may retain any Condemnation Award related to the Partial Condemnation.

If Lessor elects not to terminate this Lease, or if Lessor elects to terminate this Lease with respect to such Property (as provided above) but Lessee elects to continue this Lease with respect to such Property, then this Lease shall continue in full force and effect on the following terms: all Base Monthly Rental and other Monetary Obligations due under this Lease shall continue unabated, and Lessee shall promptly commence and diligently prosecute restoration of such Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation as approved by Lessor.  Lessee shall be entitled to keep any portion of the Condemnation Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Condemnation Award.

C.    *Total Taking*.  In the event of a condemnation of all or substantially all of any of the Properties or a Partial Condemnation, in either event that results in Lessee making a good faith determination that the restoration and continued use of the remainder of any such Property as a Permitted Facility would be uneconomic (collectively, a "Total Condemnation"), then, in such event:

(i)    *Awards*.  Lessor shall be entitled to receive the entire Condemnation Award in connection therewith without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Condemnation Award and agrees that Lessee shall not be entitled to any Condemnation Award or other payment for the value of Lessee's leasehold interest in this Lease.  Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of Lessee's personalty, any insurance proceeds with respect to Lessee's personalty, the interruption of its business and moving expenses, but only to the extent such claim or award does not adversely affect or interfere with the prosecution of Lessor's claim for the Total Condemnation or otherwise reduce the amount recoverable by Lessor for the Total Condemnation.

(ii)    *Option To Terminate*.  Lessee shall have the right to terminate this Lease with respect to the applicable Property by notice (the "Termination Notice") given to Lessor not later than sixty (60) days after the Total Condemnation.  The Termination Notice must: (1) specify a date on which this

Lease shall terminate, which date shall be the last day of a calendar month occurring not earlier than thirty (30) days and not later than one hundred twenty (120) days after the delivery of such notice (the "Early Termination Date"); (2) contain a certificate executed by an officer of Lessee which (I) describes the Total Condemnation, and (II) represents and warrants that either all of such Property has been taken, or that substantially all of such Property has been taken, and Lessee has determined in good faith that the continued use of the remainder of such Property as a Permitted Facility would be uneconomic. At the time of the Early Termination Date, all obligations of either party under the Lease with respect to such Property shall cease and the Base Monthly Rental with respect to the remaining Properties shall be proportionately reduced based upon the values attributed to all of the   Properties at the time of Lessor's acquisition of the Properties.

D.     *Insurance.*  Any award relating to a Total Condemnation shall be adjusted by Lessor or, at Lessor's election, Lessee.  Notwithstanding the foregoing or any other provisions of this Section 19 to the contrary, if at the time of any condemnation under this Section 19 or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Condemnation Award on account of such condemnation and to collect such Condemnation Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

E.     *No Limitations.*  Notwithstanding the foregoing, nothing in this Section 19 shall be construed as limiting or otherwise adversely affecting the representations, warranties, covenants and characterizations set forth in Lease.

20.     **Fair Market Value.**  With respect to the determination of fair market value for any purpose under this Lease, if the parties are unable to agree upon the fair market value, then an independent MAI appraiser shall prepare an appraisal of the fair market value of the Property, including any additions or renovations thereto.  In determining the fair market value of such Property, the appraiser shall utilize the cost, income and sales comparison approaches to value. The amount which results from the calculation of the average of the cost approach, the income approach, and the sales comparison approach, all as determined in accordance with the provisions of this Section, shall constitute the fair market value of such Property.

21.     **Default, Conditional Limitations, Remedies and Measure of Damages**.

A.     Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(i)     if any representation or warranty of Lessee set forth in this Lease is false in any material respect, or if Lessee renders any materially false statement or account;

(ii)     if any Rental or other Monetary Obligation due under this Lease is not paid within five (5) days after the same is due;

(iii)    if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against any of the Properties (subject to Lessee's right to contest pursuant to Section 8);

(iv)     if there is an Insolvency Event;

(v)      if Lessee vacates or abandons more than fifteen percent (15%) of the Properties;

(vi)     if Lessee fails to observe or perform any of the other material covenants, conditions or obligations of Lessee in this Lease; *provided, however,* if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place any material rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30) day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Lessor. If Lessee shall fail to correct or cure such failure within such ninety (90) day period an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(vii)    if a final, nonappealable judgment is rendered by a court against Lessee which has a Material Adverse Effect and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(viii)   if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution; or

(ix)     if the estate or interest of Lessee in any of the Properties shall be levied upon or attached in any proceeding and the sale or transfer of such estate or interest is imminent or such process shall not be vacated or discharged within ninety (90) days after it is made.

B.      Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise,

at its option, concurrently, successively, or in any combination, all remedies available at law or in equity, including without limitation, any one or more of the following:

(i)     To terminate this Lease, whereupon Lessee's right to possession of the Properties shall cease and this Lease, except as to Lessee's liability, shall be terminated.

(ii)     To the extent not prohibited by applicable law, to reenter and take possession of the Properties (or any part thereof), and to expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Lessor hereunder or under a forcible entry and detainer statute or similar law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states. If Lessee shall, after an Event of Default, voluntarily give up possession of the Properties to Lessor, deliver to Lessor or its agents the keys to the Properties, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease. Lessor reserves the right following any reentry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate.

(iii)     To bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor.

(iv)     To relet the Properties or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, may reasonably determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in it sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, reasonable alteration, remodeling and repair costs and expenses of preparing for such reletting. Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Properties or any part thereof and shall in no event be liable for refusal or failure to relet the Properties or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability. Lessor reserves the right following any reentry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice.

(v)     To accelerate all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such Event of Default for the entire original scheduled Lease Term, and recover from Lessee the present value (discounted at an annual rate

equal to 2% in excess of the Federal Reserve discount rate) of the excess, if any, of (1) all such Rental and other Monetary Obligations scheduled to become due and owing under this Lease after the date of such acceleration (herein, "Future Obligations"), over (2) the amount of the loss of Future Obligations which Lessee proves reasonably could have been avoided.

(vi)    To recover from Lessee all Costs reasonably paid or incurred by Lessor as a result of such Event of Default, regardless of whether or not legal proceedings are actually commenced.

(vii)    To immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such Event of Default and charge Lessee all Costs incurred by Lessor therein. Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor. Any such acts by Lessor in correcting Lessee's Event of Default hereunder shall not be deemed to cure said Event of Default or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein.

(viii)    To immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease against any sum owing by Lessee hereunder.

(ix)    To seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

All powers and remedies given by this Section to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

22.    **Mortgage, Subordination and Attornment.** Lessor's interest in this Lease and/or the Properties shall not be subordinate to any liens or encumbrances placed upon the Properties by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor. Lessee shall keep the Properties free from any liens for work performed for or at the request of, materials furnished to or obligations incurred by Lessee. NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART

OF THE PROPERTIES OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

This Lease at all times shall automatically be subordinate to the lien of any and all ground leases, mortgages and trust deeds now or hereafter placed upon any of the Properties by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such ground leases, mortgages or trust deeds as shall be reasonably necessary to further document such subordination.

If any mortgagee, receiver or other secured party elects to have this Lease and the interest of Lessee hereunder be superior to any such ground lease, mortgage or trust deed and evidences such election by notice given to Lessee, then this Lease and the interest of Lessee hereunder shall be deemed superior to any such ground lease, mortgage or trust deed, whether this Lease was executed before or after such ground lease, mortgage or trust deed and in that event such mortgagee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such ground lease, mortgage or trust deed and had been assigned to such mortgagee, receiver or other secured party.

Although the foregoing provisions shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver whatever instruments may be reasonably required to further document such subordination, and in the event Lessee fails so to do within fifteen (15) days after written demand, Lessee does hereby make, constitute and irrevocably appoint Lessor as its agent and attorney-in-fact and in its name, place and stead so to do, which appointment shall be deemed coupled with an interest.

In the event any purchaser or assignee of any mortgagee at a foreclosure sale acquires title to any of the Properties, or in the event that any mortgagee or any assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to mortgagee or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of the Lessor under this Lease which accrue after the date that such Successor Lessor acquires title. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

Lessee shall give written notice to any lender or mortgagee of Lessor having a recorded lien upon any of the Properties or any part thereof of which Lessee has been notified in writing of any breach or default by Lessor of any of its obligations under this Lease and give such lender or mortgagee sixty (60) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto. Upon written request by Lessor (made no more than one time in any twelve-month period), Lessee shall also provide Lessee's most recent audited financial statements to Lessor or any such lender or mortgagee and certify the continuing accuracy of such financial statements in such manner as Lessor or such lender or mortgagee may request.

Notwithstanding anything herein to the contrary, Lessee's subordination of this Lease and its rights hereunder is conditioned upon the holder of any superior lien, ground lease, mortgage

or trust deed recognizing and not disturbing Lessee's rights hereunder, so long as no Event of Default has occurred and is continuing.

23.    **Estoppel Certificate**. At any time, and from time to time, Lessee shall, promptly and in no event later than ten (10) business days after written request from Lessor or any lender or mortgagee of Lessor, execute, acknowledge and deliver to Lessor or such lender or mortgagee, as the case may be, a certificate in a reasonable form supplied by Lessor, certifying: (A) that Lessee has accepted the Properties; (B) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (C) the commencement and expiration dates of the Lease Term; (D) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (E) whether there are then any existing defaults by Lessor, known to Lessor, in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (F) that no notice has been received by Lessee of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (G) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Lessee; (H) that neither Lessor nor any lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Properties, including any handling or disposal of Hazardous Materials, or specifying any such involvement or control, if applicable; and (I) any other non-confidential information reasonably requested by Lessor or any lender or mortgagee, as the case may be. If Lessee shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a written request by Lessor, Lessee irrevocably constitutes and appoints Lessor as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding.

24.    **Assignment**.

A.    As a material inducement to Lessor's willingness to complete the transactions contemplated by the Lease, Lessee hereby agrees that Lessor may engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (i) with the prior written consent of Lessee, the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Properties, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing, or (ii) without the prior written consent of Lessee, a Securitization and related transactions. Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person (including without limitation, a taxable REIT subsidiary) in order to maintain Lessor's status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of the Lessor hereunder). At the request of Lessor, Lessee will execute such documents

confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations of Lessee hereunder. Lessee shall not bear any Costs in connection with any sale or transfer of any of the Properties. Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

B. Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Properties in entering into this Lease. Except as provided below, Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest therein, whether by operation of law or otherwise without the prior written consent of Lessor, which consent will not be unreasonably withheld, considering such matters as the experience of any assignee, the assumption by any assignee of all of Lessee's obligations hereunder by undertakings enforceable by Lessor, the transfer to or procurement of all necessary licenses and franchises to an assignee in order to continue operating the Properties for the purposes herein provided. At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee under this Lease pursuant to Lessor's standard form of assumption agreement. Such assignment of the Properties shall relieve Lessee of its obligations respecting this Lease except for those obligations arising prior to such assignment. Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 24 shall be voidable at the sole option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

Notwithstanding any provision contained herein, Lessee may assign this Lease to a Lessee Affiliate approved by Lessor in writing ("Assignee"), which approval shall not be unreasonably withheld, provided that (i) neither Assignee nor any Affiliate of Assignee that actually or constructively owns ten percent (10%) or more of the outstanding capital stock of Lessor shall own, directly or indirectly, (1) ten percent (10%) or more of the total combined voting power of all classes of voting capital stock of Assignee, or (2) ten percent (10%) or more of the total value of all classes of capital stock of Assignee; and (ii) the conditions set forth in this paragraph are satisfied. Lessee shall provide Lessor with notice of the proposed assignment permitted by the preceding sentence. Notwithstanding the foregoing, any such assignment shall not be effective until Lessor has approved the Assignee (which approval shall not be unreasonably withheld), and Assignee has provided written certification to Lessor that (1) Assignee or any Person who owns directly or indirectly any interest in Assignee, is not a Person whose property or interests are subject to being blocked under any of the Terrorism Laws or is otherwise in violation of the Terrorism Laws, and (2) Assignee has taken such measures as are required by the Terrorism Laws to assure that any Person who owns directly or indirectly any interest in Assignee is not a Person whose property or interests are subject to being blocked under any of the Terrorism Laws or is otherwise in violation of the Terrorism Laws.

C.    Lessee shall not sublet any or all of the Properties without the prior written consent of Lessor, which may be withheld by Lessor in its sole discretion and any such purported subletting shall be void.

25.    **Notices**.    All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease (collectively called "Notices") shall be in writing and given by any one of the following: (A) hand delivery, (B) express overnight delivery service, (C) certified or registered mail, return receipt requested or (D) electronic mail message, provided that a copy of such electronic mail message is also sent via certified or registered mail, return receipt requested, within one Business Day of the transmission of such electronic mail message, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service, (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested, or (iv) transmission, if delivered by electronic mail pursuant to the requirements of Section 25(D) above.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Lessee: | Sky Ventures, LLC<br>965 Decatur Avenue North<br>Golden Valley, MN 55427<br>Attention:  Real Estate Department Notices and Demands<br>Telephone: (763) 489-2970<br>Telecopy: (763) 489-2971<br>E-Mail: lengler@borderfoods.com |
| With a copy to: | Winthrop & Weinstine, P.A.<br>Suite 3500<br>225 South Sixth Street<br>Minneapolis, MN  55402<br>Attention:  Timothy M. Barnett, Esq.<br>Telephone: (612) 604-6653<br>Telecopy: (612) 604-6853<br>E-Mail: tbarnett@winthrop.com |
| If to Lessor: | Spirit Master Funding, LLC<br>16767 N. Perimeter Dr., Suite 210<br>Scottsdale, Arizona 85260-1042<br>Attention:  Compliance Department<br>Telephone: (480) 606-0820<br>Telecopy: (480) 606-0826<br>E-Mail: compliance@spiritfinance.com |

With a copy to:             Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016
Attention: Craig S. Ganz, Esq.
Telephone: (602) 530-8000
Telecopy: (602) 530-8500
E-Mail: craig.ganz@gknet.com

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

26. **Holdover**. If Lessee remains in possession of the Properties after the expiration of the term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rent payable under this Lease, and Lessee shall comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over. Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee.

27. **Landlord's Lien/Security Interest**. Intentionally deleted.

28. **Removal of Personalty**. Subject to compliance with the Equipment Loan (as long as the subject loan is outstanding) and so long as there is no Event of Default, Lessee may, from time to time, remove from the Properties personal property (including without limitation trade fixtures) belonging to Lessee for reasonable business purposes and/or to complete such store de-identification work as may be required under Lessee's Franchise Agreements, a copy of which requirements in effect as of the date hereof are attached hereto as Exhibit F. Lessee shall repair any damage caused by such removal and de-identification work and shall leave all of the Properties broom clean and in good and working condition and repair inside and out, subject to ordinary wear and tear. Any property of Lessee left on the Properties on the tenth day following the expiration of the Lease Term shall automatically and immediately become the property of Lessor.

29. **Financial Statements; Compliance Certificate**. Within forty five (45) days after the end of each fiscal quarter and within one hundred twenty (120) days after the end of each fiscal year of Lessee, Lessee shall deliver to Lessor (A) complete financial statements of Lessee including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; and (B) income statements for the business at the Properties. All such financial statements shall be prepared in accordance with generally accepted accounting principles, consistently applied from period to period, and shall be certified to be accurate and complete by an officer or director of the Lessee. In the event that Lessee's property and business at the Properties are ordinarily consolidated with other business for financial statements purposes, such financial statements shall be prepared on a

consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Properties with the basis for allocation of overhead of other charges being clearly set forth. The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any audited financial statements of Lessee which may be prepared, as soon as they are available.

30.   **Force Majeure**. Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder.

31.   **No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Properties by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (A) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (B) the fee estate or ownership of any of the Properties or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Properties or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

32.   **Characterization**.

A.   Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

B.   The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:

(i)   It is the intent of the parties hereto, and the parties acknowledge and agree that they have executed and delivered this Lease with the understanding that (1) this Lease constitutes a single lease of all, but not less than all, of the Properties, and, subject to the certain terms and conditions in this Lease, if at any time this Lease covers other real property in addition to the Properties, neither this Lease, nor Lessee's obligations or rights hereunder may be allocated or otherwise divided among such properties by Lessee; (2) this Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust

agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (3) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Lessor and Lessee, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership between Lessor and Lessee, to make them joint venturers, to make Lessee an agent, legal representative, partner, subsidiary or employee of Lessor, nor to make Lessor in any way responsible for the debts, obligations or losses of Lessee.

(ii)    Each of the parties hereto covenants and agrees to the following: (1) each will treat this Lease (I) as an operating lease pursuant to Statement of Financial Accounting Standards No. 13, as amended; and (II) as a true lease for state law reporting purposes and for federal income tax purposes. For federal income tax purposes, each party shall report this Lease as a true lease with Lessor as the owner of the Properties and Lessee as the lessee of such Properties including: (a) treating Lessor as the owner of the property eligible to claim depreciation deductions under Section 167 or 168 of the Code with respect to the Properties; (b) Lessee reporting its Rental payments as rent expense under Section 162 of the Code; and (c) Lessor reporting the Rental payments as rental income under Section 61 of the Code; (2) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 32.B; (3) with respect to the Properties, the Lease Term (including any Extension Term) is less than eighty percent (80%) of the estimated remaining economic life of the Properties; and (4) the Base Annual Rental is the fair market value for the use of the Properties and was agreed to by Lessor and Lessee on that basis, and the execution and delivery of, and the performance by Lessee of its obligations under, this Lease do not constitute a transfer of all or any part of the Properties.

(iii)    Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of all of the Properties. Lessee stipulates and agrees (1) not to challenge the validity, enforceability or characterization of the lease of the Properties as a true lease and/or as a single instrument pertaining to the lease of all, but not less than all, of the Properties, and (2) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 32.B.

(iv)    The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to *any and all persons, without limitation of any kind,* any

matter required under the Securities Act of 1933, as amended (the "Securities Act"), or the Securities Exchange Act of 1934, as amended (the "Exchange Act").

33.    **Easements**.  During the Lease Term, Lessor shall not have the right to grant easements on, over, under and above the Properties without the prior written consent of Lessee, such consent shall not be unreasonably withheld.

34.    **Bankruptcy**.  As a material inducement to Lessor executing this Lease, Lessee acknowledges and agrees that Lessor is relying upon (A) the financial condition and specific operating experience of Lessee and Lessee's obligation to use the Properties as Permitted Facilities, (B) Lessee's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Lessee, and (C) all defaults under this Lease being cured promptly and this Lease being assumed within sixty (60) days of any order for relief entered under the Bankruptcy Code for Lessee, or this Lease being rejected within such 60 day period and the Properties surrendered to Lessor. Accordingly, in consideration of the mutual covenants contained in this Lease and for other good and valuable consideration, Lessee hereby agrees that: (i) all obligations that accrue under this Lease (including the obligation to pay Rentals), from and after an Insolvency Event shall be timely performed exactly as provided in this Lease and any failure to so perform shall be harmful and prejudicial to Lessor; (ii) any and all Rentals that accrue from and after an Insolvency Event and that are not paid as required by this Lease shall, in the amount of such Rentals, constitute administrative expense claims allowable under the Bankruptcy Code with priority of payment at least equal to that of any other actual and necessary expenses incurred after an Insolvency Event; (iii) any extension of the time period within which the Lessee may assume or reject this Lease without an obligation to cause all obligations under this Lease to be performed as and when required under this Lease shall be harmful and prejudicial to Lessor; (iv) any time period designated as the period within which the Lessee must cure all defaults and compensate Lessor for all pecuniary losses which extends beyond the date of assumption of this Lease shall be harmful and prejudicial to Lessor; (v) any assignment of this Lease must result in all terms and conditions of this Lease being assumed by the assignee without alteration or amendment, and any assignment which results in an amendment or alteration of the terms and conditions of this Lease without the express written consent of Lessor shall be harmful and prejudicial to Lessor; (vi) any proposed assignment of this Lease shall be harmful and prejudicial to Lessor if made to an assignee that does not possess financial condition adequate to operate Permitted Facilities upon the Properties or operating performance and experience characteristics equal to or better than the financial condition, operating performance and experience of Lessee as of the Original Effective Date; and (vii) the rejection (or deemed rejection) of this Lease for any reason whatsoever shall constitute cause for immediate relief from the automatic stay provisions of the Bankruptcy Code, and Lessee stipulates that such automatic stay shall be lifted immediately and possession of the Properties will be delivered to Lessor immediately without the necessity of any further action by Lessor. No provision of this Lease shall be deemed a waiver of Lessor's rights or remedies under the Bankruptcy Code or applicable Law to oppose any assumption and/or assignment of this Lease, to require timely performance of Lessee's obligations under this Lease, or to regain possession of the Properties as a result of the failure of Lessee to comply with the terms and conditions of this Lease or the Bankruptcy Code. Notwithstanding anything in this Lease to the contrary, all amounts payable by Lessee to or on behalf of Lessor under this Lease, whether or not expressly denominated as such, shall constitute "rent" for the purposes of the

Bankruptcy Code. For purposes of this Section addressing the rights and obligations of Lessor and Lessee upon an Insolvency Event, the term "Lessee" shall include Lessee's successor in bankruptcy, whether a trustee, Lessee as debtor in possession or other responsible person.

35.  **Attorneys' Fees**. In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party in any such proceeding shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.

36.  **Memorandum of Lease**. Concurrently with the execution of this Lease, Lessor and Lessee are executing a standard form memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Properties, the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor or Lessee may not desire to disclose to the public. Further, upon Lessor's written request, Lessee agrees to execute and acknowledge a termination of lease and/or quit claim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term.

37.  **No Brokerage**. Lessor and Lessee represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Properties. Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

38.  **Waiver of Jury Trial and Punitive, Consequential, Special and Indirect Damages**. Lessor and Lessee hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury with respect to any and all issues presented in any action, proceeding, claim or counterclaim brought by either of the parties hereto against the other or its successors with respect to any matter arising out of or in connection with this Lease, the relationship of Lessor and Lessee, Lessee's use or occupancy of the Properties, and/or any claim for injury or damage, or any emergency or statutory remedy. This waiver by the parties hereto of any right either may have to a trial by jury has been negotiated and is an essential aspect of their bargain. Furthermore, Lessor and Lessee hereby knowingly, voluntarily and intentionally waive the right they may have to seek punitive, consequential, special and indirect damages from the other party and any of the affiliates, officers, directors, members, managers or employees of the other party or any of their successors with respect to any and all issues presented in any action, proceeding, claim or counterclaim brought by either of them against the other party or any of the affiliates, officers, directors, members, managers or employees of the other party or any of their successors with respect to any matter arising out of or in connection with this Lease or any document contemplated herein or related hereto. The waiver by Lessor and Lessee of any right they may have to seek punitive, consequential, special and indirect damages has been negotiated by the parties hereto and is an essential aspect of their bargain.

39.  **Securitizations and Other Transactions**. As a material inducement to Lessor's willingness to complete the transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (A) act or permit another Person to act as sponsor, settler, transferor or depositor of, or

a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (B) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 24.A of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (A) and (B) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization"). Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures and to use reasonable efforts to facilitate such Securitization, including without limitation, providing for inclusion in any prospectus or other Securities offering material such documents, financial and other data, and other information and materials which would customarily be required with respect to Lessee by a purchaser, transferee, assignee, servicer, participant, investor or rating agency involved with respect to such Securitization, and Lessee shall indemnify and hold harmless Lessor for any and all liabilities, losses and expenses arising under the Securities Act, or the Exchange Act, in connection with any material misstatement (or alleged misstatement) contained in such information provided in writing (including, without limitation, electronically) by Lessee or its officers, managers, members, employees, or agents, or any omission (or alleged omission) of a material fact by Lessee or its officers, managers, members, employees, or agents, the inclusion of which was necessary to make such written information not misleading, unless such material misstatement or alleged misstatement or omission or alleged omission is caused by Lessor or its directors, officers, managers, members, shareholders, employees, or agents. Lessee shall deliver to Lessor, any Affected Party and to any Person designated by Lessor, such statements and audit letters of reputable, independent certified public accountants pertaining to the written information provided by Lessee pursuant to this Section as shall be requested by Lessor or such Affected Party, as the case may be. Lessee also shall deliver to Lessor, any Affected Party and to any Person designated by Lessor or any Affected Party, such opinions of counsel (including without limitation, local counsel opinions), appraisals, environmental reports and zoning letters, or updates of any of the foregoing, as are customarily delivered in connection with Securitizations or as may be required by any rating agency in connection with any Securitization.

40.    **State-Specific Provisions.** The provisions and/or remedies which are set forth on the attached Exhibit E shall be deemed a part of and included within the terms and conditions of this Lease.

41.    **Performance at Lessee's Expense.** Lessee acknowledges and confirms that Lessor may impose certain minor administrative, processing or servicing fees in connection with (a) any extension, renewal, modification, amendment and termination of this Lease, (b) any release or substitution of Properties, (c) the procurement of certain consents, waivers and approvals with respect to the Properties, (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination, non-disturbance agreement, (e) the collection, maintenance and/or disbursement of reserves

created under this Lease or the other Transaction Documents, and (f) inspections required to make certain determinations under this Lease or the other Transaction Documents. Lessee further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Properties or any part thereof, if and to the extent required by law, regulation, Lessor or any Governmental Authority. Lessee hereby acknowledges and agrees to pay, immediately upon demand, all such fees, and any additional fees of a similar type or nature which may reasonably be imposed by Lessor from time to time in accordance with this Section 41.

42.   **Miscellaneous**.

A.   *Time Is of the Essence*.  Time is of the essence with respect to each and every provision of this Lease.

B.   *Waiver and Amendment*.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

C.   *Successors Bound*.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

D.   *Captions*.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

E.   *Severability*.  The provisions of this Lease shall be deemed severable.  If any part of this Lease shall be held unenforceable by any court of competent jurisdiction, the remainder shall remain in full force and effect, and such unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein.

F.   *Other Documents*.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the terms expressed in this Lease.

G.   *Entire Agreement*.  This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

H.    *Forum Selection; Jurisdiction; Venue; Choice of Law.*  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the State of Minnesota.  Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Minnesota in accordance with applicable law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  Nothing contained in this Section 42.H shall limit or restrict the right of Lessor to commence any proceeding in the federal or state courts located in the states where the Properties are located to the extent Lessor deems such proceeding necessary or advisable to exercise remedies available under this Lease.

I.    *Counterparts.*  This Lease may be executed in one or more counterparts, each of which shall be deemed an original.

43.    **Right of First Refusal/Third Party Offer.**

A.    *Offer.*  Subject to the terms and conditions set forth in this Section 43 (including, without limitation, the condition set forth in Section 43.C(i)(5) below), any time after the fourth anniversary of the Original Effective Date, if Lessor desires to sell any Property and receives a bona fide written offer from a third party which offer is in all respects acceptable to Lessor, Lessor shall deliver a complete copy of such bona fide third party offer to Lessee ("Third Party Offer").  Upon Lessee's receipt of such Third Party Offer from Lessor, and a written statement of Lessor's desire to sell the Property in accordance with such Third Party Offer, Lessee shall have the right to deliver an offer to Lessor ("Purchase Offer") to purchase Lessor's interest in any such Property for the amount of the bona fide third party offer to purchase such Property (the "Subject Purchase Price").  Lessee shall complete such purchase, subject to the satisfaction of each of the terms and conditions set forth in Section 43.B below.

B.    *Conditions Precedent.*

(i)    The purchase of Lessor's interest in a Property pursuant to Section 43.A shall be subject to the fulfillment of all of the following terms and conditions: (1) no Event of Default shall have occurred and be continuing under this Lease or other Transaction Documents; (2) Lessee or, at Lessee's discretion, the third party offeree shall have paid to Lessor the Subject Purchase Price, together with all Rental and other Monetary Obligations then due and payable under this Lease as of the date of the closing of such purchase; (3) in addition to payment of the Subject Purchase Price, Lessee shall have satisfied its obligations under Section 43.C below; (4) Lessee shall not have the right to deliver Purchase Offers until after the fourth anniversary of the Original Effective Date; and (5) the date of the closing of such purchase shall occur on the next scheduled Base Monthly Rental payment date following Lessor's receipt of the Purchase Offer.

(ii)    On the date of the closing of the purchase of a Property pursuant to this Section (the "Purchase Closing Date"), subject to satisfaction of the foregoing conditions: (1) this Lease shall be deemed terminated with respect to such Property only, and this Lease shall continue in full force and effect with respect to all of the other Properties; *provided, however,* such termination shall not limit Lessee's obligations to Lessor with respect to such Property under any indemnification provisions of this Lease (including, without limitation, Sections 12.D(v) and 15 of this Lease) and Lessee's obligations to pay any Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the Purchase Closing Date shall survive the termination of this Lease; (2) the Base Monthly Rental with respect to the remaining Properties shall be proportionately reduced based upon the values attributed to all of the Properties at the time of Lessor's acquisition of the Properties; and (3) Lessor shall convey such Property to Lessee or, at Lessee's request, the third party offeree "as is" by special warranty deed, subject to all matters of record (except for any consensual liens granted by Lessor other than those granted by Lessor at the request of Lessee), and without representation or warranty.

C.    *Costs.*  Lessee shall be solely responsible for the payment of all Costs resulting from any proposed purchase pursuant to this Section 43, regardless of whether the purchase is consummated, including, without limitation, to the extent applicable, the cost of title insurance and endorsements, including, survey charges, stamp taxes, mortgage taxes, transfer taxes and fees, escrow and recording fees, taxes imposed on Lessor as a result of such purchase, the attorneys' fees of Lessee and the reasonable attorneys' fees and expenses of counsel to Lessor.

D.    *Termination of Right.*  NOTWITHSTANDING ANYTHING TO THE CONTRARY, LESSEE'S RIGHTS UNDER THIS SECTION 43 SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT IF (i) LESSEE FAILS TO EXERCISE THE RIGHT GRANTED PURSUANT TO THIS SECTION 43, AND THE SALE TO THE THIRD PARTY PURCHASER IS CONSUMMATED; (ii) THIS LEASE TERMINATES OR THE LEASE TERM EXPIRES; (iii) THE PROPERTIES ARE SOLD OR TRANSFERRED PURSUANT TO THE EXERCISE OF A PRIVATE POWER OF SALE OR JUDICIAL FORECLOSURE OR ACCEPTANCE OF A DEED IN LIEU THEREOF; OR (iv) LESSEE SHALL BE IN DEFAULT OF ANY OF THE TERMS AND CONDITIONS OF THIS LEASE OR IF ANY CONDITION SHALL EXIST WHICH UPON THE GIVING OF NOTICE OR THE PASSAGE OF TIME, OR BOTH, WOULD CONSTITUTE A DEFAULT BY LESSEE UNDER THIS LEASE.  IN ANY SUCH EVENT, LESSEE SHALL EXECUTE A QUITCLAIM DEED AND SUCH OTHER DOCUMENTS AS LESSOR SHALL REASONABLY REQUEST EVIDENCING THE TERMINATION OF ITS RIGHT UNDER THIS SECTION 43.

E.    *Attornment.*  If Lessee does not deliver its Purchase Offer to purchase any of the Properties and such Properties are transferred to a third party purchaser, Lessee will attorn to any third party purchaser as Lessor so long as such third party purchaser

and Lessor notify Lessee in writing of such transfer. At the request of Lessor, Lessee will execute such documents confirming the agreement referred to above and such other agreements as Lessor may reasonably request, provided that such agreements do not increase the liabilities and obligations of Lessee hereunder.

F.    *Exclusions.* The provisions of this Section 43 shall not apply to or prohibit (i) any mortgages or other hypothecation of Lessor's interest in the Properties; (ii) any sale of the Properties pursuant to a private power of sale under or judicial foreclosure of any mortgage or other security instrument or device to which Lessor's interest in the Properties is now or hereafter subject; (iii) any transfer of Lessor's interest in the Properties to a mortgagee or other holder of a security interest therein or their designees by deed in lieu of foreclosure; (iv) any transfer of the Properties to any governmental or quasi governmental agency with power of Condemnation; (v) any transfer of the Properties to any Affiliate of Lessor; (vi) any transfers of interests in Lessor by any member, shareholder, partner or other owner to any other member, shareholder, partner or other owner; (vii) any transfers to any Person to whom Lessor sells all or substantially all of its assets; (viii) any transfers to any Person in connection with the transactions described in Section 23 of this Lease; or (ix) any transfer of the Properties to any of the successors or assigns of any of the Persons referred to in this Section 43.F.

G.    *Limitation on Transfer.* Notwithstanding the foregoing provisions of this Section 43, Lessee shall retain the right to approve/disapprove the sale, assignment, conveyance or transfer of all or any portion of the Properties, this Lease or any other Transaction Document, as set forth in Section 24.

**44.    Option to Purchase.** Lessee shall have the option to give Lessor notice (the "Option Notice") of Lessee's election to purchase (a) up to two (2) Properties a year during the Initial Term)(with a maximum of eight (8) properties during the Initial Term) and (b) up to three (3) Properties during each Extension Option for the greater of (x) its fair market value (which fair market value shall be determined in accordance with Section 20 above) or (y) 102% of Lessor's Total Investment (during the Initial Term), or 102% of Lessor's Total Investment (during any of the Extension Options). The closing for such purchase must occur within ninety (90) days following Lessor's receipt of the Option Notice if the required appraisal has been received and, if not, a day for day extension will be allowed until the appraisal is received.

Upon receipt of written request by Lessee, Lessor shall use its best efforts to provide short term financing to Lessee for the purchase contemplated in this Section. The terms of such financing shall be determined in Lessor's sole discretion; provided, however, such terms shall be commercially reasonable.

Upon exercise of this option, Lessor and Lessee shall open a new escrow account with a recognized title insurance company selected by mutual agreement of the parties. Such escrow shall be subject to the standard escrow instructions of the escrow agent, to the extent they are not inconsistent herewith. At or before the close of escrow, Lessor shall deliver to the escrow agent its limited warranty deed conveying to Lessee all of Lessor's right, title and interest in the Properties free and clear of all liens and encumbrances except liens for taxes and assessments and easements, covenants and restrictions of record which were attached to the Properties as of

the date hereof, attached during the term of the Lease through Lessee's action or inaction, as the case may be, have been granted by Lessor in lieu of a taking by the power of eminent domain or the like, or have been approved by Lessee. In the event Lessor is unable to convey title as required, Lessee shall have the right to accept such title as Lessor can convey or elect not to consummate its exercise of the option. Both Lessor and Lessee agree to execute a purchase agreement, escrow instructions and such other instruments as may be necessary or appropriate to consummate the sale of the Properties in the manner herein provided. All Costs incurred in connection with Lessee's exercise of the option, including, but not limited to, escrow fees, title insurance fees, recording costs or fees, reasonable attorneys' fees (including those of the Lessor), appraisal fees, stamp taxes and transfer fees shall be borne by Lessee. Lessee shall continue to pay and perform all of its obligations under this Lease until the close of escrow. The purchase price paid by Lessee in exercising this option shall be paid to Lessor or to such person or entity as Lessor may direct at closing in immediately available funds. The closing date may be extended for a reasonable period of time to permit Lessor to cure title defects or to permit either party to cure any other defects or defaults provided each party is diligently seeking to cure such defect or default and Lessee continues to perform its obligations hereunder. In the case of any mortgage or other monetary lien arising by, through or under Lessor (but not arising by, through or under Lessee), the escrow agent shall first apply the purchase price to the payment of such mortgage or monetary lien, and the balance shall be paid over to Lessor at closing.

Subsequent to the closing contemplated in this Section 44, the Lease with respect to the applicable Properties shall be deemed terminated and the Base Monthly Rental with respect to the remaining Properties shall be proportionately reduced based upon the values attributed to all of the Properties at the time of Lessor's acquisition of the Properties.

Lessee shall not have the right to exercise this option or consummate the exercise thereof if at the time of exercise or consummation (1) an Event of Default exists or is continuing; or (2) if Lessee has not yet paid, as a condition to closing, a pro-rata percentage of the Equipment Loan (as defined in the Purchase and Sale Agreement), based upon the individual purchase price allocated to the Property or Properties being purchased divided by $19,000,000 and multiplied by $2,000,000.

Lessee may not sell, assign, transfer, hypothecate or otherwise dispose of the option granted herein or any interest therein, except to an Affiliate or in conjunction with a permitted assignment of Lessee's entire interest herein and then only to the assignee thereof. Any attempted assignment of this option which is contrary to the terms of this Section shall be deemed to be an Event of Default under this Lease and the option granted herein shall be void.

Notwithstanding the foregoing, the purchase option described in this Section shall be null and void in the event that Lessor determines, in its sole and absolute discretion, that the sale of the Properties would cause Lessor to recognize income or gain from a "prohibited transaction" as defined under Section 857(b)(6) of the Internal Revenue Code of 1986, as amended

IN WITNESS WHEREOF, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**SPIRIT MASTER FUNDING, LLC**, a Delaware limited liability company

By:   Spirit SPE Manager, LLC, a Delaware limited liability company, its Manager

By: _~Sean Hufford~_

Printed Name: _SEAN HUFFORD_

Title: _VP_

STATE OF ARIZONA          )
                          ) ss.
COUNTY OF MARICOPA        )

The foregoing instrument was acknowledged before me on November 21, 2013 by _Sean Hufford_, as _VP_ of Spirit SPE Manager, LLC, a Delaware limited liability company, the Manager of **SPIRIT MASTER FUNDING, LLC**, a Delaware limited liability company, on behalf of the limited liability company.

_____
Notary Public

My Commission Expires

TANIA YOUNG
Notary Public - Arizona
Maricopa County
My Comm. Expires Mar 10, 2014

_[Signature page to Second Amended and Restated Master Lease Agreement]_

LESSEE:

**SKY VENTURES, LLC**, a Delaware limited
liability company

By:   BFI Ventures, LLC, a Minnesota limited
      liability company, Manager

By:
Printed Name: Lee J. Engler
Title: President
Tax Identification No. 41-1985514


STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF HENNEPIN          )


    The foregoing instrument was acknowledged before me on November 20th, 2013 by
Lee J. Engler, as President of BFI Ventures, LLC, a Minnesota limited liability company,
Manager of **SKY VENTURES, LLC**, a Delaware limited liability company, on behalf of the
company.

_____
Notary Public

My Commission Expires: 1/31/2013



WAYNE W. MARSHALL
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

*[Signature page to Second Amended and Restated Master Lease Agreement]*

3893266v1/22874-0079

## EXHIBIT A

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*ADA*" has the meaning set forth in Section 12.C.

"*Additional Rental*" has the meaning set forth in Section 4.C.

"*Adjustment Date*" means June 1, 2010, and every fifth (5th) anniversary thereafter during the Lease Term (including any Extension Term).

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls", "under common control with", and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Assignee*" has the meaning set forth in Section 24.B.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., as amended.

"*Base Annual Rental*" means $773,414.47.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*BSA*" means the Bank Secrecy Act (31 U.S.C. § § 5311 et. seq.), as amended.

"*Business Day*" means a day on which banks located in Scottsdale, Arizona are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Properties or arising from an adjoining property caused by fire, flood or other casualty.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Condemnation Award*" has the meaning set forth in Section 19.B.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 12% per annum or the highest rate permitted by law, whichever is less.

"*Early Termination Date*" has the meaning set forth in Section 18.C(ii)(1).

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means all federal, state and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of law in effect now or in the future and including all amendments, that relate to Hazardous Materials and/or the protection of human health or the environment and apply to Lessee and/or the Properties.

"*Environmental Liens*" has the meaning set forth in Section 12.D(i)(2).

"*Event of Default*" has the meaning set forth in Section 21.A.

"*Exchange Act*" has the meaning set forth in Section 32.B(iv).

"*Expiration Date*" has the meaning set forth in Section 3.

"*Extension Option*" has the meaning set forth in Section 3.

"*Extension Term*" has the meaning set forth in Section 3.

"*Force Majeure Event*" has the meaning set forth in Section 30.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Guarantor*" means Jeffrey Engler and Lee Engler, relating to the Equipment Loan.

"*Guaranty*" means that certain Unconditional Guaranty of Payment and Performance dated as of the date hereof between Guarantor and Lessor relating to the Equipment Loan.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants which pose a hazard to any of the Properties or to Persons on or about any of the Properties, cause any of the Properties to be in violation of any

local, state or federal law or regulation, (including without limitation, any Environmental Law), or are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", or words of similar import under any applicable local, state or federal law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to:   (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid laws; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or which may or could pose a hazard to the health and safety of the occupants of any of the Properties or the owners and/or occupants of any adjoining property.

"*Indemnified Parties*" means Lessor, and its directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 3.

"*Insolvency Event*" means (a) Lessee's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against Lessee (i) seeking to adjudicate it a bankrupt or insolvent; (ii) seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against Lessee, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) Lessee taking any corporate action to authorize any of the actions set forth above in this definition.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*" shall have the meaning described in Section 3.

"*Legal Requirements*" means the requirements of all present and future Laws (including without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations

thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to any of the Properties, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Properties, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Properties.

"*Lessee Entities*" means, collectively, Lessee, Sky Ventures Real Estate, LLC and BFI Ventures, LLC.

"*Lessor Entities*" means, collectively, Lessor and all Affiliates of Lessor.

"*Lessor's Total Investment*" means, with respect to any Property, the sum of (a) the gross purchase price paid for such Property by Lessor (or Lessor's predecessor-in-interest) (including, without limitation, any mortgage debt incurred or assumed in connection therewith), plus (b) the closing costs and expenses paid by Lessor (or Lessor's predecessor-in-interest) without reimbursement with respect to the purchase of such Property.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (i) any of the Properties, including, without limitation, the operation of any of the Properties as Permitted Facilities and/or the value of any of the Properties, (ii) Lessee's ability to perform its obligations under this Lease, or (iii) Lessor's interests in any of the Properties, this Lease or the other Transaction Documents.

"*Monetary Obligations*" means all Rental and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise, or (b) the entire proceeds of any insurance required under Section 10 payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*Notices*" has the meaning set forth in Section 25.

"*OFAC List*" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Legal Requirements, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"*Option Notice*" has the meaning set forth in Section 44.

"*Original Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Original Lease*" has the meaning set forth in the introductory paragraph of this Lease.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by (1) any of the Lessee Entities, and, or for the benefit of, (2) any of the Lessor Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents.

"*Partial Casualty*" has the meaning set forth in Section 18.B.

"*Partial Condemnation*" has the meaning set forth in Section 19.B.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials, that level or quantity of Hazardous Materials in any form or combination of forms which does not constitute a violation of any Environmental Laws.

"*Permitted Encumbrances*" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Properties as of the date of Lessor's acquisition thereof and those items which hereafter affect title as permitted under this Lease.

"*Permitted Facility*" means a retail restaurant and uses incidental thereto.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Price Index*" has the meaning set forth in Section 4.B.

"*Properties*" means, those parcels of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Purchase and Sale Agreement*" means that certain Purchase and Sale Agreement dated as of the date hereof between Lessor and Seller with respect to the Properties.

"*Purchase Closing Date*" has the meaning set forth in Section 43.B(ii).

"*Purchase Offer*" has the meaning set forth in Section 43.A.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Material, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials.

"*Rental*" means, collectively, the Base Annual Rental and the Additional Rental.

"*Rent Adjustment*" has the meaning set forth in Section 4.B.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of any of the Properties by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Securities*" has the meaning set forth in Section 39.

"*Securities Act*" has the meaning set forth in Section 32.B(iv).

"*Securitization*" has the meaning set forth in Section 39.A.

"*Seller*" means the Seller of the Properties, as identified in the Purchase and Sale Agreement.

"*Subject Purchase Price*" has the meaning set forth in Section 43.A.

"*Successor Lessor*" has the meaning set forth in Section 22.

"*Taking*" means (a) any taking or damaging of all or a portion of the Properties (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special, or (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding, or (iii) by any other means, or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the law applicable to the Properties.

"*Termination Notice*" has the meaning set forth in Section 18.C(ii).

"*Terrorism Laws*" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or

attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Third Party Offer*" has the meaning set forth in Section 43.A.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding any Property which may result from such Release.

"*Total Casualty*" has the meaning set forth in Section 18.C.

"*Total Condemnation*" has the meaning set forth in Section 19.C.

"*Transaction Documents*" means this Lease, the Purchase and Sale Agreement and all documents related thereto.

## EXHIBIT B

## LEGAL DESCRIPTION OF PROPERTIES

Attached hereto are the true and correct legal descriptions of the Properties.

**EXHIBIT A**
**(Property Description)**
**Clear Lake, IA**

Lot Two (2) in Interstate 35 Addition, Clear Lake, Cerro Gordo County, Iowa.

Hwy18
Clear Lake, IA 50428

# EXHIBIT

## LEGAL DESCRIPTION

A tract of land in Lot Fourteen (14) and Lot Twenty (20) in the subdivision of the Southwest Quarter (SW 1/4) of Section Twenty-five (25), Township Ninety-eight (98) North, Range Twenty-four (24) West of the Fifth Principal Meridian, Winnebago County, Iowa, Commencing at the Southeast Corner of the Southwest Quarter (SW 1/4) of Section 25; thence West along the South line of the SW 1/4 of said Section 25, a distance of 1432.00 feet; thence North 89.19 feet to the Northerly right of way of Iowa Highway No. 9 and the point of beginning; thence continuing North 300.31 feet; thence East 150.00 feet; thence South 320.94 feet to the Northerly right of way of Iowa Highway No. 9; thence Westerly along the Northerly right of way of Iowa Highway No. 9 and on a curve to the right with a central angle 9 degrees 35 minutes 50 seconds, a radius of 905.0 feet and an arc length of 151.59 feet to the point of beginning.

Winnebago County, Iowa

545 Hwy 9 E
Forest City, IA 50436

# EXHIBIT

## LEGAL DESCRIPTION

That part of the Southeast Quarter of Section Nineteen (19), Township One Hundred Twenty (120), Range Twenty-five (25), Wright County, Minnesota, described as follows: Commencing at a point on the West line of said Southeast Quarter distant 990.00 feet South of the Northwest corner of said Southeast Quarter; thence North 89 degrees 35 minutes 28 seconds East (assumed bearing) parallel with the North line of said Southeast Quarter, a distance of 199 42 feet; thence South 0 degrees 51 minutes 54 seconds West, a distance of 116 03 feet; thence South 54 degrees 24 minutes East, a distance of 100 27 feet to the actual point of beginning; thence continue South 54 degrees 24 minutes East, a distance of 80 44 feet; thence South 0 degrees 54 minutes 08 seconds West, a distance of 103.83 feet to the Northerly right of way line of Trunk Highway Number 55; thence North 89 degrees 35 minutes East along said Northerly right of way line, a distance of 137.00 feet to the Westerly right of way line of Trunk Highway Number 25, thence North 0 degrees 54 minutes 08 seconds East along said Westerly right of way line, a distance of 151 18 feet; thence South 89 degrees 35 minutes 28 seconds West, a distance of 203.15 feet to the point of beginning, according to the U.S Government Survey thereof.

Wright County, Minnesota
Abstract Property

1101 Hwy 25 N
Buffalo, MN 55313

# EXHIBIT

## LEGAL DESCRIPTION

Lots 1 and 2 and North 8 feet of Lot 3, Block 87, Columbia Heights Annex to Minneapolis, according to the recorded plat thereof.

Anoka County, Minnesota
Abstract Property

3854 N. Central Ave.
Columbia Heights, MN 55421

0990903

## 802872   EXHIBIT ·

### LEGAL DESCRIPTION

Lots Five (5) and Six (6), Block Twenty-three (23), Endion Division of Duluth, according to the recorded plat thereof, St. Louis County, Minnesota

Abstract Property

1918 London Rd.
Duluth, MN 55812

0990903

## 802872  EXHIBIT
### LEGAL DESCRIPTION

Lots Five (5) and Six (6), Block Twenty-three (23), Endion Division of Duluth, according to the recorded plat thereof, St. Louis County, Minnesota.

Abstract Property

5501 Grand Ave.
Duluth, MN 55808

# EXHIBIT

## LEGAL DESCRIPTION

That part of the Northeast 1/4 of the Southeast 1/4 of Section 34, Township 33, Range 26, Sherburne County, Minnesota described as follows: Commencing at the Southwest corner of said Northeast 1/4 of the Southeast 1/4; thence North 89 degrees 44 minutes 25 seconds East assumed bearing, along the South line of said Northeast 1/4 of the Southeast 1/4, a distance of 150.68 feet; thence North 0 degrees 31 minutes 09 seconds East a distance of 281.00 feet to the actual point of beginning; thence continue North 0 degrees 31 minutes 09 seconds East a distance of 329.00 feet; thence North 29 degrees 47 minutes 16 seconds East a distance of 96.48 feet to the Westerly right of way of U.S. Highway Number 169; thence South 16 degrees 40 minutes 16 seconds East along said right of way, a distance of 430.00 feet; thence South 89 degrees 44 minutes 25 seconds West, a distance of 174.27 feet to the point of beginning. Subject to an ingress and egress easement over the West 15.00 feet thereof, according to U.S. Government Survey, together with the appurtenant easements contained Document No. 222683.

Sherburne County, Minnesota
Abstract Property

260 Carson Ave.
Elk River, MN 55330

0990910

## EXHIBIT A
### (Property Description)
### Hibbing, MN

All of Lot 9 and all that part of Lot 8, Block 1, A.R.W. Addition to Hibbing which lies North and East of the following described line: Assuming the North boundary line of said Lot 8 to have a bearing North 85 degrees 32 minutes 31 seconds West and beginning at a point on the West boundary line of said Lot 8, 29.47 feet Southerly of the Northwest corner of said Lot 8; thence South 20 degrees 43 minutes 09 seconds East 67.79 feet to a point; thence South 82 degrees 50 minutes 07 seconds East 140.74 feet to a point on the East boundary line of said Lot 8 and there terminating, according to the recorded plat thereof, St. Louis County, Minnesota.

Together with the benefits of the easements contained in Document Nos. 448571 and 448573.

St. Louis County, Minnesota
Abstract Property

1101 37th St. East
Hibbing, MN 55746

**EXHIBIT A**
(Property Description)
Lakeville, MN

That part of Lot Six (6) Argonne Farms, according to the recorded plat thereof, described as follows:

Commencing at the Southeast corner of said Lot 6; thence along the South line of said Lot 6 on an assumed bearing of North 89 degrees 52 minutes 35 seconds West a distance of 256.87 feet to the point of beginning of the land to be described; thence North 0 degrees 07 minutes 25 seconds East a distance of 164.79 feet; thence Westerly a distance of 214.55 feet along a non-tangential curve concave to the South, said curve having a radius of 532.96 feet, a central angle of 23 degrees 03 minutes 54 seconds, a chord bearing of South 78 degrees 41 minutes 56 seconds West; thence Southerly a distance of 38.31 feet along a non-tangential curve concave to the East, said curve having a radius of 921.93 feet, a central angle of 2 degrees 22 minutes 51 seconds, a chord bearing of South 3 degrees 28 minutes 42 seconds East; thence South 4 degrees 40 minutes 05 seconds East, a distance of 68.51 feet; thence Southerly a distance of 18.18 feet along a tangential curve concave to the East, said curve having a radius of 539.96 feet, a central angle of 1 degree 55 minutes 38 seconds, a chord bearing of South 5 degrees 37 minutes 52 seconds East, to the South line of said Lot 6; thence South 89 degrees 52 minutes 35 seconds East, along the South line of said Lot 6, a distance of 199.10 feet to the point of beginning, according to the recorded plat thereof, Dakota County, Minnesota

Torrens Property
Torrens Certificate No. 123089

17305 Kenrick Ave.
Lakeville, MN 55044

# EXHIBIT

## LEGAL DESCRIPTION

All that part of the North Half (N ½) of Lot Forty-eight (48) of Auditor's Subdivision of Section 15, Township 126, Range 34 described as follows: Commencing at the intersection of the centerline of Main Street in Sauk Centre extended South with the East-West Quarter line of said Section 15; thence North along said centerline and extended line 827.95 feet; thence South 89 degrees 23 minutes East parallel with the South line of said N ½ of Lot 48 a distance of 41.25 feet to the West line of said Lot 48 for the point of beginning of the tract to be described; thence continue South 89 degrees 23 minutes East along said parallel line 220 feet; thence North parallel with said West line 165 feet; thence North 89 degrees 23 minutes West parallel with said South line 220 feet to said West line of Lot 48; thence South along said West line 165 feet to the point of beginning.

Stearns County, Minnesota
Abstract Property


1157 S. Main
Sauk Centre, MN 56378

**EXHIBIT A**
**(Property Description)**
**Sauk Rapids, MN**


**Lots 3, 4, 5 and 6, Block 80, in the Original Town of Sauk Rapids, according to the recorded plat thereof, Benton County, Minnesota.**

**Abstract Property**


319 N. Benton
Sauk Rapids, MN 56379

# EXHIBIT

## LEGAL DESCRIPTION

The Southerly 87 feet of Lots 1 and 2 and the Easterly 40 feet of the Southerly 87 feet of Lot 3, all in Block 1, North Shore Addition to Two Harbors.

Lake County, Minnesota
Abstract Property

1211 7th Ave.
Two Harbors, MN 55616

**EXHIBIT A**
(Property Description)
Woodbury, MN

7~~7~

Lot 1, Block 1, Eagle 4th Addition.

Together with the benefits of easements for ingress and egress and utilities filed as Document
No. 3459192.

Washington County, Minnesota
Abstract Property

ENTERED IN TRANSFER RECORD
WASHINGTON COUNTY, MINNESOTA
_June 17, 2005_
MOLLY F. O'ROURKE, AUDITOR-TREASURER
BY _____
DEPUTY
07.028.21.42.0009

1653 Weir Dr.
Woodbury, MN 55125

**786649**

**EXHIBIT A**
(Property Description)
Superior, WI

Lots Three (3), Four (4), Five (5), Six (6), Seven (7), Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13) and Fourteen (14) and the East One-half (E 1/2 ) of the vacated North-South alley adjoining on the West side of said lots, Block Forty-three (43), West Superior, First Division.

Douglas County, Wisconsin

623 Hammond Ave.
Superior, WI 54880

1404 East College Drive,
Marshall, MN

**Legal Description:**

Lot 3, Block 1, McFarland Addition, according to the recorded plat thereof, Lyon County, Minnesota, EXCEPT that part which lies South of line 1 and North of line 2 described below:

Line 1:
Beginning at a point on the west line of Section 3, Township 111 North, Range 41 West, which is 5.64 feet South of the West Quarter corner of said Section 3; thence Easterly on an azimuth of 90 degrees 54 minutes 10 seconds the direction is based on the Minnesota State Plane Coordinate System, South Zone, North American Datum of 1927, a distance of 1,426.34 feet; thence Easterly a distance of 177.38 feet along a tangential curve concave to the South, having a radius of 68,754.94 feet and a central angle of 0 degrees 08 minute 52 seconds; thence on an azimuth of 91 degrees 03 minutes 02 seconds, tangent to said curve, a distance of 3,794.40 feet to a point on the East line of said Section 3 which is 4.62 feet North of the East Quarter corner thereof.

Line 2:

Beginning at a point on the West boundary line of Lot 2, Block 1, McFarland's Addition to the City of Marshall, Lyon County, Minnesota, according to the recorded plat thereof, at a point 57 feet South of line 1; thence continuing East on a line parallel with Line 1 and 57 feet South of line 1 to a point known as Engineer's Station Number 832 plus 75; thence running Northeasterly on a straight line to a point 40 feet South of line 1, which point is 40 feet South of Engineer's Station Number 838 plus 00; thence proceeding Easterly on a line 40 feet South and parallel with line 1 to the East line of Lot 2, Block 4, McFarland's Addition to the City of Marshall, Minnesota, and thereby terminating.

Abstract Property

# EXHIBIT C

# WIRING INSTRUCTIONS

## AUTHORIZATION AGREEMENT
## PRE-ARRANGED PAYMENTS

Reference Number _____

I (We) (Tenant) authorize Midland Loan Services, Inc., (Servicer) to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ___/___/___. A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name_____Branch_____

City_____State_____Zip_____

— — — — — — — —    — — — — — — — — — — —

***Transit - ABA                    Account Number Information

ACCOUNT TYPE*** Please specify checking or savings account (C/S) _____

### PLEASE FILL IN BANK INFORMATION CAREFULLY
### ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non sufficient funds or stop payment item is charged against the servicer's account.

Tenant                                      Tax Identification
Name(s) _____Number _____

Date_____

Print Authorized Name _____

Authorized Signature _____

Print Authorized Name _____

Authorized Signature _____

Contact Phone Number _____ Fax Number _____

Email Address:_____

Return Original to:    Midland Loan Services, Inc.
                       Attn: Portfolio Servicing
                       PO Box 25965
                       Shawnee Mission, KS 66225-5965
                       Fax Number: (913) 253-9001

**EXHIBIT D**

**ENVIRONMENTAL DISCLOSURES**

None.

# EXHIBIT E

# STATE-SPECIFIC PROVISIONS

None.

**EXHIBIT F**

**DE-IDENTIFICATION REQUIREMENTS**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                            Chapter 11

Sky Ventures, LLC,                                Case No. 14-42107 (MER)

          Debtor.

---

## PROOF OF SERVICE

---

       I hereby certify that on June 13, 2014, I caused the following document:

    1.  OBJECTION OF SPIRIT MASTER FUNDING, LLC TO THE DEBTOR'S
       MOTION FOR AN ORDER (I) APPROVING SALE OF CERTAIN ASSETS,
       (II) APPROVING REVISION, ASSUMPTION, AND ASSIGNMENT OF
       SECOND AMENDED AND RESTATED MASTER LEASE AGREEMENT,
       AND (III) APPROVING PROPOSED COMPROMISE, OR, IN THE
       ALTERNATIVE, (IV) REJECTING THE SECOND AMENDED AND
       RESTATED MASTER LEASE AGREEMENT

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an

e-notice of electronic filing to all persons registered for electronic notice, including the United

States Trustee.

       I further certify that I sent the foregoing document via United States Mail, postage

prepaid, to the parties shown on the attached Chapter 11 Service List.

Dated:  June 13, 2014                             Respectfully Submitted,

                                        BALLARD SPAHR LLP

                                        By:  */e/ Craig Solomon Ganz*
                                        Craig Solomon Ganz (*Pro Hac Vice*)
                                        ganzc@ballardspahr.com
                                        1 East Washington Street, Suite 2300
                                        Phoenix, AZ 85004-2555
                                        Telephone:  (602) 798-5400
                                        Facsimile:  (602) 798-5595

Brent Weisenberg (*Pro Hac Vice*)
425 Park Avenue
New York, NY 10022
Telephone:  (646) 346-8041
Facsimile:  (212) 223-1942

-and-

Benjamin E. Gurstelle
bgurstelle@briggs.com
BRIGGS AND MORGAN, P.A.
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  (612) 977-8722
Facsimile:  (612) 977-8650

*Counsel for Spirit Master Funding, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                            Chapter 11

Sky Ventures, LLC,                                Case No. 14-42107 (MER)

       Debtor.

---

**CHAPTER 11 SERVICE LIST**

---

**See attached.**

Label Matrix for local noticing
0864-4
Case 14-42107
District of Minnesota
Minneapolis
Thu Jun 12 16:52:16 CDT 2014

Sky Ventures, LLC
5425 Boone Ave. N
New Hope, MN 55428-3614

Minneapolis
301 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415-1320

A Plus Outdoor Services
1551 164th Lane NE
Ham Lake MN 55304-5428

A+ SERVICES
4481 N FRONTAGE RD
ROCHESTER MN 55901-3236

AARON POHJOLA DBA AP SERVICES OF DULUTH
1806 W ARROWHEAD ROAD
DULUTH MN 55811-2259

ALPHA CONTAINER
4180 160TH STREET E
ROSEMOUNT MN 55068-2011

Allied Waste Services
9813 Flying Cloud Drive
Eden Prairie MN 55347-4006

Ameripride Linen & Apparel
6500 Saukview Drive
St. Cloud MN 56303-0804

Amy Cavallin
1640 Hwy 2
Two Harbors MN 55616-4017

Armor Security
2601 Stevens Avenue South
Minneapolis MN 55408-1635

Arrowhead Water Conditioning
1114 Cloquet Avenue
Cloquet MN 55720-1620

Asphalt Contractors Inc
PO Box 1656
Maple Grove MN 55311-6656

BRIGGS AND MORGAN
ATTN JASON R ASMUS
80 S EIGHTH ST
2200 IDS CTR
MINNEAPOLIS MN 55402

Bernick's - Pepsi of St. Cloud
PO Box 7008
St. Cloud MN 56302-7008

Border Foods, Inc.
5425 Boone Ave N
New Hope MN 55428-3614

Bryan Barth
c/o Nichols Kaster, PLLP
4600 IDS Ctr / 80 South 8th St
Minneapolis MN 55402

Business Music LTD
PO Box 71070
Charlotte NC 28272-1070

Business Music LTD Inc
PO Box 3013
Duluth MN 55803-3013

CARLSON REFRIGERATION
602 OGDEN AVENUE
SUPERIOR WI 54880-1013

CUSTOM CREATIONS REMODELING
1321 ANDOVER BLVD STE 112
ANDOVER MN 55304-2268

Centerpoint Energy - 4671
PO Box 1144
Minneapolis MN 55440-1144

Centurylink AZ
PO Box 52187
Phoenix AZ 85072-2187

Cintas #754
PO Box 88005
Chicago IL 60680-1005

City of Duluth Public Works
PO Box 169008
Duluth MN 55816-9002

City of Sauk Rapids
250 Summit Avenue North
Sauk Rapids MN 56379-2516

City of Woodbury - Utility
8301 Valley Creek Road
Woodbury MN 55125-2320

Cloquet Sanitary Services
1101 Industry Ave
Cloquet MM  55720-9496

Cozzini Bros. Inc.
350 Howard Avenue
Des Plaines IL 60018-1908

Cresco Times Plain Dealer
214 N Elm Street
PO Box 350
Cresco IA 52136-0350

DECA
DECA High School
1640 Hwy 2
Two Harbors MN 55616-4017

DELAGET LLC
6200 MINERAL POINT RD
SUITE 102
MADISON WI 53705-4583


Ecolab
PO Box 100512
Pasadena CA 91189-0512

Ecowater - Long Prairie
22 2nd St N. Ste 1
Long Prairie MN 56347-1254

GEOFF MICHAEL GROUP
1713 AVOCET LANE
MOUND MN 55364-1103


HYDRO RESTORATION
50 GLEN EDGE RD
DELLWOOD MN 55110-1418

Hansen Gravel
1305 South Grade Rd
Hutchinson MN 55350-9005

Hughes
PO Box 96874
Chicago IL 60693-6874


IPHFHA
7829 E ROCKHILL STREET STE 201
WICHITA KS 67206-3918

IPHFHA COOP
7830 E Rockhill Street Ste 201
Wichita KS 67206-3918

IPHFHA DMF
Digital Marketing Fund
7829 E Rockhill St Ste 201
Wichita KS 67206-3918


IQ Apparel
C/O Valley National Bank
PO Box 54249
Tulsa OK 74155-4249

Iowa Department of Revenue
Sales and Use Tax
1305 E Walnut, Hoover Bldg.
Des Moines IA 50319

JANE E HEATH ESQ
DUGGAN SMITH & HEATH LLP
560 HIGUERA ST STE B
SAN LUIS OBISPO CA 93401-3850


KFC
ATTN PYMT PROCESSING
PO BOX 116946
ATLANTA GA  30368 6946

KFC NATIONAL COUNCIL & ADVERTISING COOP
PO BOX 642474
PITTSBURGH PA 15264-2474

KFC ROYALTY
PO BOX 203805
DALLAS TX 75320-3805


KFC UPPER MIDWEST ADV ASSOC
ATTN: APRIL JOLLEY
C/O AFA KRAUSE
45 WEST 10000 SOUTH STE 201
SANDY UT 84070-3638

KFC YRSG HIRING ZONE
PO BOX 203805
DALLAS TX 75320-3805

KFC YRSG MERIT KFC
PO BOX 203805
DALLAS TX 75320-3805


Kai Steenhoek
c/o Nichols Kaster, PLLP
4600 IDS Ctr / 80 South 8th St
Minneapolis MN 55402

Kandi Mall
Kandi Mall Office
1065 South First Street
Willmar MN 56201

Kandi Mall 1999, LLC
Kandi Mall Office
1065 South First Street
Willmar MN 56201


LAKE REGION ELECTRIC
4601 113TH AVENUE NE
SPICER MN 56288-9460

LEGEND MECHANICAL
12467 BOONE AVENUE STE 1
SAVAGE MN 55378-1283

MACGILLIVRAY RANCH LLC
225 LOS ROBLES
TEMPLETON CA 93465-9002


MATTHEW C HELLAND ESQ
NICHOLS KASTER LLP
ONE EMBARCADERO CTR STE 720
SAN FRANCISCO CA 94111-3612

MATTHEW H. MORGAN ESQ
4600 IDS CENTER
80 SOUTH 8TH STREET
MINNEAPOLIS MN 55402-2100

MEIER ELECTRIC INC OF MARSHALL
1004 W MAIN ST
PO BOX 455
MARSHALL MN 56258-0455

MTG
8555 123RD STREET WEST
SAVAGE MN 55378-1150

McLane Foodservice, Inc.
2085 Midway Road
Carrollton TX 75006-5063

Mesabi Sign Co., Inc.
116 1st St. North
Virginia MN 55792-2502


Miles Warren
c/o Nichols Kaster, PLLP
4600 IDS Ctr / 80 South 8th St
Minneapolis MN 55402

Minnesota Conway Fire and Safety
575 Minnehaha Ave W
St. Paul MN 55103-1573

Minnesota Dept of Revenue
Sales and Use Tax
600 North Robert Street
Saint Paul MN 55101-2228


Minnesota Power & Light
PO Box 1001
Duluth MN 55806-1001

North American Electric
Jeff Hendrickson
6315 Long Lake Road
Chisholm MN 55719-8062

One System POP
PO Box 644361
Pittsburgh PA 15264-4361


PAR TECH INC
PO BOX 301175
DALLAS TX 75303-1175

PEPSI 75948
PO BOX 75948
CHICAGO IL 60675-5948

PH Minnesota, LLC
5425 Boone Ave N
New Hope MN 55428-3614


PIZZA HUT C/O WILLIAM EVANOFF
SIDLEY AUSTIN LLC
1 S DEARBORN ST
CHICAGO IL 60603-2323

PIZZA HUT INC ST LOUIS/YRSG
PO BOX 955641
ST LOUIS MO 63195-5641

PIZZA HUT OF AMERICA, INC.
CO JOHN J. MURPHY
7100 CORPORATE DRIVE
PLANO TX 75024-4100


PIZZA HUT OF AMERICA, INC.,
c/o JOHN J. MURPHY
14841 DALLAS PARKWAY
DALLAS TX 75254-7558

PRAXAIR DISTRIBUTION INC
DEPT CH 10660
PALATINE IL 60055-0660

Pinnacle Food Service Repair LLC
735 S Ugstad Rd
Proctor MN 55810-2450


QUIKORDER INC
351 WEST HUBBARD STREET STE 501
CHICAGO IL 60654-4498

ROYAL ROOFING
PO BOX 248
MONTICELLO MN 55362-0248

Restaurant Supply Chain Solutions
PO Box 32033
Louisville KY 40232-2033


SPIRIT MASTER FUNDING LLC
ATTN COMPLIANCE DEPT
16767 N PERIMETER DR STE 210
SCOTTSDALE AZ 85260-1062

SPIRIT REALTY CAPITAL
16767 N PERIMETER DRIVE
SUITE 210
SCOTTSDALE AZ 85260-1062

SRSI / Floyd Total Security
9036 Grand Avenue S
Bloomington MN 55420-3634


SUMMIT FACILITY & KITCHEN SERV LLC
8818 7TH AVENUE N
GOLDEN VALLEY MN 55427-4315

Shoes for Crews
250 South Australian Ave
West Palm Beach FL 33401-7437

Sky Ventures Real Estate, LLC
5425 Boone Ave N
New Hope MN 55428-3614


Summit Facility & Kitchen Serv
PO Box 1575 #159
Minneapolis MN 55480-1575

Super 8 Alexandria
4620 Hwy 29 South
Alexandria MN 56308-2911

TACO BELL CORP PO BOX 116946
ATTN PYMT PROCESSING
PO BOX 116946
ATLANTA GA 30368-6946

TH Contracting
PO Box 5092
Grand Rapids MN 55744-5092

TRUE1 ELECTRIC
PO BOX 346
ROCKWELL IA 50469-0346

Tourism Tax - City of Duluth
Treasurer's Office
411 W. 1st St
Duluth MN 55802-1188


Turf and Tree Inc
32179 South Shoal Lake Road
Grand Rapids MN 55744-4659

UFPC Parts Connection
NW 5848
PO Box 1450
Minneapolis MN 55485-5848

UFPC SMALLWARES CONNECTION
PO BOX 73184
CLEVELAND OH 44193-0002


US Trustee
1015 US Courthouse
300 S 4th St
Minneapolis, MN 55415-3070

Wisconsin Dept. of Revenue
Sales and Use Tax
2135 Rimrock Road
Madison WI 53713-1443

XCEL ENERGY - MPLS MN
PO BOX 9477
MINNEAPOLIS MN 55484-9477


Craig S Ganz
Ballard Spahr LLP
1 East Washington St
Ste 2300
Phoenix, AZ 85004-2555

Daniel C. Beck
Winthrop & Weinstine PA
225 S 6th Street
Suite 3500
Minneapolis, MN 55402-4629

Douglas S Draper
Heller Draper Patrick & Horn LLC
650 Poydras ST STE 2500
New Orleans, LA 70130-6175


Greta M Brouphy
Heller Draper Patrick & Horn LLC
650 Poydras ST STE 2500
New Orleans, LA 70130-6175

Jacob B. Sellers
Winthrop & Weinstine P A
225 S 6th St
Ste 3500
Minneapolis, MN 55402-4629

Leslie A Collins
Heller Draper Patrick & Horn LLC
650 Potdras ST STE 2500
New Orleans, LA 70130-6175


Ralph Mitchell
Lapp Libra Thomson Stoebner & Pusch
One Financial Plaza Suite 2500
120 S 6th St
Minneapolis, Mn 55402-1803

Thomas C Geelan
Farm & Home Services
220 E State St
Algona, IA 50511-2736